# NO. 23-1475

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

US BANK N.A., as Trustee for the Registered Holders of the Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11,

Plaintiff-Appellee,

v.

### MASOUD SHAKOORI-NAMINY,

Defendant-Appellant.

BRENDA SHAKOORI-NAMINY; SAND CANYON CORPORATION; WILMINGTON TRUST, NA, as Successor Trustee to Citibank, N.A., as Trustee for Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1; HERITAGE CONCRETE CORP.; FIREPLACE LLC; STEPHEN E. MOTTAU; HALLINAN CAPITAL CORPORATION; SAND CANYON CORPORATION

Defendants

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## L.T. CASE NO. 1:17-CV-00394-WES

## SUPPLEMENTAL APPENDIX

Marissa I. Delinks, Bar Id. 111180
Samuel C. Bodurtha, Bar Id. 1171902
Hinshaw & Culbertson LLP
53 State Street, 27th Floor
Boston, MA 02109
Tel: 617-213-7000/Fax: 617-213-7001
mdelinks@hinshawlaw.com
sbodurtha@hinshawlaw.com

*Attorneys for Plaintiff-Appellee*

# SUPPLEMENTAL APPENDIX

Exhibit 1 (note) to Complaint filed on August 25, 2017.................. SA001

Exhibit 1 (note) to Amended Complaint
filed March 27, 2019 (ECF 26) ......................................................... SA006

Plaintiff's Opposition to Deft. Naminy's Motion in Limine [57]
and Motion for Default Judgment
dated March 17, 2022 (ECF 60) ....................................................... SA011

Defendant's Post Trial Memorandum
filed July 8, 2022 (ECF 87) .............................................................. SA032

Plaintiff's Memorandum of Law In Support of Opp to Deft's Motion for
New Trial and to Alter and Amend the Judgment
dated January 27, 2023 (ECF 95) ..................................................... SA083

Trial Transcript - Day 1, April 5, 2022 ........................................... SA098

Trial Transcript – Day 2, April 18, 2022......................................... SA126

1062758\321321286.v1

# EXHIBIT

# 1

Loan Number: ▮▮▮▮▮    Servicing Number: ▮▮▮▮▮    Date: 7/16/03

## ADJUSTABLE RATE NOTE
### (LIBOR Index – Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

1541  TEN ROD ROAD,  EXETER, RI 02822-1910
[Property Address]

1.  **BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S.    $315,400.00    (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
Option One Mortgage Corporation, a California Corporation
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.  **INTEREST**
    Interest will be charged on unpaid principal until the full amount of principal has been paid. Interest will be calculated on the basis of a 12-month year and a 30-day month. I will pay interest at a yearly rate of    7.850%    . The interest rate I will pay may change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.  **PAYMENTS**
    **(A) Time and Place of Payments**
    I will pay principal and interest by making payments every month.
    I will make my monthly payments on the first day of each month beginning on    September 01 ,2003
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on,    August 01    ,2033    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at    Option One Mortgage Corporation
Department 7821 Los Angeles, CA  90084-7821
or at a different place if required by the Note Holder.
    **(B) Amount of My Initial Monthly Payments**
    Each of my initial monthly payments will be in the amount of U.S.    $2,281.40    . This amount may change.
    **(C) Monthly Payment Changes**
    Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.
    **(D) Application of Payments**
    Payments received by the Note Holder will be applied in the following order: (i) prepayment charges due under this Note; (ii) amounts payable under paragraph 2 of the Security Instrument (defined below); (iii) interest due under this Note; (iv) principal due under this Note; and (v) late charges due under this Note.

4.  **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the first day of    August 01    ,2005    , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
    **(B) The Index**
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
    **(C) Calculation of Changes**
    Before each Change Date, the Note Holder will calculate my new interest rate by adding    FIVE AND 15/100    percentage point(s) (    5.150%    ) to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
    The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

RHODE ISLAND ADJUSTABLE RATE NOTE-LIBOR INDEX – Single Family
Page 1 of 3                                                    RINT0021 (06/19/98)

M·S·

SA 002

Loan Number: ████████    Servicing Number: ████████    Date: 7/16/03

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than     10.850%     or less than     7.850%     . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than     13.850%     or less than     7.850%     .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.     BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due, together with accrued interest. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

If within     12 Months     from the date of execution of the Security Instrument I make a full prepayment or a partial prepayment, I will at the same time pay to the Note Holder a prepayment charge if authorized by state law. The prepayment charge will be equal to two percent (2%) of the balance due at date of such pay-off. In no event will such a charge be made if it violates state or federal law.

**6.     LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7.     BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of     15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     6.000%     of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount, together with any other charges that I owe under this Note or the Security Instrument, except as otherwise required by applicable law.

**(C) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law, whether or not a lawsuit is filed. Those expenses include, for example, reasonable attorneys' fees.

**8.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

*M. S.*

RINT6022 (06/19/98)

SA 003

Loan Number: ░░░░░░░░    Servicing Number: ░░░░░░░░    Date: 7/16/03

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)     _____ (Seal)
MASOUD    SHAKOORI-NAMINY            -Borrower                                          -Borrower

_____ (Seal)     _____ (Seal)
witness                                  -Borrower                                          -Borrower

_____ (Seal)     _____ (Seal)
                                         -Borrower                                          -Borrower

[Sign Original Only]

Page 3 of 3                                                              RINT0023 (06/19/98)

SA 004

Loan Number: ▮▮▮▮▮▮   Servicing Number: ▮▮▮▮▮▮▮   Date: 07/16/03

# ALLONGE TO NOTE
## (INVESTOR)

This allonge makes reference to the following Note:

Borrowers: MASOUD  SHAKOORI-NAMINY
Loan #: ▮▮▮▮▮▮
Property Address: 1541  TEN ROD ROAD,  EXETER, RI 02822-1910
Loan Amount: $315,400.00

Note Date: 07/16/03

Therefore, in reference to the captioned note, the following applies:

Pay to the order of:

Without Recourse

Option One Mortgage Corporation
A California Corporation

By: _____
Mary Conway
Assistant Secretary

Page 1 of 1                                          USD3050.wp (03-14-03)

SA 005

# EXHIBIT 1

Loan Number: ▮▮▮▮▮▮    Servicing Number: ▮▮▮▮▮▮    Date: 7/16/03

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)



THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

1541  TEN ROD ROAD,  EXETER, RI 02822-1910
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S.    $315,400.00          (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
Option One Mortgage Corporation, a California Corporation
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**
Interest will be charged on unpaid principal until the full amount of principal has been paid. Interest will be calculated on the basis of a 12-month year and a 30-day month. I will pay interest at a yearly rate of    7.850%          . The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**
**(A) Time and Place of Payments**
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on    September 01 ,2003          . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on,
August 01    ,2033          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at    Option One Mortgage Corporation
Department 7821 Los Angeles, CA  90084-7821
or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S.    $2,281.40          . This amount may change.
**(C) Monthly Payment Changes**
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.
**(D) Application of Payments**
Payments received by the Note Holder will be applied in the following order: (i) prepayment charges due under this Note; (ii) amounts payable under paragraph 2 of the Security Instrument (defined below); (iii) interest due under this Note; (iv) principal due under this Note; and (v) late charges due under this Note.

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of    August 01    ,2005          , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding
FIVE AND 15/100    percentage point(s) (    5.150%    )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

*McS·*

SA 007

Loan Number: ████████    Servicing Number: ████████    Date:  7/16/03

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    10.850%    or less than    7.850%    . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than    13.850%    or less than    7.850%    .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due, together with accrued interest. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

If within    12 Months    from the date of execution of the Security Instrument I make a full prepayment or a partial prepayment, at the same time pay to the Note Holder a prepayment charge if authorized by state law. The prepayment charge will be equal to two percent (2%) of the balance due at date of such pay-off. In no event will such a charge be made if it violates state or federal law.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    6.000%    of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount, together with any other charges that I owe under this Note or the Security Instrument, except as otherwise required by applicable law.

**(C) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law, whether or not a lawsuit is filed. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Page 2 of 3   *M·S·*

RINT6022 (06/19/98)

SA 008

Loan Number: ▓▓▓▓▓    Servicing Number: ▓▓▓▓▓    Date: 7/16/03

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
MASOUD  SHAKOORI-NAMINY          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
witness                          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

[Sign Original Only]

Page 3 of 3                                                      RINT0023 (06/19/98)

SA 009

Loan Number: ▉▉▉▉▉▉   Servicing Number: ▉▉▉▉▉▉   Date: 07/16/03

# ALLONGE TO NOTE
## (INVESTOR)

This allonge makes reference to the following Note:

Borrowers: MASOUD   SHAKOORI-NAMINY
Loan #: ▉▉▉▉▉▉
Property Address: 1541   TEN ROD ROAD,   EXETER, RI 02822-1910
Loan Amount: $315,400.00

Note Date: 07/16/03

Therefore, in reference to the captioned note, the following applies:

Pay to the order of:

                                        Without Recourse

Option One Mortgage Corporation
A California Corporation

By: _____
        Mary Conway
    Assistant Secretary

USD3050.wp (03-14-03)

SA 010

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| U.S. BANK N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF THE STRUCTURED ASSET SECURITIES CORPORATION, STRUCTURED ASSET INVESTMENT LOAN TRUST, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2003-BC11, | |
| Plaintiff, | |
| v. | C.A. No. 17-CV-00394-WES-LDA |
| MASOUD SHAKOORI-NAMINY a/k/a MASOUD SHAKOORI, BRENDA SHAKOORI-NAMINY, and SAND CANYON CORPORATION, | |
| Defendants. | |

**PLAINTIFF'S RESPONSE TO MASOUD SHAKOORI-NAMINY'S MOTION IN LIMINE AND MOTION FOR DEFAULT JUDGMENT (ECF NO. 57)**

**INTRODUCTION**

Defendant, Masoud Shakoori-Naminy a/k/a Masoud Shakoori ("Shakoori" or "Defendant") pursues a discovery motion on the eve of trial that is riddled with falsities and omissions in an effort to avoid this lawsuit and the enforcement of a mortgage loan in default for over ten years. The actual facts and travel of discovery demonstrate that Shakoori was not precluded from receipt or review of any single piece of evidence that Plaintiff, U.S. Bank, N.A., as Trustee for the Register Holders of the Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BV11's ("U.S. Bank, as Trustee" or "Plaintiff") intends to present at trial. Moreover, Shakoori's complaints over the admission of four assignments of mortgage, and the irrelevant documents he intends to produce that are subject of U.S. Bank, as Trustee's Motion in Limine (ECF No. 50)

misunderstand the very nature of this case: a complaint to establish the equitable assignment of mortgage when relief on title is unavailable. Reviewing the relief that U.S. Bank, as Trustee pursues in this lawsuit, and the discovery effort undertaken by U.S. Bank, as Trustee's current counsel demonstrate that the Court should deny Shakoori's motion.

## <u>LEGAL ARGUMENT</u>

<u>Shakoori Presents no Valid Basis under Fed. R. Civ. P. 37 to Sanction U.S. Bank, as Trustee</u>

Fed. R. Civ. P. 37 provides a mechanism for a party seeking discovery to obtain court order compelling production and pursuing further orders of sanctions in the event discovery is not received to the prejudice of that party's case. There is no decision in this district or the First Circuit that supports dismissal of suit on a motion to compel. As for the preclusion of evidence, this Court has previously concluded that disclosures or supplemental responses that are made much too close to trial may be precluded. *Bowling v. Hasbro, Inc.*, C.A. No. 05-2295, 2007 U.S. Dist. LEXIS 83882 at *6 (D.R.I. Nov. 2, 2007). The course of discovery in this case does not warrant the imposition of any sanction because Shakoori demonstrates no prejudice in the receipt of documents or information and instead pursues false and inflammatory claims that "Plaintiff essentially provided no discovery to Defendant."

Shakoori claims that "Plaintiff absolutely refused to provide documents which it now seeks to introduce into evidence" including the October 1, 2003 documents demonstrating the transfer of Shakoori's loan into the Trust for which U.S. Bank presently serves as trustee. (ECF No. 57 at p. 32.) First, any delay in the production of documents, responses to interrogatories or responses to requests for admission by undersigned counsel resulted from an ongoing effort to settle this case. The Court is well aware of the efforts pursued by U.S. Bank, as Trustee to resolve this case through a mediation with Berry Mitchell, that the case was referred to Dr. Mitchell on June 28, 2021, that Dr. Mitchell convened several mediation sessions but was unable

1019463\310301663.v1

SA 012

to resolve the dispute at which time the case returned to the trial calendar in November of 2021. Even before the Court referred the case to mediation, U.S. Bank, as Trustee undertook every effort to settle this case beginning with a loan modification offer presented August 5, 2019 and extending through a modification and discounted payoff offer made in January of 2021. U.S. Bank, as Trustee has clearly indicated to the Court and to Shakoori's counsel that every effort should and would be undertaken to resolve this case with a settlement, and those settlement efforts have occupied the parties' time for the better portion of this case.

Contrary to Shakoori's various assertions of U.S. Bank, as Trustee's refusal to produce documents, all discovery that is now submitted as an exhibit for trial was produced in a timely fashion that afforded Shakoori every opportunity for review in preparation for this trial:

Shakoori claims that he has been refused access to the trust documents. This claim simply is not true. On multiple occasions, Shakoori has received copies of the October 1, 2003 loan transaction documents. Excerpts from the Trust Agreement (*Exhibit J*) were attached to U.S. Bank, as Trustee's March 27, 2019 Amended Complaint as Exhibit 3. (ECF NO. 26-4.) Exhibit 3 to the Amended Complaint referred Shakoori to the U.S. Securities and Exchange Commission website (EDGAR) for purposes of locating all documents that the Trust submitted in regular reporting and listed the very same October 1, 2003 documents that U.S. Bank, as Trustee intends to submit as evidence in this case. (ECF No. 26-4 at pp. 2, 4-5.) In advance of the Court's December 20, 2021 calendar car, counsel for both parties conferenced to discuss discovery in this case.[1] In response to that discussion, U.S. Bank, as Trustee agreed to produce supplemental documents and produced documents piecemeal in supplement to discovery. (December 13, 2021 E-mail Correspondence, *Exhibit A*.) Following the conference, U.S. Bank, as Trustee produced

---

[1] U.S. Bank, as Trustee's counsel proposed the conference. Shakoori's counsel had not previously proposed a conference to discuss outstanding discovery.

1019463\310301663.v1

SA 013

series of documents that included, among other items: (1) Execution Copy of Pooling and Servicing Agreement; (2) Execution copy of Assignment Agreement Between Lehman Brothers Bank, FSB and Lehman Brothers Holdings, Inc.; and (3) Mortgage Loan Sale and Assignment Agreement between Lehman Brothers Holdings and Structured Asset Securities Corp. (*Id*.) U.S. Bank, as Trustee produced copy of the redacted transaction history by e-mail on January 18, 2022 (January 18, 2022 Email Correspondence, *Exhibit B*.)

The December 13, 2021 and January 18, 2022 delivery of documents are one of several supplements to production that U.S. Bank, as Trustee's counsel sent to Shakoori's counsel via e-mail in December of 2021 and in January of 2022 as part of U.S. Bank, as Trustee's ongoing and good faith effort to provide all documents in support of their case. These communications reject Shakoori's claim that U.S. Bank, as Trustee "refused to provide any documents which it now seeks to introduce." (ECF No. 57 at p. 32.) U.S. Bank, as Trustee, by and through undersigned counsel, have provided all of the documents they seek to introduce as exhibits at this trial, have worked with Shakoori's counsel to ensure that he had received all documents and that he had ample time to review the documents prior to trial. In truth, Shakoori's counsel has had years to review the trust documents available through EDGAR and nearly three months with the actual documents U.S. Bank, as Trustee seeks to introduce sitting in counsel's inbox.

Shakoori likewise claims that he has been denied access to the collateral file. (ECF No. 57 at p.  .) Once again, this claim relies on false assertions. Shakoori's counsel, and Shakoori's expert, Emily Will, reviewed the collateral file for the loan in question in person at undersigned counsel's office on August 20, 2021. (August 20, 2021 E-mail Correspondence to Berry Mitchell, *Exhibit C*.) Despite a complete review of the collateral file, neither Shakoori nor his counsel followed up with U.S. Bank, as Trustee with any report or further requests on the

1019463\310301663.v1

originating documents until filing the instant motion seeking to exclude the promissory note from admission into evidence. Instead, Shakoori and his counsel believe that there are custodial records and indices that demonstrate the transfer and possession of the note, as well as all other documents in the collateral file that U.S. Bank, as Trustee refuse to produce. U.S. Bank, as Trustee, however, has responded to all of these discovery requests that there are no custodial receipts for Shakoori's loan, and that the face of the Promissory Note and Allonge produced by copy to Shakoori and by original through review, indicates all dates and information applicable to the date the Note was indorsed and who indorsed the note. (U.S. Bank, as Trustee's Supplemental Response to Request for Production and Interrogatories, *Exhibit D*.) Shakoori's motion complains about documents that his counsel and expert have reviewed in addition to documents and information that simply do not exist.

No document that U.S. Bank, as Trustee intends to introduce as an exhibit at trial of this case has been withheld from Shakoori. Instead, U.S. Bank, as Trustee has provided copies of each and every document to Shakoori's counsel with ample time for review prior to the April 4 trial date (and prior to the original trial date of March 7, 2022). No grounds exist for this Court to dismiss the case. No grounds exist for the Court to provide Shakoori any relief under Rule 37 because Shakoori has not identified any prejudice in any delay on the production of documents or response to interrogatories. The course of pleadings and motions filed in this case demonstrate that Shakoori's counsel has waited until the very last minute to file any motions in this case, and this Court should not reward Shakoori's belated filings with any relief in this case.

<u>Shakoori's Claims regarding the Assignments of Mortgage Misinterpret U.S. Bank, as Trustee's Case and Pursuit of Equitable Relief</u>

Shakoori's Motion in Limine mistakenly presumes that U.S. Bank, as Trustee is pursuing a claim to enforce the mortgage by and through the assignments of mortgage recorded in the

1019463\310301663.v1

SA 015

chain of title. (Motion in Limine, ECF No. 57 at pp. 2-15.) U.S. Bank, as Trustee's Conclusions of Law and Findings of Fact demonstrate that plaintiff's case seeks to obtain an equitable assignment of mortgage in the absence of valid and enforceable assignments of mortgage. (Plaintiff's Proposed Findings of Fact, ECF No. 53.) Plaintiff's Proposed Findings of Fact demonstrates an effort to show "Attempts to Assign Mortgage Loan" and includes facts concerning the assignments of mortgage that Shakoori objects to and opposes. (*Id.* at pp. 6-7.) These facts are proposed not to prove up U.S. Bank, as Trustee's request for equitable assignment but instead to demonstrate the source and reason for U.S. Bank, as Trustee's request for equitable assignment. In Plaintiff's Proposed Conclusions of Law, U.S. Bank as Trustee details the legal requirements necessary to obtain equitable relief, to prove an equitable assignment of mortgage, to prove ownership of a mortgage beyond the assignments and to prove possession of a promissory note in support further support of ownership of the mortgage. (*Id*. at pp. 9-10.)

Shakoori continues to press objection to the assignments of mortgage in an effort to void U.S. Bank, as Trustee's mortgage interest by challenging execution and notarization of the assignment of mortgage. U.S. Bank, as Trustee previously moved to exclude the exhibits Shakoori intends to introduce in order to void the assignments because none of the documents are relevant to an assignment challenge. (Memorandum of Law in Support of U.S. Bank, as Trustee's Motion in Limine, ECF No. 51.) More importantly, U.S. Bank, as Trustee opposed admission of Shakoori's evidence because the documents are utilized in order to call into question the validity of record title on the actual assignments of mortgage, but U.S. Bank, as Trustee is requesting a court ordered assignment in equity based upon evidence of the actual

1019463\310301663.v1

transfer of the mortgage loan from Option One Mortgage Corporation into the trust and the undisputed fact that U.S. Bank, as Trustee holds the Note. (*Id.*)

Shakoori is confused in believing that U.S. Bank, as Trustee is pursuing an order of this Court on the assignments of mortgage. No such relief is sought, the record title assignments of mortgage are not relevant to U.S. Bank, as Trustee's pursuit of equitable assignment of mortgage, and Shakoori raises no valid challenge on the objections to the recorded assignments. To the extent Sharkoori continues to insist that exclusion of the record title assignments is necessary, U.S. Bank, as Trustee will agree to withdraw the proposed findings of fact and proposed exhibits concerning the attempted assignments of mortgage.

## <u>CONCLUSION</u>

For the reasons stated above, U.S. Bank, as Trustee respectfully requests that this Court deny Shakoori's motion to dismiss this case and request to exclude evidence that was produced to Shakoori's counsel and is relevant to U.S. Bank, as Trustee's equitable assignment claim.

Respectfully submitted:

U.S. BANK N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF THE STRUCTURED ASSET SECURITIES CORPORATION, STRUCTURED ASSET INVESTMENT LOAN TRUST, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2003-BC11

By: Its Attorney

/s/ *Samuel C. Bodurtha*
Samuel C. Bodurtha, Bar No. 7075
HINSHAW & CULBERTSON LLP
56 Exchange Terrace, 5th Floor
Providence, RI  02903
Tel: 401-751-0842/Fax: 401-751-0072
Email: sbodurtha@hinshawlaw.com

Dated:    March 17, 2022

1019463\310301663.v1

SA 017

**CERTIFICATE OF SERVICE**

I, Samuel C. Bodurtha, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 17, 2022.

/s/ *Samuel C. Bodurtha*
Samuel C. Bodurtha, Bar #7075

1019463\310301663.v1

SA 018

# EXHIBIT B

A3093\306083941.v1

| | |
|---|---|
| **From:** | Bodurtha, Samuel C. |
| **To:** | John Ennis (jbelaw75@gmail.com) |
| **Cc:** | Burk, Jamal D. |
| **Subject:** | Naminy: Additional Production |
| **Date:** | Tuesday, January 18, 2022 9:37:12 AM |
| **Attachments:** | Naminy - Option One.pdf |
| | Naminy - 4325-SAIL 2003-BC11 - MLS.pdf |
| | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.jpg |

Hi John:

We did not hear back from you on how you want the loan schedules delivered. So, we have redacted all other loans and included the headers for each spreadsheet in this supplemental production. If you require more information out of the loan schedules, please let us know.

Many thanks,
Sam

**Samuel C. Bodurtha**
**Hinshaw & Culbertson LLP**

SBodurtha@hinshawlaw.com
My Bio | hinshawlaw.com

*Boston Office*
53 State Street, 27th Floor, Boston, MA 02109
**O:** 617-213-7039 | **F:** 617-249-0245

*Providence Office*
56 Exchange Terrace, 5th Floor, Providence, RI 02903
**O:** 401-751-0842 | **F:** 401-751-0072

**Follow us on**    

Hinshaw & Culbertson LLP

SA 020

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | DEAL | LOANID | ALOANID | SLOANID | ORIGINATOR | SERVICER | CURBAL |
| 2854 | | | | | | | |
| 2855 | | | | | | | |
| 2856 | | | | | | | |
| 2857 | | | | | | | |
| 2858 | | | | | | | |
| 2859 | | | | | | | |
| 2860 | | | | | | | |
| 2861 | | | | | | | |
| 2862 | | | | | | | |
| 2863 | | | | | | | |
| 2864 | | | | | | | |
| 2865 | | | | | | | |
| 2866 | | | | | | | |
| 2867 | | | | | | | |
| 2868 | | | | | | | |
| 2869 | | | | | | | |
| 2870 | | | | | | | |
| 2871 | | | | | | | |
| 2872 | | | | | | | |
| 2873 | | | | | | | |
| 2874 | | | | | | | |
| 2875 | | | | | | | |
| 2876 | | | | | | | |
| 2877 | | | | | | | |
| 2878 | | | | | | | |
| 2879 | | | | | | | |
| 2880 | | | | | | | |
| 2881 | | | | | | | |
| 2882 | | | | | | | |
| 2883 | | | | | | | |
| 2884 | | | | | | | |
| 2885 | | | | | | | |
| 2886 | | | | | | | |
| 2887 | | | | | | | |
| 2888 | | | | | | | |
| 2889 | | | | | | | |
| 2890 | | | | | | | |
| 2891 | | | | | | | |
| 2892 | | | | | | | |
| 2893 | | | | | | | |
| 2894 | BC11 | 381006307 | 109718189 | | 11380177 | OPTION ONE | 314962.25 |
| 2895 | | | | | | | |
| 2896 | | | | | | | |
| 2897 | | | | | | | |
| 2898 | | | | | | | |
| 2899 | | | | | | | |

SA 021



SA 022



| PANDI | ORIGRATE | RATE | LOANTYPE | BALLOON | BALLOON_PAYDATE | RATETYPE | ARMTYPE | TEASER_PERIOD | INDEX | FLOOR | ROUND_CODE | ROUND_FACTOR | LOOKBACK | MARGIN | FIBERCAP | PERCAP | LIFECAP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2,281.40 | 7.85 | 7.85 | Subprime | Fully Amortizing | | Adjustable | 2/28 ARM (Libor) | | 6 Month Libor (Wall St) | 7.85 | Upper | 0.125 | 30 Days | 5.15 | 3 | 1 | 6 |





SA 025



SA 026

# EXHIBIT C

A3093\306083941.v1

| | |
|---|---|
| **From:** | Bodurtha, Samuel C. |
| **To:** | Berry Mitchell |
| **Cc:** | John Ennis (jbelaw75@gmail.com); court_lefebvrelaw.com; Grimard, Lynn; Burk, Jamal D. |
| **Subject:** | RE: Activity in Case 1:17-cv-00394-WES-LDA U.S. Bank N.A. v. Shakoori-Naminy, et al |
| **Date:** | Friday, August 20, 2021 10:39:22 AM |
| **Attachments:** | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.jpg |

Hi Berry:

Writing to confirm that John's expert reviewed the original promissory note at my office. John's expert did not reveal any conclusions or opinion on her review, so I suppose we will wait for the big reveal at 2pm.

Thanks,
Sam

**Samuel C. Bodurtha**
**Hinshaw & Culbertson LLP**

SBodurtha@hinshawlaw.com
My Bio | hinshawlaw.com

*Boston Office*
53 State Street, 27th Floor, Boston, MA 02109
**O:** 617-213-7039 | **F:** 617-249-0245

*Providence Office*
56 Exchange Terrace, 5th Floor, Providence, RI 02903
**O:** 401-751-0842 | **F:** 401-751-0072

**Follow us on**   

Hinshaw & Culbertson LLP

---

**From:** Berry Mitchell <Berry_Mitchell@RID.USCOURTS.GOV>
**Sent:** Thursday, August 19, 2021 3:44 PM
**To:** Bodurtha, Samuel C. <sbodurtha@hinshawlaw.com>
**Cc:** John Ennis (jbelaw75@gmail.com) <jbelaw75@gmail.com>; court_lefebvrelaw.com <court@lefebvrelaw.com>; Grimard, Lynn <LGrimard@hinshawlaw.com>; Burk, Jamal D. <JBurk@hinshawlaw.com>
**Subject:** RE: Activity in Case 1:17-cv-00394-WES-LDA U.S. Bank N.A. v. Shakoori-Naminy, et al

## *** External email ***

**CAUTION: Verify the sender and use caution before opening any attachments, clicking on links or responding to a request for information.**

Yes use the same dial-in-instructions. I am attaching them again.

-Berry

---

**From:** Bodurtha, Samuel C. <sbodurtha@hinshawlaw.com>
**Sent:** Thursday, August 19, 2021 3:09 PM
**To:** Berry Mitchell <Berry_Mitchell@RID.USCOURTS.GOV>
**Cc:** John Ennis (jbelaw75@gmail.com) <jbelaw75@gmail.com>; court_lefebvrelaw.com <court@lefebvrelaw.com>; Grimard, Lynn <LGrimard@hinshawlaw.com>; Burk, Jamal D. <JBurk@hinshawlaw.com>
**Subject:** FW: Activity in Case 1:17-cv-00394-WES-LDA U.S. Bank N.A. v. Shakoori-Naminy, et al

**CAUTION - EXTERNAL:**


Hi Berry:
The client representative, Ben Verdooren, cannot attend tomorrow's mediation. Ocwen/PHH's Senior Loan Analyst Richard Schwiner will attend. Richard's direct dial is 214-215-4062. Richard does not have an Iphone (he uses an Android) so he is unable to access video calls through FaceTime. Will you confirm that we are to use the same dial-in number for the mediation?

Many thanks,
Sam



**Samuel C. Bodurtha**
**Hinshaw & Culbertson LLP**

SBodurtha@hinshawlaw.com
My Bio | hinshawlaw.com

*Boston Office*
53 State Street, 27th Floor, Boston, MA 02109
**O:** 617-213-7039 | **F:** 617-249-0245

*Providence Office*
56 Exchange Terrace, 5th Floor, Providence, RI 02903
**O:** 401-751-0842 | **F:** 401-751-0072

**Follow us on**    

SA 029



**From:** cmecf@rid.uscourts.gov <cmecf@rid.uscourts.gov>
**Sent:** Tuesday, August 03, 2021 4:08 PM
**To:** cmecfnef@rid.uscourts.gov
**Subject:** Activity in Case 1:17-cv-00394-WES-LDA U.S. Bank N.A. v. Shakoori-Naminy, et al

## *** External email ***

**CAUTION: Verify the sender and use caution before opening any attachments, clicking on links or responding to a request for information.**

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of Rhode Island**

### Notice of Electronic Filing

The following transaction was entered on 8/3/2021 at 4:07 PM EDT and filed on 8/3/2021
**Case Name:**        U.S. Bank N.A. v. Shakoori-Naminy, et al
**Case Number:**      1:17-cv-00394-WES-LDA
**Filer:**
**Document Number:** 46

**Docket Text:**
NOTICE of Hearing: Continuation of mediation will convene via Teleconference/FaceTime on 8/20/2021 at 02:00 PM with the Court-Appointed Mediator. Dial-In-Instructions have been provided to counsel in advance of the Mediation. Supplemental Mediation Statements are due 5 days in advance of the scheduled mediation. Counsel are to provide the Mediator with the names,email addresses and cell phone numbers of all persons who will be

SA 030

**participating in the Mediation. The "In-Person" attendance requirement set forth in this form Notice is waived.(Mitchell, Berry)**

**1:17-cv-00394-WES-LDA Notice has been electronically mailed to:**

Samuel C. Bodurtha     samuel-bodurtha-0754@ecf.pacerpro.com, akenna@hinshawlaw.com, lgrimard@hinshawlaw.com, sbodurtha@hinshawlaw.com

Christopher M. Lefebvre     court@lefebvrelaw.com, efarbstein@edcombs.com

John B. Ennis     jbelaw@aol.com, jbennisattorney@aol.com, jbelaw75@gmail.com

Jamal D. Burk     jburk@hinshawlaw.com, mtervo@hinshawlaw.com

John S. McNicholas     maklitigationnotifications@kordeassociates.com, jmcnicholas@kordeassoc.com

Catherine V. Eastwood     maklitigationnotifications@kordeassociates.com, ceastwood@kordeassociates.com

**1:17-cv-00394-WES-LDA Notice has been delivered by other means to:**

Hinshaw & Culbertson LLP is an Illinois registered limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

UNITED STATES DISTRICT COURTH

FOR THE DISTRICT OF RHODE ISLAND

U.S. BANK N.A AS TRUSTEE

FOR THE REGISTERED HOLDERS

OF THE STRUCTURED ASSET

SECURITIES CORPORATION, STRUCTURED

ASSET INVESTMENT LOAN TRUST

MORTGAGE PASS-THROUGH

CERTIFICATES, SERIES 2003-BC11

VS                          CA: 17-CV-394 WES

MASOUD SHAKOORI ET AL

POST TRIAL MEMORANDUM OF DEFENDANT

This Matter was heard by the Court on the Plaintiff's Complaint for a

Declaratory Judgment that it was the holder of the note by way of an endorsement

and for a Declaration that it be equitably assigned to the Plaintiff by an Order of

this Court.   The only witnesses who testified were Defendant and an employee of

Ocwen Financial Corporation, Howard Handville.  A review of the testimony and

the Requests for Admission, which were not responded to by the Plaintiff in a

1

SA 032

timely manner indicates that the Plaintiff has not met its burden of proof and as a result Judgment should enter for the Defendant.

FRCP 36 sets forth the standard for Requests for Admissions:

b) EFFECT OF AN ADMISSION; WITHDRAWING OR AMENDING IT. A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.

The following are admissions which Plaintiff did not timely respond to and to which it did not move to be allowed to withdraw before Trial or at any time.

1. On December 15, 2008 , Option One was not owed any indebtedness under the Defendant's note.

2. On December 15, 2008 Option did not own Defendant's note.

3. On December 15, 2008 Option One did not own Defendant's mortgage.

4. On December 15, 2008, La Salle Bank National Association as

SA 033

Trustee for Structured Asset Securities Corporation Structured Asset
Investment Loan Trust Mortgage Pass-Through Certificates, Series
2003-BC11("LaSalle as Trustee" did not purchase Defendant's
Mortgage from any entity.

5. On December 15, 2008, La Salle Bank as Trustee
did not purchase Defendant's note from any entity.

6. La Salle as Trustee did not provide any consideration to any
entity on December 15, 2008.

7. No entity with the name of Structured Asset Securities
Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through
Certificates, Series 2003-BC11has ever existed.

8. La Salle Bank, National Association was never the trustee for
Structured Asset Securities Corporation Structured Asset Investment Loan
Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

9. The purported assignment referenced as Exhibit 5 to the
complaint was not signed by Linda Green.

10. The purported witness to the purported assignment referenced as
Exhibit 5 to the complaint was not signed by Tywanna Thomas.

11. The purported notarization to the purported assignment
referenced as Exhibit 5 to the complaint was not signed by Bailey Kirchner.

12. Exhibit A is a genuine and authentic copy of a complaint filed by
AHMSI against DocX, LLC and Lender

13. Lender Processing Services, Inc. ("LPS") was the parent
company of DocX, LLC.

14. Linda Green was never an officer of AHMSI.

15. Exhibit B is a genuine and authentic copy of a Consent Order of
the Board of Governors of the Federal Reserve System, the Federal
Deposit Insurance Corporation, the Office of Comptroller of the Currency,
the Office of Thrift Supervision, Lender Processing Services, Inc.,

SA 034

DocX, LLC and LPS Default Solutions, Inc., dated April 13, 2011.

16. Option One did not own Plaintiff's mortgage on July 15, 2011.

17. On March 18, 2009, an affidavit was filed in the United States Bankruptcy Court for the Eastern District of Louisiana in case number 07-11862.

18. Exhibit C is a genuine and authentic of the affidavit referenced in Request for Admission 17.

18. The original of Exhibit C was signed by Dale Sugimoto.

19. Dale Sugimoto on March 18, 2009 was the President of Sand Canyon.

20. On March 18, 2009 Sand Canyon did not own any residential real estate mortgages.

21. On July 15, 2011 Option One did not own any residential real estate mortgages.

22. On December 15, 2008 Option One did not own any residential real estate mortgages.

23. On July 15, 2011, Sand Canyon did not own any residential real estate mortgages.

24. On December 15, 2008 Sand Canyon did not own Defendant's mortgage.

25. On December 15, 2008 Sand Canyon did not own Defendant's note.

26. La Salle Bank as Trustee did not provide any consideration to Sand Canyon for Defendant's note on July 15, 2011.

27. La Salle Bank as Trustee did not provide any consideration to Sand Canyon for Defendant's mortgage on July 15, 2011.

28. La Salle Bank as Trustee never purchased Defendant's mortgage from Sand Canyon at any time.

SA 035

29. La Salle Bank as Trustee never purchased Defendant's note from Sand Canyon at any time.

30. La Salle Bank as Trustee did not provide any consideration for Defendant's mortgage to Sand Canyon on July 15, 2011.

31. Exhibit 6 to the complaint was not signed by an officer of Sand Canyon.

32. Tonya Hopkins was not an officer of Sand Canyon on July 15, 2011.

33. Tonya Hopkins was an employee of AHMSI on July 15, 2011.

34. Tonya Hopkins did not sign the purported assignment dated July 15, 2011.

35. La Salle Bank National Association did not exist as an entity on February 22, 2013.

36. La Salle Bank National Association merged with Bank of America, N.A. on October 17, 2008.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

38. On February 22, 2013 La Salle Bank as Trustee did not own Defendant's mortgage.

39. La Salle Bank as Trustee never granted a power of attorney to Homeward Residential, Inc., authorizing it to sign an assignment of mortgage from La Salle Bank as Trustee to U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 on February 22, 2013.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

SA 036

42. Pamela Stoddard was not an officer of Homeward Residential on February 22, 2013.

43. Pamela Stoddard was never an officer of Homeward Residential on February 22, 2013.

44. Pamela Stoddard was an employee of Security Connections, Inc. on February 22, 2013.

45. Pamela Stoddard did not sign the purported assignment dated February 22, 2013.

The purpose of these requests for Admissions was to preclude the Plaintiff

presenting fraudulent assignments to the Court which it originally sought to do in

the Original and Amended Complaint and which it sought to present in its original

list of Exhibits. However the admissions made by Plaintiff in regard to several of

these Requests bind the Plaintiff and cannot be controverted.

7. No entity with the name of Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11has ever existed.

8. La Salle Bank, National Association was never the trustee for Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

38. On February 22, 2013 La Salle Bank as Trustee did not own Defendant's mortgage.

39. La Salle Bank as Trustee never granted a power of attorney to Homeward Residential, Inc., authorizing it to sign an assignment of mortgage from La Salle Bank as Trustee to U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through

SA 037

Certificates, Series 2003-BC11 on February 22, 2013.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

The case law is clear that Plaintiff cannot undo these admissions, nor has it made any attempt to do so.  The case law in the First Circuit and elsewhere is clear, these admissions bind the Plaintiff.  In *Brook Village North Associates v. General Electric Company*, 686 F. 2d 66 (First Cir., 1982) the Court reversed the Trial Court for allowing a withdrawal of an admission at trial on Motion of the party bound by the admission.  The Court noted the basis for the rule, the procedure and standards for removing admissions and the different standard at trial:

Under Rule 36 in its present form (the rule was amended in 1970), if a party fails timely to answer a request for admissions, the requested items are deemed admitted. Any matter thus admitted under the Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. And courts have not hesitated in appropriate cases to apply the sanction of Rule 36 to material facts that conclusively establish or preclude a party's claim. *See, e.g., Rainbolt v. Johnson,* 669 F.2d 767 (D.C.Cir.1981); *United States v. Kenealy,* 646 F.2d 699 (1st Cir.), *cert. denied,* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981).

The instant case poses the question of the discretion of a district court to permit withdrawal or amendment of an admission by default once trial has commenced. In general, the standard for being relieved of a failure to respond in a timely fashion to a request for admissions is permissive: a court may allow withdrawal or amendment of an admission "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." Fed.R.Civ.P. 36(b). The prejudice contemplated by the Rule is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, *e.g.,* caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions. *See Westmoreland v. Triumph* 71*71 *Motorcycle Corp.,* 71 F.R.D. 192 (D.Conn.1976).

The Rule understandably imposes a more restrictive standard, however, on the granting of a request to avoid the effect of an admission once trial had begun. Rule 36(b) specifies that the court can permit withdrawal or amendment of admissions "[s]ubject to the provisions of Rule 16 governing amendment of pre-trial order." Rule 16 authorizes the conduct and defines the contours of a conference before trial. "The chief purposes of the pre-trial conference are to define and simplify the issues, to lessen surprise at trial and the risk of judicial error, to conclude stipulations on matters of evidence, and to promote settlements." 3 J. Moore, *Moore's Federal Practice* ¶ 16.03 at 16-6 to 16-7 (2d ed. 1982) (footnote omitted). To give effect to matters resolved at conference, Rule 16 provides for the court to make an order "which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreement of counsel." The pre-trial order, once entered, controls the subsequent course of action. "No proof need be offered as to matters stipulated to in the order, since the facts admitted at the pretrial conference and contained in the pre-trial order stand as fully determined as if adjudicated at the trial." 3 J. Moore, *supra,* ¶ 16.19 at 16-40 to 16-41 (footnote omitted). The order can be modified at trial, but only "to prevent manifest injustice." Thus, Rule 16 by its terms sets a higher threshold for a trial judge to exercise his discretion to avoid the force of admissions under Rule 36 once trial has begun.

The district court in the instant case appears to have disregarded the existence of this higher threshold for opening up admissions after commencement of trial.

At no time, did Plaintiff  file a Motion to withdraw these admissions. The

Defendant raised this issue on the first day of trial as indicated by the Transcript:

And I would
specifically present to the Court Request for Admission Number Seven which states that no entity within the name of Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 has ever existed. That is an established fact which is the name of the plaintiff in this case which is seeking relief.

Request for Admission Eight, which is a fact accepted as true, deemed true, pursuant to Federal Rule of Civil Procedure 36, is that LaSalle Bank National Association was never the trustee for Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

 Request for Admission Forty, which is deemed admitted, which is very crucial: U.S. BankNational Association was never a trustee for any entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

And Request for Admission Number Four, there is no such entity named Structured Asset Investment Loan Trust,Mortgage Pass-Through Certificates, Series 2003-BC11.

Now, as a result, your Honor, by virtue of that, my brother indicated, he's the attorney for this trust, it has been deemed admitted that this trust does not exist. So I would suggest that the plaintiff cannot  proceed under the name it's proceeding under because it doesn't exist as a matter of law and fact.

Defendant's Requests for Admissions established that these were conclusive facts and Plaintiff could not at the last minute in trial without a Motion ask the Court to not consider these Admissions because they were not true. This defeats the purpose of the rule and is prejudicial to the Defendant who relied on the admissions. Defendant also had  had filed a  Motion in Limine and for Sanctions pursuant to Fed. R. Civ. Pro. 37.  Plaintiff has proposed certain  Trial Exhibits, which it sought to introduce into evidence which were referenced in the attached Exhibit List provided by Plaintiff. The  Exhibits, which are the scope of this Motion were as follow:

July 16, 2003 $315,400 Adjustable Rate Note with Option One Mortgage Corporation ("Option One") *Exhibit C*.

October 1, 2003 Assignment and Assumption Agreement between Lehman Brothers Bank, FSB and Lehman Brothers Holdings, Inc., *Exhibit G*.

October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*.

October 1, 2003 Trust Agreement, *Exhibit I*.

October 1 2003 Servicing Agreement, *Exhibit J*.

October 1, 2003 Mortgage Loan Schedule, *Exhibit K*.

April 30, 2008 American Home Mortgage Servicing, Inc. ("AHMSI") Purchase Agreement, *Exhibit L*.

June 30, 2009 Notices of Resignation and Appointment of Trustee, *Exhibit M*.

Loan Payment History, *Exhibit R*.

The Court admitted these exhibits into evidence despite they inability of the purported business records witness to authenticate these records and the refusal of the Plaintiff to provide them until the eve of trial, thus further prejudicing the Defendant. The Motions in Limine and for Sanction are incorporated into this Post Trial Memorandum and should be granted. PHH and Plaintiff should be sanctioned for trial by ambush and for seeking to present evidence without any authentication prior to trial at discovery level and certainly at trial where the witness could not establish any evidence about original documents or most copies as will be discussed.

The travel of this case indicates the following loan servicers who mailed bills to the Defendant:

SA 041

Option One Mortgage Corporation

American Home Mortgage

American Home Mortgage Servicing, Inc. which later changed its name to Homeward Residential, which utilized a servicing platform known as Black Knight MSP

Ocwen Loan Servicing, LLC, which utilized a servicing platform known as Real Servicing

PHH Mortgage which utilized a servicing platform known as  Black Knight MSP

   The First Circuit set forth the standard for admission of purported business records  in U.*S. Bank Trust v. Jones*, 925 F. 3d 534 (1st Circuit, 2019). The holding in *Jones* mandates that the testimony of Howard Handville is defective because it does not verify anything about the boarding or the verification of the records of Homeward Residential (formerly American Home Mortgage Servicing, Inc., This corporation was not the original American Home Mortgage Servicing, Inc., the original servicer, which filed a Chapter  11 Bankruptcy Petition on August 6, 20007 in case number 07-11050 in the United States Bankruptcy Court for the District of Delaware, of which this case can take judicial notice.  Thus this mortgage loan has been serviced by five entities:

(1) Option One Mortgage Corporation

(2) The first American Home Mortgage Servicing, Inc. until its bankruptcy on August 6, 2007.

(3) The second American Home Mortgage Servicing, Inc. from its creation on September 6, 2007 until its name change of Homeward Residential, Inc. on May 31, 2012 as reflected in the record of the Rhode Island Secretary of State, of which the Court can take judicial notice.

(4)     Ocwen Loan Servicing, LLC from March 1, 2013 to June 1, 2019.

(5) PHH Mortgage Services from June 1, 2019.

> This witness could not explain how the records of Homeward/AHMSI regarding this loan were confirmed and verified by Ocwen when servicing was transferred. He could not explain how the records of American Home Mortgage were confirmed and verified by AHMSI when servicing was transferred. He could not explain how the records of Ocwen and its RealServicing electronic system of record, were confirmed and verified when PHH took over servicing of Ocwen and transferred the records from Ocwen's servicing platform to its own servicing platform. This testimony did not address any of the hearsay issues in *Jones*, in which the Court allowed the records to be considered because the servicer employee relied on the accuracy of the mortgage history and took measures to verify the same and the servicer incorporated the previous servicer's records into its own database and place its own financial interests at stake by relying on those

SA 043

records and that is took steps to review the previous servicer's records in a way that assured itself of the accuracy of those records. *Jones* at p.538.  No such testimony was presented in  this case and no reference was made to the verification or the procedures followed to verify accuracy when the records were purportedly integrated. The Court held:

[W]hether a third party's records . . . can be integrated into the records of the offering entity . . . for purposes of admission under the business records exception **is not an issue upon which this circuit has reached a uniform conclusion**" covering every instance. United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012). **Rather, the admissibility of the evidence turns on the facts of each case.**

Thus, we have affirmed the admission of business records containing third-party entries without third-party testimony where the entries were **"intimately integrated**" into the business records, FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010), or where the party that produced the business records "**relied on the [third-party] document and documents such as those[] in his business,**" United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992) (internal quotation marks omitted). Conversely, in the absence of third-party evidence**, we have rejected the admission of business records containing or relying on the accuracy of third-party information integrated into the later record where, for example, the later business did not "use[] a procedure for verifying" such information, lacked a "self-interest in assuring the accuracy of the outside information,**" United States v. Vigneau, 187 F.3d 70, 77 & n.6 (1st Cir. 1999) (emphasis omitted), or sought admission of third-party statements made "by a stranger to it," Bradley, 891 F.3d at 35 (quoting Vigneau, 187 F.3d at 75 (alterations omitted)). The key question is whether the records in question are "reliable enough to be admissible." Direct Marketing Concepts, 624 F.3d at 16 n.15..

The Court reviewed the testimony of the trial witness and noted:

SA 044

In answering that question, we are mindful that the "**reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation**." Fed. R. Evid. 803 advisory committee's note to 1972 proposed rules. The rule seeks "to capture these factors and to extend their impact" by applying them to a "regularly conducted activity." Id (emphasis added).

The District Court had received testimony from a loan servicer employee who had

testified that:

 **Caliber incorporated the previous servicer's records into its own database and "plac[ed] its own financial interest at stake by relying on those records," and that "Caliber's acquisition department took steps to review the previous servicer's records in a way that assured itself of the accuracy of the records**." 330 F. Supp. 3d 530, 543 (D. Me. 2018); see Trial Tr. 28:3-6, 60:17-19.

(emphasis added).

All this testimony consisted of was his  recital of the business exception to the

hearsay rule with no factual basis. Thus these records should not have been

admitted nor considered. He could not verify the accuracy of any records as per

this testimony. He could not authenticate the note and allonge. On page 98 he

indicated that his answer to interrogatory 14 was accurate indicating that the

allonge was dated July 16, 2003 and on page 99 that:

And do you have any information which indicates that the signed promissory note

was in the possession of Option One on July 16, 2003.

A. I don't

14

SA 045

Thus there is testimony that the allonge was dated July 16, 2003, the date that the

note was signed, even though the allonge was not affixed to the note on that date.

He had no idea when the note was placed in the collateral file on page 102-103:

```
1    Q.   So you have no idea what was in the collateral
2    file when you signed that answer; isn't that
     correct?
3    A.   I had an idea.
4    Q.   Well, you had not seen it; isn't that correct?
5    A.   Yes.
6    Q.   And you didn't know if the original note was
     in
7    that file; isn't that correct?
8    A.   I had not seen any indication that it was
     missing and my counsel had talked to  confirm its
1    whereabouts, so I'm comfortable with that answer. .
     . Q.  Okay.   Now, when did this note leave the
2    possession of Option One?
3    A.   I don't know.
```
This witness could not confirm that the note and allonge were original documents

and in fact in his answers to interrogatories he indicated that the allonge was dated

July 16, 2003, the same date as the note.  He did not provide any information about

the collateral file and the location of collateral file documents, indicating the

promissory note and allonge and other documents, which would shed light on

when the so-called allonge was indorsed and placed in the collateral file.  This is an important issue, because pursuant to R.I.G.L.6A-3-204, an allonge is effective only if it is affixed to the executed promissory note at the time that a name is placed on an allonge.

As mentioned in the Motion in Limine Plaintiff refused to produce any documents requested in Request numbers  28, 31, 32, 33, 34, 35, 36. 37, 38, 39, 40, 41, 42, 43 and 44. These Requests asked for the custodial agreement, seeking records relating to custodial receipts by the Custodian. However Plaintiff refused to comply any document. The documents sought in this  group of requests should have been provided as Defendant has not been provided the custodian information or the documents in the collateral file and when they were placed into the file with the indices. Plaintiff should not be rewarded for its refusal to provide discovery. It has not amended its answers to interrogatories or provided the complete documents, which have missing exhibits, but only presented these documents on the eve of trial. Evidence regarding the note should not be admitted without authentication regarding the allonge, its date of creation, the date it was signed and added to the collateral file. One document provided by Plaintiff is attached, which twice indicates that there were two separate documents provided, a note and allonge

SA 047

The Plaintiff in its Supplemental Answer to Interrogatory 14 still refused to indicate the date that the allonge to the promissory note was actually signed. This answer suggests that the allonge was executed on July 16, 2003 when the note had not yet been signed or it was signed remotely and not affixed to the note. However the note could not be indorsed until the note existed. R.I.G.L. 6A-3-204 states that that an indorsement is one made "for the purpose of negotiating the instrument". Since the "allonge" was purportedly executed before the instrument existed there could no intent to negotiate a document which did not exist and the purported allonge was not affixed to a note executed by the Plaintiffs.

R.I.G.L. 6A-3-204 defines an indorsement as a signature on the instrument for the purpose of negotiating the instrument. This section states:

**§ 6A-3-204. Indorsement.**

(a) "Indorsement" means a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument, but regardless of the intent of the signer, a signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement. For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument.

(b) "Indorser" means a person who makes an indorsement.

(c) For the purpose of determining whether the transferee of an instrument is a holder, an indorsement that transfers a security interest in the instrument is effective as an unqualified indorsement of the instrument.

SA 048

(d) If an instrument is payable to a holder under a name that is not the name of the holder, indorsement may be made by the holder in the name stated in the instrument or in the holder's name or both, but signature in both names may be required by a person paying or taking the instrument for value or collection.

A Negotiable Instrument is defined by R.I.G.L. 6A-3-104 as follows:

## § 6A-3-104. Negotiable instrument.

(a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional **promise** or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) Is payable on demand or at a definite time; and

(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor. (emphasis added)

The note was in the possession of the closing attorney  not in the possession

of the Defendant and could not have been signed on July 16, 2003 unless it were

signed first or signed remotely contrary to the UCC. In the case of *In Re;*

*Weisband*,  B.R. 427 B.R. 13, 15 (Bankr D. AZ, 2010)    the Bankruptcy Court held

that for an endorsement by allonge the paper had to be affixed to the note when

signed:

However, for the Endorsement to constitute part of the Note, it must be on "a paper

affixed to the instrument." A.R.S. § 47-3204; *see also* In re Nash, 49 B.R. 254, 261

SA 049

(Bankr.D.Ariz.1985). Here, the evidence did not demonstrate that the Endorsement was affixed to the Note. The Endorsement is on a separate sheet of paper; there was no evidence that it was stapled or otherwise attached to the rest of the Note

As stated previously pursuant to the definition of instrument in UCC 6A-3-104 and 2-204 an instrument contains a promise to pay money. R.I.G.L. 6A-3-103 (5) defines maker as:

(5) "Maker" means a person who signs or is identified in a note as a person undertaking to pay.

R.I.G.L. 6A-3-103 (9) defines promise as:

(9) "Promise" means a written undertaking to pay money signed by the person undertaking to pay. An acknowledgment of an obligation by the obligor is not a promise unless the obligor also undertakes to pay the obligation.

Thus only when the Defendant signed the note did it become a promise, an instrument and an undertaking to pay under the Uniform Commercial Code. When the document has been signed by the maker, only then does it become an instrument, which can be transferred by assignment (if non-negotiable) or by negotiation (if a negotiable instrument). R.I.G.L. 6A-2-204 clearly states that a writing on a separate piece of paper if affixed to the instrument when it is executed is *part of the document.*

This section of the UCC does not permit so called traveling allonges which are executed when not affixed to the instrument. An  endorsement may be made on the instrument itself.  If there is a separate piece of paper known as an is allonge it must be affixed to the instrument when the signature is added, pursuant to the provisions of R.I.G.L. 6A-3-204. A signature on separate document, not affixed to the instrument is not effective to endorse the instrument. Plaintiff disregarded the need for  negotiation by delivery and endorsement, which explicitly requires that the instrument be executed prior to the endorsement or when affixed to the note, but not before or remotely. The failure to provide this information until February 2, 2022 effectively prejudiced the Defendant in defending this complaint. The witness did not provide this information in his testimony and thus only the note without the allonge can be considered by the Court.

Howard Handville testified that he only looked at copies of documents and did not know the location of or whether there were any original documents. The First Circuit in *Airframes Systems, Inc  L-3 Communications Corporation*  658 F. 3d (First Cir. , 2011) discussed the Best Evidence Rule:

The Best Evidence Rule requires that a party seeking to prove the "content" of a writing must introduce the "original" or a "duplicate" of the original, unless it is established that (1) all originals have been lost or destroyed (absent bad faith by the proponent); (2) the original cannot be obtained; (3) the original is in the

possession of an opposing party who refuses to produce it; or (4) the writing is not closely related to a controlling issue. *See* Fed. R.Evid. 1001-1004;

A review of his testimony indicates that he had never seen any original documents and made no effort to locate these documents and had no idea where they were.  As a result this witness could not have authenticated any sales agreements, loan schedules or any Trust Agreement, because all he looked at were copies without any reference to original documents. Rule 1002 specifically requires that original documents be provided:

An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.

However he testified that he had never seen the originals of any loan schedules or trust agreements or any documents, which Plaintiff asked that this Court admit into evidence:

On  page 108 the following testimony was elicited on cross examination:

```
1     Q.   Okay.  That assumes that this is an original
2     document, correct, a copy of an original document;
3     isn't that correct?
4     A.   Yes.
5     Q.   And you don't know that this is a copy of the
```

21

SA 052

6    original loan schedule in this case; isn't that

7    correct?

8    **A.   I have not seen the original.  I don't know.**

9    **Q.**   In fact, you have no idea where the original loan

10    schedule is; isn't that correct?

11    **A.**   I haven't seen it so I don't know.

12    **Q.**   You've made no attempt to find that original loan

13    schedule; isn't that correct?

14    **A.**   No, I haven't.

15    **Q.**   And as a matter of fact, you recall your

16    deposition on April 7th in which you testified

17    under oath; is that correct?

18    **A.**   Yes.

19    **Q.**   You recall that deposition?  In that

20    deposition you had indicated when you've addressed

21    this document,the so-called loan schedule, you

22    indicated that it was a standalone document not

23    attached to the so-called trust agreement; isn't

24    that correct?

25    **A.**   In our business records it was a standalone

26    document.

This continued on page 109 in which he indicated no knowledge about the

original documents stating that the purported loan schedules were not attached to

the purported trust agreement and that he never looked at the original trust

agreement and never compared paragraph by paragraph the copy with any

original agreement. He could not provide any information aboutgloan agreement

from Lehman Brothers Bank and Brothers Holding Inc on page 110, exhibit G,

which on page 11 he indicated contained no loan schedules. He stated on page

111 that he was not aware of any loan schedules for the document referenced as

Exhibit G, an assignment and assumption agreement and that he has never seen

the original and could not compare the original with what he claimed to be a

copy. On page 112 he indicated:

**Q.**     And therefore, you cannot say that Exhibit G is anaccurate copy of the original record of any transaction between Lehman Brothers Bank and Lehman Brothers Holding; isn't that correct?

**A.**     Correct

On page 112 he indicated that he was not aware of any documents which existed

which indicate that Option One Mortgage Corporation sold the Defendant's

mortgage loan to Lehman Brothers Bank:

**Q.**     Are you aware of any documents which exist which indicate

that Option One Mortgage Corporation sold the defendants' mortgage

loan to Lehman Brothers Bank?

**A.**      No.

He testified that the purported Exhibit by which Lehman Brothers holding purportedly transferred Defendant's loan to Structured Asset Securities Corporation did not contain a loan schedule and that he did not verify the accuracy of his copy because he had never seen the original document.

(p 113).

He indicated that the loan schedules did not contain the street address, city and zip code and that there were no records of any custodian certifications as to this loan.

This witness did not make any effort to communicate with the custodian, Wells Fargo in order to obtain any documents requested in discovery. He was asked on page 121 whethere PHH had a procedure to verify the accuracy of prior servicer records and answered that there was a procedure. However on page 121 his prior deposition testimony was that he was not aware of any such procedure:

- **Q.**    Okay.  And do you recall your testimony in the deposition on April 7, 2022, on pages 19 and 20, in which I asked you, "Does PHH have a protocol to determine -- let me strike that.  Does PHH currently have a protocol to confirm and verify the accuracy of all prior servicer documents when it loads the

24

SA 055

> documents on its electronic system of record?"  And you answered, "Not to my knowledge."
>
> •    Was that your testimony at that time?
>
> •    **A.**   If that's what I'm stating in the deposition, that's correct.

He did not know of the people who may have verified the accuracy other than they were in India and did not review any documents whether there was any accuracy when the loan was boarded. (pp 121-122) and did not know when exhibits G, H I J K L and M were imaged (p 123).

He also testified that the Ocwen platform is no longer available for review and that he did not know whether any procedures were complied with to verify the accuracy of any data boarded into the Ocwen system when it took over servicing from Homeward Residential. He also testified that he did not have any first hand knowledge of the manner in which the Option One records were verified when it transferred servicing on page126.

He also testified that he was not aware of any sales agreement from Option One to any entity regarding Defendant's loan on page 127. Also contrary to the answers to interrogatories, he indicated that somehow another Option One trust had the loan without any documentation for that purported transaction.

SA 056

This witness could not identify any original documents as to any copies which Plaintiff sought to place in evidence. FRE 1002 was not satisfied, nor was the standard set forth by the First Circuit in *Jones*. Thus his testimony should be disregarded and all Plaintiff's exhibits should not be considered.

THE PLAINTIFF'S ATTEMPT TO PROVE ITS CASE BY THE DEFENDANT'S BANKRUPTCY PLEADINGS FAILS AS A MATTER OF LAW

Plaintiff's post trial memorandum focused on purported testimony of Defendant about the Bankruptcy Petition that he filed listing entities as creditors. A mortgage in Rhode Island is a conveyance of land.  Rhode Island is a Title State, in which the mortgage is a conveyance of land to the mortgagee. This conveyance is made pursuant to the statutory condition and with the statutory power of sale.   A review of the mortgage in this case indicates that if the loan is reformed, the mortgagor will have to also be the borrower of the obligation.  R.I.G.L. 34-11-20 defines the mortgage covenants which indicate the nature of this conveyance of land:


§ 34-11-20.  Meaning of mortgage covenants.

SA 057

In any conveyance of real estate the words "with mortgage covenants" shall have the full force, meaning, and effect of the following words, and shall be applied and construed accordingly: "The mortgagor, for himself or herself and for his or her heirs, executors, and administrators, covenants with the mortgagee and his or her heirs and assigns, that he or she is lawfully seised in fee simple of the mortgaged premises; that the same are free from all incumbrances; that he or she has good right, full power, and lawful authority to sell and convey the same to the mortgagee and his or her heirs and assigns; that the mortgagee and his or her heirs and assigns shall at all times hereafter peaceably and quietly have and enjoy the mortgaged premises and that the mortgagor will, and his or her heirs, executors, and administrators shall, warrant and defend the premises to the mortgagee and his or her heirs and assigns forever against the lawful claims and demands of all persons, and that the mortgagor and his or her heirs and assigns, in case a sale shall be made under the power of sale, will, upon request, execute, acknowledge, and deliver to the purchaser or purchasers such deed or deeds confirmatory of the sale as may be required; and that insurance against loss by fire shall be kept and maintained on the buildings, if any, on the mortgaged premises in such office or offices as the mortgagee or his or her heirs, executors, administrators, or assigns shall approve, in a sum not less than the amount secured by the mortgage deed, or as otherwise provided herein, and that the policy or policies of such insurance shall be delivered

to and held by the mortgagee and assigned and transferred, or made payable in case of loss, to the mortgagee or his or her heirs, executors, administrators or assigns, as collateral security hereto, and in default thereof, that the mortgagee or his or her heirs, executors, administrators or assigns may effect such insurance in the name of the mortgagor or his or her heirs or assigns, payable in case of loss to the mortgagee or his or her heirs, executors, administrators or assigns, and that the premium or premiums paid therefor shall be a further charge upon the mortgaged premises."

A conveyance requires consideration and delivery.  The testimony of the Defendant cannot establish ownership of a mortgage or note.  To rely on bankruptcy documents which name a servicer and La Salle Bank as Trustee without naming the trust filed by Defendant's attorney does not constitute a binding admission, which allows Plaintiff to avoid its burden of proof.

THIS CASE IS SIMILAR TO A MASSACHUSETTS SUPREME COURT CASE

The Massachusetts Supreme Court considered almost an identical situation in *U.S. Bank National Association v. Ibanez,* 458 Mass. 637 (2011), a title clearing action brought by U.S. Bank to establish ownership of a mortgage, which had a similar ownership claim as this case,  after a foreclosure. The purported chain of title in *Ibanez* was:

Rose Mortgage, Inc. (originator) ↓ Option One Mortgage Corporation (record holder) ↓ Lehman Brothers Bank, FSB ↓ Lehman Brothers Holdings Inc. (seller) ↓ Structured Asset Securities Corporation (depositor) ↓ U.S. Bank National Association, as trustee for the Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-Z

The issue before the court in Ibanez was whether the two securitization trusts could prove a chain of title for the mortgages they were attempting to foreclose on. Absent such a chain of title, they did have standing to foreclose. The Trusts claimed three alternative bases for chain of title:

(1) that the mortgages were transferred via the pooling and servicing agreement (PSA)--basically a contract of sale of the mortgages

(2) that the mortgages were transferred via assignments in blank.

(3) that the mortgages follow the note and transferred via the transfers of the notes.

The Supreme Judicial Court (SJC) held that arguments #2 and #3 had no validity in Massachusetts. The reasoning here was heavily derived from Massachusetts being a title theory state. The opinion was unanimous verdict (with an even sharper concurrence) by one of the most highly regarded state courts in the country. The opinion is quite lucid and persuasive, particularly the point that if the wrong

plaintiff is named is the foreclosure notice, the homeowner hasn't received proper notice of the foreclosure.

Regarding  the first basis for the transfer, the Court held that a Pooling and Servicing Agreement *might* suffice as a valid assignment of the mortgages, if the PSA is executed and contains a schedule that sufficiently identifies the mortgage in question, *and*  if there is proof that the assignor in the PSA itself held the mortgage. This last point is nothing more than the  rule of *nemo dat*--you cannot give what you don't have. It shows that there has to be a complete chain of title going back to origination. The Rhode Island Supreme Court in *Mruk v. Mortgage Electronic Registration Systems, Inc.* 82 A.3d 527 (2013**)** held that a mortgagor could challenge a void assignment and defined "void" by referencing the Federal Court's seminal cases on void assignments in a foot note:

> More recently, the United States District Court of the District of Rhode Island relied on the First Circuit's reasoning in the *Culhane* decision and concluded that Rhode Island law also provided the same protections to mortgagors and held that mortgagors have standing to challenge "`invalid, ineffective, or void' assignments, such as situations where `**the assignor had nothing to assign or had no authority to make an assignment to a particular assignee.**'" *Cosajay v. Mortgage Electronic Registration Systems, Inc.,* ___ F.Supp.2d ___, ___, 2013 WL 5912569, at *4 (D.R.I. 2013) (quoting *Culhane v. Aurora Loan Services of Nebraska,* 708 F.3d 282, 291 (1st Cir.2013)).

The purported assignments in this case were all void since Option One Mortgage Corporation did not transfer anything to the Plaintiff by assignment or otherwise. Any subsequent assignments were also void, since the original was void.

--

SA 061

On the facts, both mortgages in *Ibanez* failed these requirements. In one case, the PSA couldn't even be located and in the other, there was a non-executed copy and the purported loan schedule, not the actual schedule,didn't sufficiently identify the loan. Moreover, there was no proof that the mortgage chain of title even got to the depositor (the assignor), without which the PSA is meaningless:.

Even if there were an executed trust agreement with the required schedule, US Bank failed to furnish any evidence that the entity assigning the mortgage – Structured Asset Securities Corporation [the depositor] — ever held the mortgage to be assigned. The last assignment of the mortgage on record was from Rose Mortgage to Option One; nothing was submitted to the judge indicating that Option One ever assigned the mortgage to anyone before the foreclosure sale.

So *Ibanez* means that to foreclosure in Massachusetts, a securitization trust needs to prove:

(1) a complete and unbroken chain of title from origination to securitization trust

(2) an executed PSA

(3) a PSA loan schedule that unambiguously indicates that association of the defaulted mortgage loan with the PSA. Just having the ZIP code or city for the loan won't suffice.

SA 062

The real problem for authentication in this case is that the purported loan schedules often cannot be found (as in this case) or are not sufficiently specific. The SJC did not say that an executed PSA plus valid schedules was sufficient for a transfer; the parties did not raise and the SJC did not address the question of whether there might be additional requirements, like those imposed by the PSA itself.

The SJC did note that a "confirmatory assignment" could be valid, but it: "cannot confirm an assignment that was not validly made earlier or backdate an assignment being made for the first time. Where there is no prior valid assignment, a subsequent assignment by the mortgage holder to the note holder is not a confirmatory assignment because there is no earlier written assignment to confirm." In other words, a confirmatory assignment does notn't establish transfer unless there is a showing of an original assignment.

### US BANK HAS THE SAME PROBLEMS IN THIS CASE AS IN IBANEZ

The deficiencies found in *Ibanez* are present in this case. Without a valid assignments there can be no demonstration that Option One conveyed the mortgage, without a sales agreement of the mortgage. The documents presented by Plaintiff simply do not demonstrate any transaction. Nor do any of the purported

SA 063

sales documents from Lehman Brothers Bank, FSB to Lehman Brothers Holding,

Inc. or from Lehman Brothers Holding, Inc. to Structured Asset Securities

Corporation contain any loan schedules, which identify the Defendant's loan. The

purported loan schedule has not been verified as being part of any document and

there is no information which has been provided in discovery. In fact the Plaintiff's

answers to interrogatories did not identify each owner of the mortgage or how each

obtained ownership nor identify the documents by which it was sold. The

Supplemental Answers and Response provided after discovery had closed on

February 2, 2022 were provided so late on the eve of trial that Defendant has been

Prejudiced. The First Circuit in *McCauley v. Anas*, 321 F.3d 45 (2003)   upheld a

District Court preclusion of an expert witness from testifying due to the failure to

update discovery responses. The Court noted the duty to update discovery in a

timely manner mindful of scheduling Orders:

 Once such a disclosure is made, it must be kept current. *See* Fed.R.Civ.P. 26(e)(1)

(explicating the duty to supplement discovery responses). Since an important

object of these rules is to avoid trial by ambush, the district court typically sets

temporal parameters for the production of such information. *See, e.g.,* Fed.R.Civ.P.

16(b). Such a timetable "promotes fairness both in the discovery process and at

trial." . . . When a party fails to

comply with this timetable, the district court has the authority to impose a

conditional sanction (including the authority to preclude late-disclosed expert

testimony)

*Anas* at p. 50.

Rule 26(e) requires a party to supplement discovery. In *Anas,* the Court cited

a prior case, *Thibault v. Square D. Company*, 960 F.2d 239 , 245(1992) in

which the First Circuit held that a sanction could be imposed without a Court

Order citing the ability to sanction a violation of Rule 26(e):

While Fed.R.Civ.P. 37(b) requires that a court order must be in effect, and then
violated, as a prerequisite for the imposition of sanctions thereunder, *R.W. Int'l
Corp. v. Welch Foods, Inc.,* 937 F.2d 11, 15 (1st Cir.1991), no such requirement
exists under Rule 26(e). The rule itself furnishes fair warning. Thus, when Rule
26(e) is flouted, district courts possess the power to impose sanctions without first
issuing a firm discovery deadline or an admonitory order. *See Bradley v. United
States,* 866 F.2d 120, 124 n. 6 (5th Cir.1989); *Outley v. City of New York,* 837 F.2d
587, 589 (2d Cir.1988); *Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th
Cir.1980); 8 Charles A. Wright & Arthur R. Miller, *Federal Practice and
Procedure* § 2050 (1970).

Moreover, a district court confronted with a violation of Rule 26(e) can fashion an
appropriate sanction from a wide range of options. Preclusion is one of these

options. *See* Fed.R.Civ.P. 26 advisory committee's note ("The duty [to supplement] will normally be enforced ... through sanctions imposed by the trial court, including exclusion of evidence, continuance, or other action, as the court may deem appropriate."). Clearly, then, the trial court possessed the power to preclude appellant's proffered expert testimony despite the lack of an antecedent order.

Plaintiff contended that it could not be sanctioned because there was no Court

Order which it violated. However Rule 26(e) required it to provide responses in a

timely manner, not on the eve of trial and when discovery was closed.

The proposed exhibits provided to the Defendant after discovery closed did

not contain any loan schedules attached to thme  A review of these documents

indicates that there is no reference that this schedule was part of the first so-called

title document, the October 1, 2003 Assignment and Assumption Agreement

(Exhibit G). That document does not contain an Exhibit of Loan Schedules. Instead

it contains an exhibit A, which has no reference to Option One Loans or purchase

agreement from Option One. This document states:

**WHEREAS, the Assignor is a party to the sale and servicing agreements identified on Exhibit A attached hereto (each, a "Sale/Servicing Agreement"), pursuant to which the Assignor has acquired certain mortgage loans (the "Initial Mortgage Loans") identified on the Mortgage Loan Schedule attached hereto as Exhibit B (the "Mortgage Loan Schedule") or pursuant to which such Initial Mortgage Loans are being serviced by various servicers;**

**WHEREAS, the Assignee has agreed on certain terms and conditions to purchase from the Assignor the Initial Mortgage Loans, together with all right and interest of the Assignor under the Sale/Servicing Agreements, to the extent relating to the Initial Mortgage Loan**s;

SA 066

There is no sales agreement  and no identification of the Initial Mortgage Loans.

Exhibit A contains the following references:


21. Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of May 13, 2003 (Group No. 2003 LBB/001);

22. Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner *T*rust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of June 20, 2003 (Group No. 2003 LBB/002);

23. Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of August 25, 2003 (Group No. 2003 LBB/003);

Thus none of the so-called Initial Mortgage Loans which were the purported

subject of this were post July 16, 2003 loans of Option One and Exhibit B simply

put does not exist. Exhibit A indicates that these agreements were servicing

agreements.  Exhibit B contains no loan schedule and states that there are no loan

schedules attached. Instead it states:


**Exhibit B**
**Mortgage Loan Schedule**

[To be maintained in a separate closing binder entitled "SAIL 2003-BC 11 Mortgage Loan Schedules" at McKee Nelson LLP]

SA 067

This indicates that the mortgage loan schedules are not yet determined and that they are to be maintained at McKee Nelson LLP.   Thus like *Ibanez,* this document does not contain the loan schedules attached to it and there is no documentation which indicates that the Defendant's loan was contained in this Assignment and Assumption Agreement.

The next document which Plaintiff seeks to admit into evidence is a purported October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*. This document does not contain an Exhibit A or any schedules of loans. The copy submitted as Exhibit H with the Court's Clerk is not signed and consists of 31 pages. Most importantly there is no proof that Lehman Brothers Bank FSB ever purchased the Option One Mortgage. Thus there is no chain of title which is confirmed by any documents. Nor does this document indicate that the Defendant's mortgage was included in this sale. There were two purported Exhibits A-1 and A-2 which state:


SCHEDULE A-1

TRANSFERRED MORTGAGE LOANS
MORTGAGE LOAN SCHEDULE
(including Prepayment Charge Schedules and Prepayment Charge Summary)
To be maintained in a separate closing binder entitled "SAIL 2003-BC 11
Mortgage Loan Schedules" at McKee Nelson LLP]

SA 068

SCHEDULE A-2
BANK ORIGINATED MORTGAGE LOANS
MORTGAGE LOAN SCHEDULE
(including Prepayment Charge Schedules and Prepayment Charge Summary)
[To be maintained in a separate closing binder entitled "SAIL 2003-BC11
Mortgage Loan Schedules" at McKee Nelson LLP]

As with the previous exhibit, the document indicates that the mortgage loan

schedules are not yet determined and that they are to be maintained at McKee

Nelson LLP.   Thus like *Ibanez*, this document does not contain the loan schedules

attached to it and there is no documentation which indicates that the Defendant's

loan was contained in this Assignment and Assumption Agreement. This document

also references the purported loan sales which are included in loans purportedly

purchased by Lehman Brothers Bank, FSB. There is a reference to loan purchase

agreements, not of which reference Option One and all of which relate to loans

closed or securitizations before July 16, 2003:

1.
Flow Purchase and Warranties Agreement by and between LBH and
BNC Mortgage Inc. dated as of August 15, 2000;

2.
Flow Mortgage Loan Purchase and Warranties Agreement by and
between LBH and Finance America, LLC dated as of June 30, 1999; and

3.
Flow Mortgage Loan Purchase and Warranties Agreement by and
between LBH and People's Choice Home Loan, Inc., dated as of July 1, 2002
(Group No. 2002-Flow).

WHEREAS, Lehman Brothers Bank, FSB (the "Bank"), pursuant to the
following specified mortgage loan purchase and warranties agreements (each, a

SA 069

"Bank Transfer Agreement," and together with the LBH Transfer Agreements, the "Transfer Agreements"), has purchased or received from certain transferors identified below (each, a "Bank Transferor," and together with the LBH Transferors, the "Transferors") certain mortgage loans, each identified on the Mortgage Loan Schedule attached hereto as Schedule A-1 (collectively, the "Initial Bank Transferred Mortgage Loans" and, together with the Initial LBH Transferred Mortgage Loans, the "Initial Transferred Mortgage Loans"):

1.
Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Aames Capital Corporation dated as of April 21, 2003;

2.
Loan Purchase Agreement by and between the Bank and Alternative Financing Corporation dated as of April 17, 2003;

3.
Flow Purchase and Warranties Agreement by and between the Bank and BNC Mortgage Inc. dated as of March 1, 2002;

4.
Loan Purchase Agreement by and between the Bank and Colorado Federal Savings Bank dated as of March 18, 2002;

5.
Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Equifirst Corporation dated as of June 20, 2002, Series 2002-Flow;

6.
Loan Purchase Agreement by and between the Bank and Equity Financial Inc., dated as of February 19, 2002;

7.
Flow Mortgage Loan Purchase Agreement by and between the Bank and Fieldstone Mortgage Company, dated as of July 1, 2000, as amended by Amendment No. 1 dated as of July 20, 2001 and Amendment No. 2 dated as of October 31, 2002;

8.
Loan Purchase Agreement by and between the Bank and Fieldstone Mortgage Company, dated as of October 17, 2002;

39

9.

Loan Purchase Agreement by and between the Bank and First Mutual Corp. dated as of June 24, 2002;

10.

Loan Purchase Agreement by and between the Bank and Genysis Financial Corp. dated as of February 14, 2002;

11.

Loan Purchase Agreement by and between the Bank and Harbourton Mortgage Investment Corporation d/b/a HMIC dated as of December 21, 2001;

12.

Loan Purchase Agreement by and between the Bank and Home Loan Corporation, dated as of May 30, 2002;

13.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Novelle Financial Services, Inc., dated as of February 21, 2003;

14.

Mortgage Loan Purchase Agreement by and between the Bank and Lime Financial Services, Inc., dated as of July 21, 2003;

15.

Mortgage Loan Purchase Agreement by and between the Bank and Lime Financial Services, Inc., dated as of August 21, 2003;

16.

Mortgage Loan Purchase Agreement by and between the Bank and United Pacific Mortgage, dated as of April 4, 2002;

17.

Loan Purchase Agreement by and between the Bank and American Mortgage Express d/b/a Millennium Funding Group, dated as of July 2002;

18.

Loan Purchase Agreement by and between the Bank and MLSG Inc. dated as of June 11, 2002;

19.

SA 071

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Oak Street Mortgage LLC dated as of April 1, 2003;

20.

Loan Purchase Agreement by and between the Bank and Old Towne Financial, Inc. dated as of January 30, 2002;

21.

Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of May 13, 2003 (Group No. 2003 LBB/001);

22.

Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of June 20, 2003 (Group No. 2003 LBB/002);

23.

Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of August 25, 2003 (Group No. 2003 LBB/003);

24.

Flow Purchase and Warranties Agreement by and between the Bank and Pinnacle Direct Funding Corp. dated as of May 29, 2001 (Group No. 2001-1);

25.

Flow Loan Purchase and Warranties Agreement by and between the Bank and Residential Mortgage Assistance Enterprise, LLC dated as of May 1, 2003;

26.

Loan Purchase Agreement by and between the Bank and Sea Breeze Mortgage Services, dated as of January 30, 2003;

27.

SA 072

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and SIB Mortgage Corp. dated as of June 10, 2002, as amended by Amendment No. 1 dated as of November 1, 2002;

28.
Loan Purchase Agreement by and between the Bank and SIB Mortgage Corporation dated as of October 31, 2002;

29.
Loan Purchase Agreement by and between the Bank and Steward Financial dated as of June 4, 2003;

30.
Loan Purchase Agreement by and between the Bank and Stonecreek Funding Corp. dated as of July 8, 2002;

31.
Loan Purchase Agreement by and between the Bank and Superior Mortgage dated as of February 12, 2002;

32.
Seller's Warranties and Servicing Agreement by and between the Bank and Wells Fargo Home Mortgage, Inc., dated as of June 1, 2003 (2003-M05); and

33.
Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Wilmington Finance, Inc., dated as of August 22, 2002.

Once again, none of these prior purchase agreements are attached and there is no loan schedule to this transaction. Thus this document had no reference to Defendant's mortgage.

The third document which Plaintiff sought to admit into evidence is Exhibit I a copy of a purported Trust Agreement, dated October 1, 2003. However there is no loan schedule attached to this document and more importantly this document is

SA 073

not a sale of any loans but rather an agreement to transfer at the closing date,

October 31, 2003 unspecified loans, in return for mortgage backed securities,

which will be paid for by investors. The date of this document is October 1, 2003.

The closing date for any transfers of mortgage loans in return for the issuance of

the certificates is October 31, 2003.  The Preliminary Statement of this document

indicates as such:

The Depositor has acquired the Initial Mortgage Loans from the Seller, and at the Closing Date is the owner of the Initial Mortgage Loans and the other property being conveyed by it to the Trustee hereunder for inclusion in the Trust Fund.  **On the Closing Date, the Depositor will acquire the Certificates from the Trust Fund, as consideration for its transfer to the Trust Fund of the Initial Mortgage Loans, the Pre-Funding Amount and the other property constituting the Trust Fund.  The Depositor has duly authorized the execution and delivery of this Agreement to provide for the conveyance to the Trustee of the Initial Mortgage Loans, any Subsequent Mortgage Loans and the other property constituting the Trust Fund.**  All covenants and agreements made by the Seller in the Mortgage Loan Sale Agreement and by the Depositor, the Master Servicer, the Securities Administrator and the Trustee herein with respect to the Mortgage Loans and the other property constituting the Trust Fund are for the benefit of the Holders from time to time of the Certificates and, to the extent provided herein, any NIMS Insurer.  The Depositor, the Trustee, the Master Servicer, the Securities Administrator and the Credit Risk Manager are entering into this Agreement, and the Trustee is accepting the Trust Fund created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. (emphasis added).

This trust agreement does not contain any loans listed nor the Defendant's

mortgage. It only states:

**Exhibit B
Mortgage Loan Schedule**

43

SA 074

[To be maintained in a separate closing binder entitled "SAIL 2003-BC 11 Mortgage Loan Schedules" at McKee Nelson LLP]

However as indicated above this document is "to be maintained" as it did not exist on October 1, 2003. Thus this document contains no reference to the Defendant's mortgage and thus does not transfer any mortgage. Furthermore this Trust Agreement speaks of a future event which had not yet occurred on October 1, 2003.   The Plaintiff responded in its belated answer to interrogatories that there were no custodial certificates.  This Trust Agreement contains  unsigned and undated Exhibits B1, B2 and B3  which provide for certification and verification that mortgages are actually delivered to the Custodian of the mortgage loan. Plaintiff refused to provide the identity of the custodian or provide the custodial agreement contained in the Trust Agreement and in fact stated that there were no custodial receipts. The Initial Certification, if signed would  have   provided and stated that the Custodian (LaSalle Bank at the time) :

 certifies that it has received the documents listed in Section 2.01(c) of the Trust Agreement for each Mortgage File pertaining to each Mortgage Loan listed on Schedule A to the Trust Agreement, subject to any exceptions noted on Schedule I hereto.

   The Interim Certification by the Custodian if signed  .would have provided and stated:

   The undersigned hereby certifies that as to each Mortgage Loan identified on the Mortgage Loan Schedule, other than any Mortgage Loan listed on Schedule I hereto, it has reviewed the documents listed in Section 2.01(c) of the Trust

44

SA 075

Agreement and has determined that each such document appears regular on its face and appears to relate to the Mortgage Loan identified in such document.

Finally the Final Certification by the Custodian if signed  .would have provided and stated:

In accordance with Section 2.02(d) of the Trust Agreement, the undersigned, as Custodian on behalf of the Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on Schedule I hereto) it (or its custodian) has received the applicable documents listed in Section 2.01(c) of the Trust Agreement.

The undersigned hereby certifies that as to each Mortgage Loan identified in the Mortgage Loan Schedule, other than any Mortgage Loan listed on Schedule I hereto, it has reviewed the documents listed in Section 2.01(c) of the Trust Agreement and has determined that each such document appears to be complete and, based on an examination of such documents, the information set forth in items (i) through (vi) of the definition of Mortgage Loan Schedule is correct.

However the document provided does not contain such certificates or any

documents from the custodian. Thus there is no record that this occurred and that

Defendant's  mortgage loan was transferred.

This explanation of the documents which Plaintiff seeks to admit into

evidence demonstrates that Plaintiff's failure to answer interrogatories about these

documents in any manner and failure to provide  documents prior to February 2,

2022, long after discovery had closed, clearly prejudiced the Defendant. A review

of the February 2, 2022 supplemental answers indicates the belated nature of the

responses after stonewalling the process and refusing to indicate any travel of the

loan other than the void assignments. After the Court indicated that there would be

a trial Plaintiff amended its answers. However Defendant due to the closure of

SA 076

discovery could not depose the witness which the Plaintiff identified nor determine which documents he reviewed or will review or the travel of the loan.

CONCLUSION

The Plaintiff should not be rewarded for not complying with Rule 26(e). The failure to respond to the Request for Admissions is fatal to the Plaintiff's case. In *Far Mann v M/V Rozita* 903 F.2d 871 (First Cir., 1990), this Court recognized that Rule 36's deemed admissions could be removed if a party filed a motion and met the two pronged test of the facilitation of truth and lack of prejudice.  In *Farr Man*, the Court found that the two prong test had been met:

As to the first part of Rule 36(b)'s test, we find that permitting the withdrawal of M/V ROZITA's admissions would "facilitate the development of the case in reaching the truth," 4A J. Moore, *supra*, ¶ 36-08 at 36-79, because, as the district court noted, the most current stipulation of facts sets the damages suffered by plaintiffs at $29,268.63, rather than the amount admitted to of $285,268.63. Thus, we conclude, the first prong of Rule 36(b) is satisfied. The second hurdle is similarly easily surmounted.
*Farr Man* at p. 874

In this case, the Plaintiff has not sought to remove the admissions, which would be prejudicial at the eve of trial. Thus this issue is not even before the Court since the Plaintiff has not requested a withdrawal of the admission pursuant to the Rule.

In addition to the deemed admissions, Plaintiff should not be allowed to present these documents because it after three years finally responded to Interrogatories with objections as to each interrogatory, some of which were

SA 077

clearly relevant to Defendant's defense that the assignments were void.  Plaintiff objected to virtually every interrogatory and only belatedly provided supplemental answers which did not really answer the questions, which Defendant was entitled to have util discovery had been closed and on the eve of trial. At no time prior to February 2, 2022 were the interrogatories supplemented and even now the reference to Rule 33(d) without any specific reference for each question renders the answers non-responsive and not in line with the testimony it seeks to present at trial. Defendant sought in number 3 to identify all documents which reference a sale of the note or the mortgage from the orig]nation of the note to the present. Plaintiff did not provide this answer until February 2, 2022 after the closure of discovery and then only referenced documents. However there is no document which conveys the mortgage from Option One Mortgage Corporation. It also uses the language "further demonstrates" thus still clinging to the void assignments of mortgage as a basis for its claim of ownership of the mortgage. At no time has it amended its answers and removed the assignments from its claim of ownership. These documents including one purported loan schedule were provided after discovery was closed and thus Plaintiff should be  precluded from seeking their admission into evidence.

Defendant in number 6 asked for information about servicing of the mortgage by various servicers as well as all documents by which servicing was authorized.

SA 078

Defendant objected, refused to identify any the documents and now seeks to introduce a servicing agreement, *Exhibit J* and a Loan Servicing Purchasing Agreement, *Exhibit K.* It refused to identify any sale documents or servicing agreements or custodial agreements until it sought to introduce those documents after discovery closed. Plaintiff refused to answer this question and waived any objections by not responding to the interrogatories for three years. This answer is inconsistent with the complaint and the attempt of the Plaintiff to prove ownership of the mortgage by securitization.

The Plaintiff seeks to prove that the loan was included in various sales ands has objected and has only produced a copy of a pooling and servicing agreement. By not providing this information Plaintiff should be sanctioned by not being allowed to present any evidence regarding this securitization. It now seeks to present photocopies of documents which all claim to be the travel of the loan, without authentication after close of discovery, including a purported loan schedule. That violation of Rule 26(e) is particularly egregious. The internet copy of the securitization documents contained no loan schedule. However miraculously on February 2, 2022, this purported schedule appeared.  The Plaintiff was It in fact indicated that these documents were irrelevant to the case, yet seeks to present into evidence the same documents that it contended were irrelevant.

48

SA 079

The Plaintiff refused to provide any documents which indicated sales of the note or mortgage from origination to the present other than an unauthenticated Trust Agreement copy. The Defendant had propounded Requests 7, 8, 11, 13,14, 15, 21, 29, 46, 47 and 48, all of which requested documents regarding the securitization of the mortgage loan, as indicated in this memorandum

October 1, 2003 Assignment and Assumption Agreement between Lehman Brothers Bank, FSB and Lehman Brothers Holdings, Inc., *Exhibit G*.

October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*.

October 1, 2003 Trust Agreement, *Exhibit I*.

October 1 2003 Servicing Agreement, *Exhibit J*.

October 1, 2003 Mortgage Loan Schedule, *Exhibit K*.

April 30, 2008 American Home Mortgage Servicing, Inc. ("AHMSI") Purchase Agreement, *Exhibit L*.

June 30, 2009 Notices of Resignation and Appointment of Trustee, *Exhibit M*.

None of these documents were produced in June, 2021 when the Plaintiff made its belated and objection filled response to the Requests for Production. The Defendant was not afforded an opportunity to review the documents and as a result the Plaintiff has thrusted on the Court, documents never mentioned in its response to discovery. Rule 37 requires that Plaintiff not be allowed to introduce documents which it previously refused to provide, claiming that they were irrelevant to the issues of the case.

SA 080

For these reasons, the Court should rule for the Defendant and

deny the discovery avoiding Plaintiff the relief it seeks.

MASOUD SHAKOORI

By his attorney,

July 8, 2022                              /s/ John B. Ennis

John B. Ennis, Esq. #2135

1200 Reservoir Avenue

Cranston, RI 02920

401-943-9230

jbelaw75@gmail.com

CERTIFICATION

I hereby certify that I emailed a copy of the above  Post Trial  Memorandum
to the following electronically, on this  8th day of July, 2022:

Samuel Bodurtha

Christopher Lefebvre

SA 081

/s/ John B. Ennis

SA 082

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U.S. BANK N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF THE STRUCTURED ASSET SECURITIES CORPORATION, STRUCTURED ASSET INVESTMENT LOAN TRUST, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2003-BC11,<br><br>U.S. Bank, as Trustee,<br><br>v.<br><br>MASOUD SHAKOORI-NAMINY a/k/a MASOUD SHAKOORI, BRENDA SHAKOORI-NAMINY, WILMINGTON TRUST, NATIONAL ASSOCIATION, AS SUCCESSOR TRUSTEE TO CITIBANK, N.A. AS TRUSTEE FOR BEAR STEARNS SECOND LIEN TRUST 2007-SV1, MORTGAGE-BACKED CERTIFICATES, SERIES 2007-SV1, HERITAGE CONCRETE CORP., THE FIREPLACE LLC, STEPHEN E. MOTTAU and HALLINAN CAPITAL CORPORATION,<br><br>Defendants. | C.A. No. 17-CV-00394-WES-LDA |

## U.S. BANK, AS TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO DEFENDANT MASOUD SHAKOORI'S MOTION FOR NEW TRIAL AND TO ALTER AND AMEND THE JUDGMENT

### I. INTRODUCTION

This Court has granted an equitable assignment of mortgage to U.S. Bank, as Trustee, U.S. Bank N.A., as Trustee for the Registered Holders of the Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 ("U.S. Bank, as Trustee") based on irrefutable evidence that Defendant, Masoud Shakoori-Naminy a/k/a Masoud Shakoori ("Shakoori") originated a loan with Option One Mortgage Corporation ("Option One") that U.S. Bank, as Trustee now owns. Shakoori seeks to amend the judgment or a new trial on grounds that this Court committed manifest error of law by claiming: (1) that the

SA 083

Promissory Note's (the "Note") indorsement was not valid because there was no evidence that the allonge was affixed to the Note at the time it was executed; (2) that Howard Handville's ("Handville") testimony should not have been admitted under *U.S. Bank Trust v. Jones*; and (3) that U.S. Bank, as Trustee's admissions prohibited judgment. There is no legal or factual support for any of Shakoori's arguments.

First, no statute or decision, in Rhode Island or outside this jurisdiction, requires execution of an allonge at the time it is affixed to a promissory note in order to effect a valid indorsement. In fact, all statutes and decisions Shakoori cites for his signature theory actually support U.S. Bank, as Trustee's enforceable possession of the Note. Second, Handville's detailed testimony on PHH Mortgage Corporation's ("PHH") processes to integrate a prior servicers records, and the steps he took to verify all documents submitted as exhibits at trial of this case, demonstrate compliance with *Jones*, Handville's qualification as a witness and the admissibility of all records. Third, this Court's admission of all facts from Shakoori's requests to admit did not and should not alter the Court's decision to grant an equitable assignment. U.S. Bank, as Trustee did not pursue relief based on any assignment recorded in the subject property's chain of title, but instead presented evidence of the loan's origination and transfer through trust documents and of possession of the promissory note. Moreover, Shakoor's own testimony verified the Note, the travel of his loan between servicers and lenders that U.S. Bank, as Trustee proved up, and that he has not made a single payment in more than ten years. The Court committed no manifest error of law in concluding that the equities weigh in favor of granting U.S. Bank, as Trustee's request for equitable assignment. Accordingly, the Court should deny Shakoori's Motion.

1019463\312429047.v1

## II. STANDARD OF REVIEW

Following a nonjury trial, a motion for a new trial may only be granted for reasons that would allow rehearing in a federal court equitable a suit. *See* Fed. R. Civ. P. 59(a)(1)(B). These reasons must be substantial; judgment will not be set aside unless there has been a manifest error of law or mistake of fact. *Jackson v. United States*, No. 08-40024-FD, 2011 U.S. Dist. LEXIS 145003, *8, (D. Mass. Dec. 15, 2011) (quoting *Ball v. Interoceanica Corp.*, 71 F.3d 73, 76 (2d Cir. 1995)); *see also In re Brooks*, No. 07-41941-MSH, 2010 Bankr. LEXIS 2498, *4 (B.A.P. 1st Cir. 2012)). Likewise, under Fed. R. Civ. P. 59(e), a party may only move to alter or amend judgment entered after trial "where the movant shows a manifest error of law or newly discovered evidence." *Prescott v. Higgins,* 538 F.3d 32, 45 (1st Cir. 2008) (quoting *Kansky v. Coca-Cola Bottling Co. of New England,* 492 F.3d 54, 60 (1st Cir. 2007)). The First Circuit has noted that prevailing on a rule 59(e) motion is very difficult. *Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1, 7 n.2. (1st Cir. 2005). A court may properly deny a Rule 59(e) motion if the arguments in the motion rely on evidence that could have been discovered earlier through the exercise of due diligence, are repeat arguments that were made prior and properly rejected, could have and shown have been raised before judgment issued. *Yeomalakis v. FDIC,* 562 F.3d 56, 61 (1st Cir. 2009).

## III. LEGAL ARGUMENT

In the first place, Shakoori presents arguments and evidence that simply rehash prior legal positions Shakoori pressed throughout the course of this trial, in pretrial filings and in post-trial briefs submitted before the Court granted the equitable assignment. Shakoori also has not presented any new evidence in his motion. No relief under Rule 59(e) is available because the arguments and evidence Shakoori utilizes to request an alteration of judgment rely on evidence that was already presented to the Court and repeat arguments Shakooir made through out the case,

1019463\312429047.v1

SA 085

before, during and following trial. If, however, this Court is willing to proceed despite the fact that no new argument or evidence is presented, no manifest error of law has occurred in this case.

A) *The Court Committed No Manifest Error of Law in Finding a Valid Note & Indorsement*

Shakoori's claim of manifest error of law falsely challenges the Note by arguing that U.S. Bank, as Trustee did not present evidence that the allonge was affixed to the Note at the time it was executed. (Shakoori's Memorandum of Law in Support of Motion to Amend ("Shakoori Memorandum"), ECF No. 90-1 at pp. 1-10.). No Rhode Island statute, no decision in this jurisdiction, and no case from any other jurisdiction supports Shakoori's position that an allonge must be attached to a promissory note at the time the allonge is executed.

Shakoori constructs an incorrect interpretation of Rhode Island law by arguing that the state's Uniform Commercial Code ("UCC") defines "indorsement" to require that a party affix the allonge to a promissory note when the signature is made. While the UCC defines "Indorsement" as a signature and allows for an indorsement by allonge ("a paper affixed to the instrument is part of the instrument"), no part of the definition includes any requirement or even reference to affixing an allonge at the time of signature. *See* § R.I.G.L. 6A-3-2-204. Nevertheless, Shakoori argues that inclusion of the word "signature" in the definition of an indorsement allows him to demand date and time of the signature on an allonge for U.S. Bank, as Trustee to prove possession of the Note in this case. U.S. Bank, as Trustee has demonstrated compliance with Rhode Island's Uniform Commercial Code by submitting evidence, and presenting to the Court for review, the original Note with an endorsement in blank by allonge that is permanently affixed to the agreement.

Shakoori attempts to rely on several decisions from the Rhode Island Supreme Court, *Note Capital Grp., Inc. v. Perretta*, 207 A.3d 998, 1005, 1006-07 (R.I. 2019), *Pimentel v. Deutsche Bank Nat'l Trust Co.*, 174 A.3d 740, 745 (R.I. 2017), and *Moura v. Mortgage Elec. Registration*

1019463\312429047.v1

*Sys.*, 90 A.3d 852, 858 (R.I. 2014), to argue that this Court disregarded the UCC in deciding that an allonge did not have to be affixed to the note at the time it was signed. (Shakoori Memorandum, ECF No. 90-1 at pp. 4-5.) These decisions do not support Shakoori's claim. In *Perretta*, the Rhode Island Supreme Court concluded that Note Capital Group could not foreclosure because there was insufficient proof to establish possession of a lost note under UCC 3-309. 207 A.3d at 1005, 1006-07. In *Pimentel*, the Court affirmed summary judgment in favor of the foreclosing bank despite the fact that the borrower submitted copies of unendorsed notes because the bank "provided a copy of the note with an allonge that demonstrate[d] that the note was endorsed, along with an affidavit attesting that it [held] the note.". 174 A.3d at 746. Finally, in *Moura*, while the borrower challenged the validity of the travel of the promissory note through "a disorganized mélange of conclusory statements that purportedly undergird a claim of genuine issue of material fact," the Court affirmed summary judgment in favor of the bank. 90 A.3d at 858. "The evidence and supporting documents, including the Asher Affidavit, establish that Michael Moura signed the note, that the note was signed in favor of Accredited Home Lenders, which endorsed an allonge in blank, and that it was subsequently held by Vericrest Financial on behalf of Deutsche Bank." *Id.*

In this case, there is no dispute Shakoori signed a promissory note in favor of Option One Mortgage Corp., that the Note is endorsed in blank by allonge, and that U.S. Bank, as Trustee currently holds the Note with a permanently affixed allonge. No part of the original note is missing. While *Perretta*, *Pimental* and *Moura* provide no support of Shakoori's demand of the actual date the allonge was executed, these same decisions demonstrate that U.S. Bank, as Trustee is entitled to judgment on their claim for equitable assignment of mortgage because the evidence demonstrates a valid endorsement and present possession of the Note.

5

Shakoori also attempts to rely on several decisions outside of Rhode Island to argue the timing of a signature on an allonge determines whether negotiation of the promissory note occurred in compliance with the UCC. Once again, no decision Shakrooi cites supports this argument. In *In re Shapoval*, 441 B.R. 392, 393 (B.K. Ma. 2010), the Massachusetts bankruptcy court denied a motion for relief from stay in favor of an evidentiary hearing, because the bank filed a proof of claim that did not include a note endorsed by allonge, and then filed a response to the borrower's objection to the proof of claim with an allonge. *Shapoval* raised the question of whether the allonge was permanently affixed under the UCC. The same challenge over whether an allonge was permanently affixed to the promissory note arose in *Thomas v. CitiMortgage, Inc.* (*In Re Thomas*), 447 B.R. 402, 411 (Bankr. D. Mass. 2011) and in *Adams v. Madison Realty & Dev., Inc.*, 853 F.2d 163, 166-67 (3rd Cir. 1988). In *Boguslav v. Blb Trading, LLC*, 136 F. Supp. 3d 11, 15 (D. Mass. 2015), the Massachusetts federal court dismissed a borrower's challenge to the types of endorsement that appeared on a promissory note a bank sought to enforce. The court concluded that "[r]egardless of intent of the signer, a signature is an indorsement unless accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement and when a bank holds a blankly indorsed Note, the blankly indorsed instrument is payable to the bearer." *Id.*

Here, Shakoori is attempting to employ decisions that review whether an allonge is permanently affixed to the Note to argue that the timing of a signature on the allonge is critical to enforcement. The cases Shakoori discusses do not include or discuss any such holding or theory and instead focus on whether the allonge is permanently affixed to the note. There is no dispute here that the allonge is permanent affixed to the Note, and any one of the decisions Shakoori cites supports judgment in in favor of U.S. Bank, as Trustee.

This Court correctly points out that no Rhode Island or First Circuit decision establishes the timing and means of signature necessary to create an effective endorsement by allonge, which is precisely why Shakoori's argument must be rejected and motion denied. The Court did not commit any error by review and discussion of *Livonia Prop. Holdings, L.L.C. v. 12840-12976 Farmington Rd. Holdings, L.L.C.*, 717 F. Supp. 2d 724, 734 (E.D. Mich. 2010), and *Kohler v. United States Bank Nat'l Ass'n*, No. 11-C-0893, 2013 U.S. Dist. LEXIS 87565, at *15-*16 (E.D. Wis. June 21, 2013). Both decisions stand for the legal principle that so long as the information on an allonge indicates an intent to serve as indorsement of the note, the allonge is effective. *Livoinia Prop. Holdings*, 717 F.Supp.2d at 734, *Kohler*, 2013 U.S. Dist. LEXIS 87565, at *15. Shakoori attempts to distinguish these cases on facts (in *Livonia* the assignment and in *Kohler* a bank witnesses' testimony as to custody of bank files) while ignoring the basic principle of intent to negotiate as determinative of the endorsement's enforceability. Review of the allonge affixed to the Note evidences a clear and unambiguous intent to negotiate the agreement by an endorsement in blank so that the party who possesses the original note with allonge, namely U.S. Bank, as Trustee, has the authority to enforce collection under Rhode Island's Uniform Commercial Code and is entitled to an equitable assignment of mortgage.

B) *The Court Did Not Commit a Manifest Error of Law by Admitting Evidence to Grant U.S. Bank, as Trustee's Equitable Assignment*

Shakoori challenges the admission of Howard Handville's testimony, and authentication of records under *U.S. Bank Trust v. Jones*, 925 F.3d 534 (1st Cir. 2019), by arguing that Handville did not verify the boarding or verification of business records. (Shakoori Memorandum, ECF No. 88 at p. 9.) A complete review of Handville's testimony rejects Shakoori's challenge under *Jones*. Federal Rule of Evidence 803(6) excludes from hearsay records kept in the course of regularly conducted business activity. *Jones* dictates that business records "containing third-party entries

without third-party testimony" may be admitted if "the entries 'were intimately integrated' into the business records." 925 F.3d 534 (quoting *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 16 n.15 (1st Cir. 2010)). Likewise, business records may also be admitted when the party introducing them relied on a "third-party 'document and documents such as those[] in the business.'" *Id.* (quoting *United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992)).

In *Jones*, the First Circuit affirmed admission of business records in a judicial foreclosure that the foreclosing lender's loan servicer acquired following a transfer from a prior servicer. The First Circuit emphasized the following facts elicited through the testimony of the loan servicer's witness: the servicer "incorporated the previous servicer's records into its own database[,]" and the servicer's "acquisition department took steps to review the [prior] servicer's records in a way that assured itself of the accuracy of records." *Jones*, 925 F.3d. at 538 (quoting *Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985)). In this case, Handville testified that the boarding process through which PHH obtained a prior servicer's records involved several phases. (April 18 Trial Transcript ("April 18 Tr."), p. 9:12-19.) Handville described in detail the process through which a prior servicer's records were transferred to PHH and verified, including steps such as the prior servicer sending a report with the borrower's loan information prior to and after the transfer, running the loan information through a series of spreadsheets to have the most up-to date information, running a test on the loan once its brought into the new servicing system, and conducting a series of audits. (*Id.* at pp. 9:12-12:9; 12-21-13:22; 14:9-15:4; 29:10-30:25.)

Handville further explained how Ocwen Loan Servicing ("Ocwen") received the documents particular to Shakoori's loan from Homeward Residential: that Ocwen received a CD with the loan information on it and the documents were imported into a SharePoint database, an

1019463\312429047.v1

intranet site where employees can access trust acquisition documents. (April 18 Tr. at p. 16:9-17:24.) Handville familiarized himself with Shakoori's loan file by reviewing business records, including "origination documents, the HUD-1, the closing settlement statements, collateral file documents such as the note [and] mortgage," and he confirmed that it is a normal and customary practice of PHH to maintain records he reviewed in preparation for trial. (*Id*. at p. 20:10-22.) He testified that there were programs in place, such as "iDesk" and "CIS" to transfer documents from the prior servicer and to review documents from the prior and current servicer, and "Black Night MSP" to review investor information. He also testified that he had reviewed Homeward's servicing records for other mortgage loans that originated with Option One Mortgage Corporation. (*Id*. at pp. 17:25-18:19.) The sum and substance of Handville's testimony verified and demonstrated the integration of business records into those maintained by the current servicer, and illuminated the steps Handville undertook to verify and understand all of the records related to Shakoori's loan as part of his trial testimony.

Shakoori claims that Handville could not explain how the records of Ocwen were confirmed and verified through the merger with PHH. (Shakoori Memorandum, ECF No. 90-1 at pp. 10-11.) The record of Handville's testimony contradicts this claim. Handville specifically testified that when Ocwen and PHH merged, the servicing records that Ocwen maintained and all of the data transferred from the "REAL servicing mortgage platform" to "Black Knight LoanSphere MSP" using the same type of boarding process that Ocwen used to obtain Homeward's records. (April 18. Tr. Pp. 19:2-18; 31:1-38:17.) He discussed the systems and processes used to integrate and review the loan records. (*Id*. at pp. 31:1-38:17.) Handville described how Ocwen maintained loan documents in an image database called "CIS[,]" and after the merger with PHH, the documents were imported into a new document repository, called

"iDesk." (*Id.* pp. 19:19-20:5.) Handville provided detailed testimony regarding how Ocwen and PHH maintained its records, how Ocwen verified the accuracy of the records it got from Homeward, and how PHH verified the accuracy of its records when PHH and Ocwen merged. This testimony demonstrated that Handville was a witness sufficiently qualified to authenticate and discuss business records.

Contrary to Shakoori's claim that the mortgage loan has been serviced by five entities (ECF No. 90-1 at p. 11), there has only been one service transfer. Option One sold its mortgage servicing rights to American Home Mortgage Servicing, Inc. ("AHMSI"). (April 18. Tr., pp. 77:24-78:25.) AHMSI then changed its name to Homeward Residential ("Homeward"), but was still the same entity. (*Id.* at pp. 8:22-25; 9:3-22.) Ocwen then acquired Homeward (*Id.* at p. 8:7-16), and PHH Mortgage merged with Ocwen Loan Servicing, LLC, in 2019. (*Id.* at p. 6:2-10.) With only one service transfer, from Option One to AHMSI, Shakoori has little to no ground to even compare this case with *Jones* or somehow complain about the integration of business records with or without Handville's complete testimony.

Shakoori erroneously argues that Handville violated the Best Evidence Rule, because he only looked at copies of documents, and did not know the location of the original documents so that he could not authenticate sales agreements, loan schedules, or any trust agreement. Once again, the record of this case contradicts this claim. *Jones* explains that Federal Rule of Evidence 1002 requires an original writing, unless otherwise provided by federal rules or statute. Federal Rule of Evidence 1001(d) allows for a printout to constitute an original document for electronically stored information, as long as the printout accurately reflects the information. 925 F.3d at 540. The First Circuit in *Jones* affirmed the district court's finding that the exhibit the loan servicer sought to introduce satisfied the federal rules because the witness testified that she personally reviewed the

records, found that they were accurate, and specifically attested that the exhibit was "an account summary and payment history" printed from the loan servicer's record. *Id*. In other words, the "printout" accurately reflected a date in the servicer's database and was an "original writing" under Rules 1001(d) and 1002. *Id*.

Here, Handville's testimony demonstrated that loan and trust documents were printed from electronic records PHH maintained on one of their intranet sites, and this testimony satisfied Rules 1001(d) and 1002 in the need for providing "original documents." Handville testified that PHH maintains systems in place to search for documents, i.e., the "Share Point website" that show the investor's acquisition of the loans that Ocwen services, which consists of documents such as the pooling and servicing agreement, acquisition-related documents regarding the placement of the loans, the mortgage loan schedule (April 18. Tr., pp. 38:18-42:4.) Handville explained that in his role as loan analyst it was the normal practice to review deal documents on the Sharepoint website, it was the customary practice of PHH to maintain the "deal documents" on the Sharepoint website, and that the exhibits presented at trial were true and accurate copies of the documents he reviewed. (*Id*. at pp. 43:5-45:4.) Handville described each "deal document" in detail and was able to authenticate each document as a true and accurate copy of the documents within the "Sharepoint" system and establish that U.S. Bank, National Association was the trustee for Shakoori's loan. (*Id*. at pp. 41:22-82:3.)

Particular to the promissory note at issue in this case, Handville provided testimony and evidence to authenticate the Note by reviewing both the original collateral file containing the Note and allonge and bailee letters that PHH and its counsel have used to acknowledge transfer of the Note from one entity or person to another. (Apr. 18 Tr. 86:19-95:14.) Handville was able to identify that the original Note, with the allonge endorsed in blank attached, and testified regarding the

1019463\312429047.v1

Note's integration into the business records. Finally, Shakoori's claim that U.S. Bank, as Trustee could not authenticate the Note contradicts evidence Shakoori himself provided when he testified as to the contents of the Note, that his initials were on the bottom of the pages, and that his signature was on the Note. (April 5 Transcript ("Apr. 5 Tr."), pp. 38:5-39:9.) There is no dispute that Shakoori verified the Note through his own testimony. Under *Jones*, the original Note was correctly admitted by the Court as evidence in this matter.

C) *The Court Did Not Commit a Manifest Error of Law by Refusing to Accept the Deemed Admissions as Dispositive of this Case.*

Shakoori's argument that this Court committed manifest error of law by not accepting as admitted the facts in the requests for admissions lacks merit. (Shakoori Memorandum, ECF No. 90-1 at pp. 21-28.) In the first place, the Court granted Shakoori's motion in limine and admitted all facts in the request for admissions. The Court's decision, however, demonstrates that the admitted facts had little effect, if any, on this case because the facts addressed the assignments of mortgage recorded in title. By contrast, U.S. Bank, as Trustee's case pursued an equitable assignment of mortgage notwithstanding the assignments of record and without any adequate remedy at law. *United States Bank Nat'l Ass'n v. Ibanez*, 458 Mass. 637, 652 (2011). U.S. Bank, as Trustee seeks an equitable assignment in part on their ability and authority to enforce a promissory note Shakoori admits he signed and that without dispute was endorsed in blank and in the possession of U.S. Bank, as Trustee. R.I. Gen. Laws § 6A-3-301 (2000); *Bucci v. Lehman Bros. Bank*, 68 A.3d 1069, 1088 (R.I. 2013). Handville and Shakoori's testimony and presentation of the original Note with allonge for review, satisfied the requirement that U.S. Bank, as Trustee possess the original note, endorsed in blank in order to enforce the terms of the mortgage loan.

Handville's testimony also demonstrates that U.S. Bank, as Trustee was the current trustee for the loan through a review of the pooling and servicing agreement, trust agreement, and loan

schedule. (Apr. 18. Tr. 50:20-83:16.) Handville described in detail the transfer of the loan from originator to trust including: (1) the depositor, Structured Asset Securities, purchased the loans from Lehman brothers, who then placed the loans into the trust; (2) the original trustee was LaSalle Bank National Association; (3) and the name of the trust is Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11. (*Id*.) Handville also was able to identify Shakoori's mortgage loan in the loan schedule, demonstrating that Shakoori's loan was part of the trust. (*Id.* at 80:14-82.3.) He confirmed that the Trustee for the trust changed from LaSalle Bank to the current trustee, U.S. Bank, National Association. (*Id*.)

Shakoori's own testimony confirmed Handville's testimony and authentication of transaction documents. Shakoori testified that he signed a loan modification agreement with American Home Mortgage Servicing, and agreed that in 2008, AHMSI was his loan servicer. (*See* Apr. 5. Tr. 53:24-60:4.) Shakoori also confirmed that in his 2012 bankruptcy petition, LaSalle Bank, N.A. was listed under creditor as the mortgage holder and American Home Mortgage Servicing Inc. was the servicer of his mortgage loan. (*See* Apr. 5. Tr. 68:7-80:5.) In his testimony on the 2015 bankruptcy petition, Shakoori admitted that Ocwen was his mortgage loan servicer at that time. (*Id*. at 92:20-110:17.) Shakoori also admitted during trial that he had not made a mortgage payment in over ten years. (*See* Apr. 5. Tr. 66:14-67:4.) The facts admitted in response to Shakoori's Requests for Admission were not dispositive of this case because substantial evidence, from both Handville and Shakoori, demonstrates that U.S. Bank, as Trustee was the holder of the Note endorsed in blank and owner of a loan that Shakoori obtained from Option One, that Shakoori was no longer personally liable on the loan following a bankruptcy discharge, and that Shakoori had not made a single monthly payment in more than ten years while living at the

subject property for free. The equities weighed in favor of this Court granting U.S. Bank, as Trustee

an equitable assignment of mortgage.

### D) The Court Did Not Commit a Manifest Error of Law
### by Not Imposing Sanctions on U.S. Bank, as Trustee

Contrary to Shakoori's argument, this Court did not commit any manifest error of law by

not imposing sanctions on U.S. Bank, as Trustee. (Shakooir Memorandum ECF No. 90-1 at pp.

28-30). The Court correctly concluded that there was no evidence that U.S. Bank, as Trustee

disobeyed a court order, ignored any warnings, or acted with disregard for authority in responding

to discovery requests in this case. The record of this case also reflects that Shakoori sought no

relief, not even a motion to compel, at any time until Shakoori demanded dismissal of suit, one of

the harshest of all sanctions under Rule 37. Moreover, the docket reflects that Shakoori waited

until two days prior to the first day of trial (April 3, 2022) to submit Proposed Findings of Fact

that included documents he had not provided or produced through discovery at any time. (Proposed

Findings of Fact, ECF No. 68.) U.S. Bank, as Trustee did not disobey any court orders, ignore

warnings, or act with disregard for authority. Any delay in answering interrogatorie resulted from

the parties' ongoing efforts to settle the case, and the resulting delays did not prejudice Shakoori's

defense of the case.

### IV. CONCLUSION

Based on the foregoing, U.S. Bank, as Trustee, U.S. Bank N.A., as Trustee for the

Registered Holders of the Structured Asset Securities Corporation, Structured Asset Investment

Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 respectfully requests that the

Court deny Defendant, Masoud Shakoori-Naminy a/k/a Masoud Shakoori's Motion for a New

Trial and to Alter and Amend the Judgment.

1019463\312429047.v1

SA 096

Respectfully submitted,

U.S. BANK N.A., AS TRUSTEE FOR THE
REGISTERED HOLDERS OF THE
STRUCTURED ASSET SECURITIES
CORPORATION, STRUCTURED ASSET
INVESTMENT LOAN TRUST,
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2003-BC11

By: Its Attorney

/s/ *Samuel C. Bodurtha*

Samuel C. Bodurtha, Bar No. 7075
Jessica M. Goldberg, Bar No. 10531
HINSHAW & CULBERTSON LLP
56 Exchange Terrace, 5th Floor
Providence, RI  02903
Tel: 401-751-0842/Fax: 401-751-0072
Email:  sbodurtha@hinshawlaw.com
            jessicagoldberg@hinshawlaw.com

Dated:      January 27, 2023

## CERTIFICATE OF SERVICE

I, Samuel C. Bodurtha, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 27, 2023.

/s/ *Samuel C. Bodurtha*

Samuel C. Bodurtha

1019463\312429047.v1

SA 097

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
- - - - - - - - - - - - - - -X
U.S. Bank N.A., as          :  17-cv-00394-WES
Trustee for the             :
Registered Holders of the   :
Structured Asset            :
Securities Corporation,     :
Structured Asset            :
Investment Loan Trust,      :
Mortgage Pass-Through       :
Certificates, Series        :  United States Courthouse
2003-BC11,                  :  Providence, Rhode Island
        Plaintiff,          :
                            :
                            :  Tuesday, April 5, 2022
                            :
    vs.                     :
                            :
                            :
                            :
                            :
MASOUD SHAKOORI-NAMINY,      :
et al.,                     :
        Defendants.         :
- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CIVIL CAUSE FOR A BENCH TRIAL
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:    SAMUEL C. BODURTHA, ESQ.
                      Hinshaw & Culbertson LLP
                      56 Exchange Terrace, 5th Floor
                      Providence, RI  02903

For the Defendants:   JOHN B. ENNIS, ESQ.
                      1200 Reservoir Avenue
                      Cranston, RI  02920

Court Reporter:   Lisa Schwam, CRR-RPR-RMR
                  One Exchange Terrace
                  Providence, RI  02903

1  accurate?

2  **A.**    I guess, yes.

3  **Q.**    Okay.  And in November of 2001, you obtained a

4  mortgage loan from Finance America, LLC, correct?

5  **A.**    I guess.  I don't have any documents in front of

6  me.

7  **Q.**    Okay.  Let me see if I can refresh your

8  recollection here.

9         THE COURT:  Let's go off the record for a

10  second.

11         (Off-the-record discussion)

12  **Q.**    Mr. Shakoori, what I'm showing you is a document

13  that has been marked for identification as Plaintiff's

14  Exhibit letter B.  And I just enlarged it as best I

15  can.  Can you see the words on the page?  It's going to

16  be --

17  **A.**    I can see the heading and the book number and the

18  last thing is mortgage.

19  **Q.**    All right.  Bear with me here because what we're

20  going to do is go to the last page.

21         All right.  So now, Mr. Shakoori, I am on page

22  21 and 22 of Exhibit B at the top of that page.  Is

23  that your signature?

24  **A.**    Yes.

25  **Q.**    Okay.  And then if I go through the pages that

1   precede that, if you look at the bottom, are those your

2   initials on the bottom?

3   **A.**   Yes.

4   **Q.**   Okay.  Now, I'm going to go back to the very first

5   page of the agreement, okay.  All right.  Now, this

6   agreement that has -- and let me go to the bottom.

7        Those are your initials at the bottom, MSN?

8   **A.**   Yes.

9   **Q.**   Okay.  And looking at this document, it appears

10  that it's dated November 5, 2001.  Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  Does review of this document refresh your

13  recollection of the mortgage loan you entered into with

14  Finance America?

15  **A.**   Yes.

16  **Q.**   Okay.  I'm going to go to the next page that has

17  the actual amounts.  Do you recall how much money you

18  borrowed from Finance America?

19  **A.**   I do not, but it says it right here.

20  **Q.**   Okay.  That was my next question.  It says in the

21  actual agreement that it was $243,750.  Does that

22  refresh your recollection of the amount you borrowed?

23  **A.**   Yes.

24  **Q.**   Did you borrow this money to purchase the

25  property?

1   **A.**   Yes.

2   **Q.**   I believe you had owned the property for at least

3   ten months prior to executing this mortgage loan.  Is

4   there any reason that you can recall for the delay in

5   the purchase and the mortgage funding?

6   **A.**   I'm a little confused with your question.  I'm

7   sorry, go ahead.

8   **Q.**   Let me see if I can rephrase.

9        The question is:  This mortgage is dated

10  November of 2001, right, but the property purchase was

11  actually ten months earlier.  Based upon your

12  recollection of events, can you tell us why there was

13  that ten-month period of delay?

14  **A.**   No.

15  **Q.**   Okay.  Now, when you signed this agreement, Mr.

16  Shakoori, did you understand that you were pledging

17  1541 Ten Rod Road as security to guarantee repayment of

18  this loan?

19  **A.**   Yes.

20  **Q.**   Okay.  Moving beyond the signature date on the

21  mortgage, you made all regular monthly mortgage loan

22  payments to Finance America, correct?

23  **A.**   I'm sure, yes.

24  **Q.**   You're sure.  Okay.

25        Mr. Shakoori, you refinanced the Finance America

1 mortgage loan in July of 2003, correct?

2 **A.** I don't -- do you have any paperwork?

3 **Q.** You don't recall that? Let me see if I can

4 refresh your recollection.

5     What I'm showing you is marked as Plaintiff's

6 Exhibit C.

7 **A.** I can see that.

8 **Q.** All right. Now, the first page of the actual

9 exhibit is titled "Adjustable Rate Note," and it's

10 dated July 16, 2003.

11     Do you have that before you?

12 **A.** 7-16-03? Yes.

13 **Q.** Yes. And why don't you take a quick look at this

14 document to see if it refreshes your recollection as to

15 this loan.

16 **A.** Okay.

17 **Q.** Now, having looked at this, does that refresh your

18 recollection as to the loan you obtained in 2003?

19 **A.** Yes.

20 **Q.** Do you see the name of the lender?

21 **A.** Where would that be? No. Can you tell me the

22 number so I can see it.

23 **Q.** If you look at paragraph number one, borrower's

24 promise to pay, do you see where it says the lender is?

25 **A.** Roughly, yes. Letters are very small.

1    **Q.**    Okay.  Would you agree with me that the lender

2    identified on this note is Option One Mortgage

3    Corporation, a California corporation?

4    **A.**    Yes.

5    **Q.**    Okay.  Would you agree with me that the loan was

6    in the amount of $315,400?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, if I take you to page 4 of 5, is that

9    your signature?

10   **A.**    It appears to be.

11   **Q.**    Okay.  And on the bottom of each page, are those

12   your initials, MS?

13   **A.**    Yes.

14   **Q.**    Okay.  And on the first page, your initials, MS,

15   right?

16   **A.**    Yes.

17   **Q.**    Okay.  Do you recall actually signing the note,

18   Mr. Shakoori?

19   **A.**    Yes.

20   **Q.**    Okay.  When you signed the note -- I'm going to

21   move you to another page.  This is page 5 of 5 of this

22   exhibit.

23          When you signed the note, was this document

24   attached to it?  It's called allonge to note?

25   **A.**    I do not recall.

1 **Q.** Okay.

2 **A.** I do not recall.

3 **Q.** Okay.  If you look at the bottom of the page, do

4 you see your initials on the bottom of the page?

5 **A.** No.  I don't see my initials.

6 **Q.** All right.  But your initials are on the bottom of

7 every other page of the note?

8 **A.** The one you're showing me is missing.

9 **Q.** This one doesn't have it because it has your

10 signature, right?

11 **A.** Yes.

12 **Q.** Okay.  But on the page before there, there's your

13 initials, page 2 and 3?

14 **A.** Yes.

15 **Q.** And on the first one, there are your initials on

16 page 1 of 3, right?

17 **A.** Yes.

18 **Q.** Okay.  Now, you understood, Mr. Shakoori, when you

19 signed this note, that you would be required to make

20 monthly payments, right?

21 **A.** Yes.

22 **Q.** And you understood that if you didn't make the

23 monthly payments that you would default on the note,

24 right?

25 **A.** Yes.

**Q.** Did you also understand that this note had an adjustable rate?

**A.** I'm sorry?

**Q.** Did you also understand that the note had an adjustable rate?

**A.** I'm not sure.

**Q.** Okay. Do you know what an adjustable interest rate is?

**A.** I believe it changes.

**Q.** Okay. Do you know if this note had an adjustable interest rate?

**A.** I'm not quite sure.

**Q.** Okay. Now, if I can turn your attention to the page that we're on, okay. This is on page 2 of 5. And if you look -- I'm going to zoom in on this so you can see it, okay. If you look at paragraph 3, payments, time and place of payments, do you see that?

**A.** Yes.

**Q.** All right. And if you read through that, it indicates that there's a first day for each month of payment, correct?

**A.** Yes.

**Q.** As of September 1, 2003, right?

**A.** Yes.

**Q.** And a last date for payment of August 1, 2033. Do

1  you see that?

2  **A.**   Yes.

3  **Q.**   And you would agree with me that we're not quite

4  at August 1 of 2033, right?

5  **A.**   Yes.

6  **Q.**   So this note still has payments that are owing and

7  due on it, correct?

8  **A.**   Yes.

9  **Q.**   All right.  And you haven't paid off the note in

10  its entirety at any time before today, have you?

11  **A.**   No.

12  **Q.**   So you haven't obtained a refinance or other funds

13  that you used to pay off this loan, right?

14  **A.**   No.

15  **Q.**   Okay.  So you would agree with me that this note

16  remains owing and due, correct?

17       MR. ENNIS:  Objection to the form, your Honor.

18  I believe that calls for a legal conclusion as to my

19  client.

20       THE COURT:  Well, you can rephrase the question

21  and --

22       MR. BODURTHA:  I'll rephrase it.

23       THE COURT:  -- ask what he understands it to be.

24       MR. BODURTHA:  I'll rephrase it.

25  **Q.**   You would agree with me, Mr. Shakoori, that you

1    still owe money on this note, correct?

2    **A.**   Yes, with explanation.

3    **Q.**   Okay.  Now, with the understanding that you have

4    been discharged of all debts in the bankruptcy court,

5    right?

6    **A.**   Yes.

7    **Q.**   Okay.  So that you're not -- is it your

8    understanding that you're not personally liable for the

9    note, right?

10   **A.**   That's what I was told by my attorney.

11   **Q.**   Okay.  All right.

12        MR. BODURTHA:  Your Honor, I have an original

13   copy of the promissory note.  May I approach and have

14   the witness look at it?

15        THE COURT:  Sure.  Show it to Mr. Ennis first.

16   **Q.**   Now, Mr. Shakoori, what I have given you is the

17   original version of the promissory note that has been

18   marked as Exhibit C.  And I'm going to -- sorry.  I'm

19   going to pull this copy back up on your screen and ask

20   you to confirm that the document you're holding in your

21   hand is the same as the copy that you just reviewed on

22   the digital screen.

23   **A.**   Could you make it larger, please.

24   **Q.**   Sure.

25   **A.**   Thank you.

1    **Q.**   Is that big enough?

2    **A.**   Yes.

3         MR. ENNIS:  Your Honor, I believe a different

4    one has been submitted.  The digital screen shows a

5    bankruptcy document --

6         THE COURT:  Well, do you want to stipulate that

7    the document introduced as Exhibit C is a true and

8    accurate copy of the original?

9         MR. ENNIS:  Well, of the note, not of the

10   allonge, your Honor.

11        THE COURT:  All right.  Mr. Bodurtha can ask his

12   questions.

13        MR. BODURTHA:  Okay.

14   **Q.**   Mr. Shakoori, let me turn your attention to the

15   last page of that document that I handed to you.

16   **A.**   Okay.

17   **Q.**   In reviewing that last page, is that the same page

18   as what you're seeing on the screen as Exhibit C?

19   **A.**   Yes, except the loan number has been crossed out.

20   **Q.**   Right.  So the loan number and servicing number

21   have been redacted.  That's a requirement in order to

22   file documents so that we don't divulge your personal

23   information in the matter -- in a public record.  But

24   beyond those redactions, is that the same document that

25   you're looking at in front of you?

1   **A.**    It appears to be, yes.

2   **Q.**    Okay.  Now, if you go to the page before on the

3   document you're holding.

4   **A.**    Okay.

5   **Q.**    That's your signature on the page, right?

6   **A.**    It appears to be, yes.

7   **Q.**    Okay.  And go to the page before.  That's your

8   initials at the bottom of the page?

9   **A.**    Yes.

10   **Q.**    And the page before that?

11   **A.**    Okay.

12   **Q.**    Those are your initials at the bottom of the page?

13   **A.**    Correct, yes.

14   **Q.**    So would you agree with me that that document is

15   the same document as what you were looking at under

16   Exhibit C?

17   **A.**    Yes.

18   **Q.**    Okay.  Do you have any reason to doubt that the

19   document you're holding is the original promissory note

20   that you signed?

21        MR. ENNIS:  Objection, your Honor.  How can he

22   establish the original nature of a document?  He can

23   ask him is that your signature, but they're trying to

24   authenticate the note through my client, including the

25   allonge.

1       THE COURT: I understand your objection. It's

2  overruled. He can testify, and he has testified that

3  the documents are identical. I don't know that he can

4  do more than that.

5       MR. BODURTHA: My question was whether Mr.

6  Shakoori has any reason to doubt that that's the

7  original promissory note that he signed in 2003.

8       THE COURT: All right. So the objection is

9  noted and overruled. You may answer that question.

10       THE WITNESS: The last page, allonge to note, I

11  have never seen that.

12  **Q.**  Okay.

13  **A.**  This is the first time.

14  **Q.**  Okay. So you didn't see that when you signed the

15  promissory note?

16  **A.**  Correct.

17  **Q.**  Okay.

18  **A.**  I have not.

19  **Q.**  How about the three pages that precede the

20  allonge? Are those -- do you have any reason to doubt

21  that those are the original document pages that you

22  initialled and you signed when you obtained the loan

23  from Option One?

24  **A.**  It appears, except the original looks like it was

25  copied.

1    **Q.**   Okay.  Thank you.

2          MR. BODURTHA:  May I approach, your Honor?

3          THE COURT:  Yes.

4    **Q.**   Mr. Shakoori, in order to obtain this loan from

5    Option One, you had to sign a mortgage, correct?

6    **A.**   Yes.

7    **Q.**   Do you recall signing the mortgage?

8    **A.**   I'm not looking at --

9    **Q.**   I'm sorry.  I was going to ask you first if you

10   recalled it.  And if you don't, then I can show you the

11   mortgage to refresh your recollection.

12   **A.**   Isn't that the paper you just gave me?

13   **Q.**   I just gave you a promissory note.  I'm asking you

14   about the mortgage.

15         Do you recall signing a mortgage?

16   **A.**   I signed papers, yes.

17   **Q.**   Okay.  Let me show you this document to refresh

18   your recollection.  It's marked as Exhibit D.

19         Do you recognize this document, Mr. Shakoori?

20   **A.**   Can you enlarge it, please.

21   **Q.**   Yes.

22   **A.**   Thank you.  Okay.

23         Is this recorded?

24   **Q.**   Do you see the recording marks at the top of the

25   document, book 212, page 001?

1    **A.**    Yes.

2    **Q.**    Bear with me here.  Is that your signature, Mr.

3    Shakoori, on page 7 of the exhibit?

4    **A.**    It appears to be.

5    **Q.**    Okay.  On page 6, are those your initials at the

6    bottom of the page?

7    **A.**    Yes.

8    **Q.**    And on page 4 of 6, are those your initials at the

9    bottom of the page?

10   **A.**    Yes.

11   **Q.**    Page 3, those are your initials?

12   **A.**    Yes.

13   **Q.**    All right.  And page 1, are those your initials?

14   **A.**    Yes.

15   **Q.**    Okay.  And if I direct your attention to page 1 --

16   let me know if I need to blow this up -- do you see the

17   names on that page?

18   **A.**    Yes.

19   **Q.**    And your name is listed on there, is it not?

20   **A.**    Yes.

21   **Q.**    And also the mortgagee is listed on that page, is

22   it not?

23   **A.**    Yes.

24   **Q.**    And who is the mortgagee on the page, if you can

25   review that for us?

1    **A.**    Option One Mortgage.

2    **Q.**    Okay. And the amount, can you find the amount on

3    the mortgage?

4    **A.**    Yes.

5    **Q.**    How much is the mortgage for?

6    **A.**    $315,400.

7    **Q.**    Okay. Now, is that the same amount that was on

8    the note that you just reviewed?

9    **A.**    Yes.

10    **Q.**    Okay. So do you have a recollection now that you

11    reviewed this document of signing this mortgage

12    agreement?

13    **A.**    Yes.

14    **Q.**    Do you understand the effect of signing this

15    mortgage agreement?

16    **A.**    Yes.

17    **Q.**    What is the effect of your signature on this

18    mortgage agreement?

19    **A.**    I borrowed money.

20    **Q.**    But isn't it the case that when you signed this

21    mortgage agreement, you agreed to secure payment of

22    that loan with a mortgage lien on your property; isn't

23    that the case?

24    **A.**    Correct, yes.

25    **Q.**    Okay. And you understood that by signing this

1   mortgage agreement that if you didn't make the mortgage

2   payments, that your mortgagee, here, Option One, could

3   foreclose on that property?  You understood that,

4   right?

5   **A.**   Yes.

6   **Q.**   Can we agree, Mr. Shakoori, going forward, that

7   when I say "mortgage loan," I'm talking about this

8   Option One Mortgage loan?

9   **A.**   Yes.

10  **Q.**   Okay.  Thank you.

11         Now, Mr. Shakoori, I'm going to test your memory

12  here on this mortgage loan a little.  When you obtained

13  the proceeds from the mortgage loan, in other words,

14  you got money out of this mortgage loan with Option

15  One, do you recall where the proceeds were paid?

16  **A.**   The other mortgage.

17  **Q.**   Okay.  Namely, the Finance America mortgage was

18  paid off, right?

19  **A.**   I can't see the names.  Yes.

20  **Q.**   Okay.  Did you receive a cash payment from this

21  mortgage loan?

22  **A.**   I'm not sure, but I'm sure, yes.

23  **Q.**   What I'm showing you is Plaintiff's Exhibit E

24  titled "Settlement Statement" at the top.

25  **A.**   Yeah.

1    **Q.**   Is that your signature at the bottom?

2    **A.**   It appears to be, yes.

3    **Q.**   Okay.  Then on page 2 of the settlement statement,

4    is that your signature as well?

5    **A.**   Yes.

6    **Q.**   All right.  And then there's an addendum.  Is that

7    your signature?

8    **A.**   Yes.

9    **Q.**   And it says that you've reviewed the HUD-1

10   settlement statement, it's true and accurate, correct?

11   **A.**   Yes.

12   **Q.**   And you confirmed that you received a copy of the

13   HUD-1 by signing it?

14   **A.**   I'm sorry.  Say that again.

15   **Q.**   You confirmed that you had received a copy of the

16   HUD-1 by signing this addendum?

17   **A.**   Yes.

18   **Q.**   Okay.  Now, if I take you back to the first page

19   all the way at the bottom, right, do you see Item 303

20   on the left-hand side?  And it says, "Cash to

21   borrower."

22        Do you see that?

23   **A.**   Yes.  It's not clear, but yes.

24   **Q.**   Okay.  Does that refresh your recollection as to

25   what happened with the money that was borrowed beyond

1  what was paid on the prior mortgage lender?

2  **A.**   Yes.

3  **Q.**   So you'll agree with me that you received nearly

4  $54,000 in cash from this mortgage loan?

5  **A.**   Yes.

6  **Q.**   What did you do with the money?

7  **A.**   Put it in -- paying bills and building a house, I

8  believe.

9  **Q.**   Was that a house you were building on the property

10  or was it on a different property?

11  **A.**   On a different property.

12  **Q.**   Okay.  Do you know the address of that other

13  house?

14  **A.**   I'm not quite sure.  It could be somewhere in

15  Diamond Hill Road.

16  **Q.**   Okay.  Did you own that property?

17  **A.**   Yes.

18  **Q.**   Okay.

19  **A.**   Company did.

20  **Q.**   The company did.  Okay.

21       Now, at some point in the course of this

22  mortgage loan, the Option One mortgage loan, you

23  defaulted on the loan, correct?

24       MR. ENNIS:  Objection to the term "default,"

25  your Honor.  I believe that's a legal term.  Either

1    delinquent or don't pay, but default is a term of art.

2    It is the term about a note in the mortgage.

3             THE COURT:  Okay.  You can rephrase it.

4             MR. BODURTHA:  I'll rephrase it.

5    **Q.**   At some point in time, Mr. Shakoori, you stopped

6    making payments on the mortgage loan, correct?

7    **A.**   At my attorney's advice, the answer is yes.

8    **Q.**   Okay.  Can you tell us the first time you failed

9    to make a monthly mortgage loan payment on the Option

10   One loan.

11   **A.**   I cannot give you a date or a time, sir.

12   **Q.**   Okay.  Did you at any time enter into a

13   modification on this mortgage loan?

14   **A.**   The answer is yes, at the advice of an attorney.

15   **Q.**   Okay.  Do you know when you entered into that

16   modification agreement?

17   **A.**   The date?

18   **Q.**   Can you give me the year?

19   **A.**   I'm not sure, but my -- do I answer?

20   **Q.**   If you're not sure --

21            THE COURT:  If you're not sure, you're not sure.

22            THE WITNESS:  Okay.  I'm not sure about the time

23   or the date.

24   **Q.**   Okay.  And did you enter into that loan

25   modification in order to resolve the fact that you had

1     failed to make monthly mortgage loan payments?

2     **A.**    No.  I need to correct you.  You keep on saying

3     failed mortgage payment.  I did not fail mortgage

4     payment.

5     **Q.**    Okay.  Let me rephrase then.

6          Did you enter into the loan modification

7     agreement in order to resolve the payments that you had

8     missed on the mortgage loan?

9     **A.**    Again, I did not miss payments.  There was

10    argument between myself and the mortgage company, and I

11    hired an attorney.  And that attorney on my behalf

12    contacted Option One.  And during this conversation, I

13    had questions regarding payments; that it was not being

14    recorded on Option One's document.

15         And my attorney called Option One and said he

16    wanted to know what's going on.  And they suggested

17    modification which I did not want to sign, but my

18    attorney said as a good faith we will do this until the

19    original document and all the paperwork showing where

20    all the money I sent was going to.

21    **Q.**    Okay.  Do you remember signing the mortgage loan

22    modification agreement?

23    **A.**    Yes, with objection.

24    **Q.**    And how did you know that you were signing the

25    mortgage loan modification agreement with an objection?

1    **A.**   My attorney Charlie Wick explained and explained

2    to Option One legal department on a phone call

3    conversation that my client will sign this, send

4    monthly payment until they prove where all my payments

5    were because they did not have accounting of where all

6    the money I sent was going to.

7    **Q.**   And what your attorney said to Option One was

8    reduced to a written agreement showing that you were

9    going to make these modification payments until this

10   documentation was provided, right?

11   **A.**   Yes.  I was making -- I was to make payments such

12   time Option One provided accounting paperwork and at

13   some point they did not.

14   **Q.**   Okay.  Just to confirm, that whole agreement was

15   reduced to a writing, a modification agreement, that

16   you signed?

17   **A.**   Yes.

18   **Q.**   Okay.  Let me show you what plaintiff has marked

19   as Exhibit L.  Sorry, wrong exhibit.

20       All right.  Mr. Shakoori, I'm going to show you

21   what's been marked as Exhibit Q, all right.  Can you

22   see that?

23   **A.**   I can read the words "loan modification

24   agreement."

25   **Q.**   Can you read anything below it?

1   **A.**   No.  Very fuzzy.

2   **Q.**   Let me see if I can enlarge it for you.

3        Now can you read it?

4   **A.**   Yes.

5   **Q.**   All right.  I'm going to take you to the last page

6   of this agreement, okay.  Actually, it's the

7   second-to-last page.

8        Is that your signature, Mr. Shakoori?

9   **A.**   Yes.

10  **Q.**   Now I'm going to take you back to the first page

11  of the agreement.

12       Do you recall signing this agreement?

13  **A.**   Yes.

14  **Q.**   Is this the modification agreement you were just

15  discussing that you entered into but objected to making

16  the payments?

17  **A.**   The answer is, yes, I objected to everything.

18  **Q.**   Okay.  As you testified, where in the document

19  does it say that you're making these payments under an

20  objection?

21  **A.**   I don't know.  My attorney handled this.

22  **Q.**   Okay.  So you don't actually know for a fact if

23  those objections that you were just testifying was

24  actually reduced to a written agreement, do you?

25  **A.**   Actually, yes, it was my attorney, previous

1    attorney, wrote a letter and got a -- letter --

2    **Q.**    Okay.

3    **A.**    -- from Option One.

4    **Q.**    You just testified before that you agreed to a

5    loan modification under an objection that Option One

6    provide you with all this information as to where your

7    payments were made.

8    **A.**    Yeah.

9    **Q.**    And that that agreement was reduced to a writing,

10   right?

11   **A.**    Yes.

12   **Q.**    Is what I've shown you as Exhibit Q, is that that

13   writing?

14   **A.**    No.

15   **Q.**    Okay.  It's a separate writing?

16   **A.**    Correct.

17   **Q.**    Okay.

18   **A.**    It was a letter sent to my attorney.

19   **Q.**    So it's not included in the actual loan

20   modification agreement, is it?

21   **A.**    It's not here, no.

22   **Q.**    Why not?

23   **A.**    I have no idea.

24   **Q.**    Okay.  If I can turn your attention to page 1 of

25   this agreement.  Are those your initials at the bottom

1   of the page?

2   **A.**   Yes.

3   **Q.**   Okay.  And if I blow this up for you, do you see

4   where it says the parties -- it lists the parties to

5   the agreement, Mr. Shakoori?

6   **A.**   Where?  What number is that?

7   **Q.**   I'm at the top of the page, and it starts, "This

8   loan modification agreement made as of the first day of

9   December of 2008."

10  **A.**   I see that.

11  **Q.**   Do you see the parties on there?

12  **A.**   Yes.

13  **Q.**   One of whom is yourself, right?

14  **A.**   That's correct.

15  **Q.**   And the other one is listed as American Home

16  Mortgage Servicing, Inc., as servicer.  Do you see

17  that?

18  **A.**   I see that.

19  **Q.**   Okay.  Earlier you testified that you entered into

20  a modification agreement with Option One.  Is that the

21  agreement you're talking about here or is that a

22  different modification agreement?

23  **A.**   American Mortgage, like you just said, it was the

24  servicer on behalf of Option One.

25  **Q.**   Okay.  So your recollection, as you sit here

1    today, is that American Home Servicing, Inc., was the

2    mortgage loan servicer?

3    **A.**    For Option One, correct, that's what I was told.

4    **Q.**    Okay.  And so when you were talking earlier about

5    the agreement that you entered into with Option One, it

6    was actually an agreement that you entered into with

7    American Home Mortgage Servicing as loan servicer for

8    Option One?

9    **A.**    Correct.

10   **Q.**    Okay.  So you will agree with me that in December

11   of 2008, American Home Mortgage Servicing, Inc., was

12   your mortgage loan servicer?

13   **A.**    Yes.

14   **Q.**    And you would agree with me that this modification

15   agreement altered, modified and changed the terms of

16   the mortgage loan, the July 2003 Option One mortgage

17   loan, right?

18   **A.**    Yes, with objection, I guess if I'm saying it

19   correctly.

20   **Q.**    Okay.  And your objection is that you had asked

21   for documents or information from Option One?

22   **A.**    Correct.  And American Mortgage.

23   **Q.**    And from American Mortgage?

24   **A.**    The servicer.

25   **Q.**    And it's your testimony that those objections are

1        Now the last question asked, do you want to

2    restate it?

3        MR. BODURTHA:  I'll restate.  Thank you, your

4    Honor.  Apologies for that.

5    **Q.**   So as you sit here today, the source of your

6    dispute is the amount of money that you owe on the

7    mortgage?

8    **A.**   Yes.

9    **Q.**   And the dispute can be resolved by providing you

10   with an accounting of the loan, right?

11   **A.**   With a proper accounting of the note, yes.

12   **Q.**   A proper accounting of the loan?

13   **A.**   Correct.

14   **Q.**   Okay.  And there's no doubt in your mind as you

15   sit here today that you've discharged your personal

16   liability for the mortgage loan, right?

17   **A.**   That's correct.

18   **Q.**   That happened as a result of the 2015 bankruptcy?

19   **A.**   Correct.

20   **Q.**   And there's no doubt in your mind that when you

21   got that discharge order, that Ocwen Loan Servicing,

22   Ocwen Mortgage Company, was your mortgage loan

23   servicer?

24   **A.**   Yes.

25   **Q.**   Is it reasonable to assume that in the ten years

1          I, Lisa Schwam, CRR-RPR-RMR, do hereby

2     certify that the foregoing transcript is a correct

3     transcript prepared to the best of my skill, knowledge

4     and ability of the proceedings in the above-entitled

5     matter.

6

7     /S/ Lisa Schwam

8     <u>Lisa Schwam, CRR-RPR-RMR</u>          Date:
      Federal Official Reporter          April 21, 2022
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - -X
U.S. Bank N.A., as          : 17-cv-00394-WES
Trustee for the             :
Registered Holders of the   :
Structured Asset            :
Securities Corporation,     :
Structured Asset            : United States Courthouse
Investment Loan Trust,      : Providence, Rhode Island
Mortgage Pass-Through       :
Certificates, Series        :
2003-BC11,                  :
          Plaintiff,        : Monday, April 18, 2022
                            :
                            :
    vs.                     :
                            :
                            :
MASOUD SHAKOORI-NAMINY,     :
et al.,                     :
          Defendants.       :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR A BENCH TRIAL
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:    SAMUEL C. BODURTHA, ESQ.
                      Hinshaw & Culbertson LLP
                      56 Exchange Terrace, 5th Floor
                      Providence, RI  02903
For the Defendants:   JOHN B. ENNIS, ESQ.
                      1200 Reservoir Avenue
                      Cranston, RI  02920

Court Reporter:   Lisa Schwam, CRR-RPR-RMR
                  One Exchange Terrace
                  Providence, RI  02903

1    (In open court)

2    18 APRIL 2022

3    (Time noted; 9:48 a.m.)

4         THE COURT:  Good morning.  We're here for

5    continuation in the trial of U.S. Bank vs.

6    Shakoori-Naminy.  And you've already entered your

7    appearances so I think we're ready to proceed.

8         What's the order of business?

9         MR. BODURTHA:  Your Honor, the plaintiff, U.S.

10   Bank, N.A., as Trustee calls Howard Handville,

11   corporate representative for PHH Mortgage.

12        THE COURT:  Good morning, Mr. Handville.

13        I can see you there on the screen.  Can you hear

14   me all right?

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Okay.  Very good.  We're going to

17   get you sworn in by the clerk and we'll proceed with

18   your examination.

19        THE CLERK:  Please raise your right hand.

20        **HOWARD HANDVILLE**, PLAINTIFF'S WITNESS, SWORN

21        THE CLERK:  Please state your name and spell

22   your last name for the record.

23        THE WITNESS:  My name is Howard Handville,

24   H-a-n-d-v-i-l-l-e.

25        THE COURT:  All right.  Thank you.

1    All right.  Mr. Bodurtha, you may inquire.

2         MR. BODURTHA:  Thank you, your Honor.

3              DIRECT EXAMINATION

4    BY MR. BODURTHA:

5    **Q.**   Good morning, Mr. Handville.  Can you hear me?

6    **A.**   Yes, I can.

7    **Q.**   Okay.  The first thing I want to do, Mr.

8    Handville, as a housekeeping measure -- you and I have

9    discussed this in preparation -- I just want to run

10   through the exhibits that we're going to be reviewing

11   today because you have access to those exhibits, but we

12   can't screen share them from this courtroom to you,

13   okay?

14   **A.**   I understand.

15   **Q.**   So for today's testimony, will you confirm that

16   prior to the hearing, I sent you an electronic version

17   of all of U.S. Bank, N.A., as Trustee's proposed

18   exhibits?

19   **A.**   Yes, I can confirm that.

20   **Q.**   And will you confirm that you have access to

21   exhibits that are premarked A through JJ for

22   identification purposes available for review and

23   testimony today?

24   **A.**   Bear with me while I double-check them.

25   **Q.**   Okay.

1   **A.**   Can you tell me which one JJ is.

2   **Q.**   Of course.  That was going to be a follow-up

3   question because this is a little bit tricky.  Exhibit

4   JJ is an Excel spreadsheet titled

5   "4325-SAIL2003-BC11-MLS."

6          Do you have that document available?

7   **A.**   I do.

8   **Q.**   Okay.  And I have provided the Court and my

9   brother with a copy of the same spreadsheet, and

10  obviously I'll let you know as we're going through

11  these when we get to each exhibit, okay?

12  **A.**   Okay.

13  **Q.**   Where do you work, Mr. Handville?

14  **A.**   I work for Ocwen Financial Corporation.

15  **Q.**   What is your position there?

16  **A.**   Senior loan analyst.

17  **Q.**   And what are the responsibilities, duties and

18  obligations of a senior loan analyst?

19  **A.**   Senior loan analysts work primarily on litigated

20  loans.  We work with our in-house counsel and our

21  outside counsel.  We do research.  We are assigned

22  loans to be the party that would be assigned for things

23  like trials or depositions or mediations.

24          We are also empowered to execute on behalf of

25  the servicing units and we are MERS certified so we can

1    execute on behalf of MERS Corporation as well.

2    **Q.**    Does your work with Ocwen Financial include

3    reviewing records and recordkeeping systems on a daily

4    basis?

5    **A.**    It does.

6    **Q.**    How long have you worked for Ocwen?

7    **A.**    Over 11 years.

8    **Q.**    Where did you work prior to Ocwen?

9    **A.**    I worked for a company called ABN AMRO Mortgage

10    Corporation.

11    **Q.**    And how long did you work there?

12    **A.**    I was with them for three years.

13    **Q.**    Can you describe to the Court Ocwen Financial's

14    business.

15    **A.**    Ocwen is the parent company of a number of

16    business units, one of which is PHH Mortgage which is a

17    mortgage loan servicer.  They also have Liberty which

18    is an origination unit for mortgage loans.  And they

19    also service reverse mortgages.

20    **Q.**    What is the relationship between Ocwen Financial

21    Corporation and Ocwen Loan Servicing?

22    **A.**    Ocwen Loan Servicing used to be owned by Ocwen

23    Financial Corporation.

24    **Q.**    Okay.  And when you say it used to be owned by

25    Ocwen Financial, what happened to Ocwen Loan Servicing,

1  to the best of your knowledge?

2  **A.**   Ocwen Loan Servicing merged with PHH Mortgage.  I

3  believe it was the third or fourth quarter of 2018.

4  And in 2019 the servicing transferred from Ocwen Loan

5  Servicing to PHH.

6  **Q.**   Okay.  So since 2019, can you tell the Court who

7  has -- what entity has provided servicing for mortgage

8  loans?

9  **A.**   Ocwen Loan Servicing did it up until June 1.

10  Effective June 1 of 2019, it transferred to PHH.

11  **Q.**   Will you describe the current relationship between

12  PHH and U.S. Bank, as Trustee, the plaintiff in this

13  case.

14  **A.**   PHH services the loan for the trust.

15  **Q.**   Okay.  And what does it mean when you say that PHH

16  is the servicer for U.S. Bank, as Trustee?

17  **A.**   As long as the loan remains active, a servicer

18  would be involved with the loan in order to administer

19  payments or provide information regarding interest

20  paid, yearend statements, escrow analysis, loans that

21  are in default.  We maintain monthly inspections to

22  ensure that property hasn't been abandoned or vacated

23  or has any kind of code violations.

24         The servicing continues through such time as

25  either the loan is paid off or it's liquidated or

1  transferred to somebody else.

2  **Q.**   Does PHH maintain records for loans that are owned

3  by trusts?

4  **A.**   Yes.

5  **Q.**   Does PHH maintain records for loans owned by the

6  trust that U.S. Bank services that is the plaintiff in

7  this case?

8  **A.**   It does.

9  **Q.**   Does PHH maintain records for the particular loan

10  at issue in this case owned by the trust?

11       MR. ENNIS:  Objection, your Honor; foundation.

12       THE COURT:  Well, he can answer the question.

13  You can ask him how he knows that and that will satisfy

14  the foundation.

15  **Q.**   You can answer the question, Mr. Handville.

16  **A.**   Yes.

17  **Q.**   How do you know that PHH maintains records for the

18  loan at issue in this litigation?

19  **A.**   The records that we have involve prior servicer

20  records and current servicer records which you can pull

21  up the loan on the servicing system to look at it which

22  is where the servicing action takes place.  And you can

23  also look at image records of correspondence that have

24  been received or generated.

25  **Q.**   Does PHH retain any records of the trust's

1    acquisition of the loan at issue in this case?

2    **A.**    Yes.

3    **Q.**    And how do you know that?

4    **A.**    I've looked at the business records that we have

5    received and have verified that the loan is part of

6    that trust.

7    **Q.**    In the 12 years or 11-plus years since you've

8    worked for Ocwen and PHH, has Ocwen acquired or merged

9    with any other companies in the business of mortgage

10   loan servicing?

11   **A.**    Yes, there were several.  Ocwen acquired and

12   merged with Litton.  I think that's back in 2010.  And

13   then Ocwen acquired servicing from One West Bank.

14   Ocwen acquired servicing for Homeward Residential which

15   was another merger.  And Ocwen was the surviving

16   corporation out of that merger.

17   **Q.**    Were you employed with Ocwen when the company

18   acquired Homeward?

19   **A.**    Yes.

20   **Q.**    Did you work as a loan analyst at that time?

21   **A.**    Yes.

22   **Q.**    Are you aware of whether Homeward had changed its

23   name prior to Ocwen's acquisition?

24   **A.**    Yes.  They used to be called American Home

25   Mortgage Servicing.  We refer to them as AHMSI,

1    A-H-M-S-I.

2    **Q.**   Are you aware whether Homeward's mortgage

3    servicing records were integrated into Ocwen's records?

4         MR. ENNIS:  Objection, your Honor.  To show

5    integration, the case of *U.S. Bank vs. Jones* requires

6    knowledge of the manner in which the records of the

7    prior servicer were verified and confirmed.  And I

8    think to do that they have to demonstrate a foundation

9    for this question.

10        THE COURT:  All right.  Well, I'll leave it to

11   Mr. Bodurtha to do that.  Go ahead.

12   **Q.**   Mr. Handville, at the time Ocwen acquired

13   Homeward, are you aware of processes and systems

14   through which Homeward records were forwarded to Ocwen

15   Loan Servicing?

16   **A.**   I am.

17   **Q.**   And how did that occur?  If you can explain this

18   to the Court.

19   **A.**   The boarding process involved several phases.  The

20   electronic phase as I call it, the first phase, is the

21   coordination of efforts between the two technology

22   groups on how they're going to transfer the

23   information, when and where they're going to transfer

24   the information and the metadata language of the data

25   that will be transferred.  The acquiring servicer then

has a system where they send two reports, one about a
month before the transfer and one the day before the
transfer.  The first report that's sent has all the
master data which is over 3500 data fields; everything
from the borrower's name, address, phone number,
socials, every little intimate bit of information
that's in a servicing platform.

They make sure that it will populate into the
new loan system.  The new loan system, they create new
loan numbers so they can import the data into the
system.  That report that's received 24 hours before
going live just picks up the differences, if any
payments have been made or if anything's changed
regarding escrow disbursements or anything like that,
so that we have the most up-to-date information.  They
run everything through a series of spreadsheets to make
sure that there aren't any quality control issues for
the data that's received and the language of the data
so that it's placed into the system.  So they do a data
mapping process.

When the loan is brought into the servicing
system, they run a test on it to make sure everything
works and then the loans go live.  Once the loans go
live, there's a series of audits that are undertaken;
if the loan is in default or foreclosure.  Timeline

1  foreclosure coordinators will go in and verify the due

2  dates, whether the loan has been --

3  **Q.**  Mr. Handville, can I interrupt you for one second.

4  Do you think you can just slow down a little bit?  Our

5  court reporter is having some difficulty transcribing

6  your testimony.  Thank you.

7  **A.**  I'm sorry.  I understand.

8  **Q.**  Can you start with the timeline, sir.

9  **A.**  The timeline foreclosure coordinators will verify

10  the default date.  They'll look at the notice of intent

11  or demand letters.  They will also verify the

12  foreclosure firm that's handling it and make sure that

13  they have the proper information regarding the loan in

14  foreclosure default.  Also the bankruptcy; so they'll

15  update the bankruptcy information.

16      Once the loan goes live, a series of audits take

17  place to make sure that the escrow information has been

18  imported properly.  The escrow team will verify this

19  with the city or county.  Same for the taxes.

20      The other phase is done by the investor

21  reporting group.  They have a reconciliation specialist

22  go in and verify that the loan terms that have been set

23  up in the system comport with the balance that's been

24  sent over, the due dates, if we have the right term in

25  place, if a modification has been done, how that

1   changed the terms.  So that's how they validate the

2   accuracy of the information that's been brought into

3   our servicing system.

4        Subsequent to that, like I said, the audits for

5   taxes and insurance take place.  And the servicing

6   picks up at either a stage where the loan is current

7   and they just apply payments and administer escrows or

8   it's in foreclosure or bankruptcy and those different

9   business units will service the loan accordingly.

10  **Q.**   Okay.  So how about documents?  Can you explain to

11  the Court how Ocwen received documents of loans from a

12  servicer such as Homeward that has merged into Ocwen?

13       MR. ENNIS:  Objection.  No specificity related

14  to this loan.

15       MR. BODURTHA:  I'm asking him about documents in

16  general on a servicer acquisition and merger.  I'll get

17  to the specific documents after that.

18       THE COURT:  All right.  Objection is overruled.

19  **Q.**   You can answer, Mr. Handville.

20  **A.**   Could you run the question by me again, I'm sorry.

21  **Q.**   Sure.  The question was if you could explain to

22  the Court how documents kept by a prior servicer were

23  transferred to Ocwen, for example, when Homeward merged

24  with Ocwen.

25  **A.**   The documents that Ocwen received are transmitted

1    from the prior servicer.  It's part of the data that

2    they transfer.  They send these documents over.

3    They're imaged so they're electronic data transfers.

4    They are sorted out by our imaging team and placed into

5    a database associated strictly with that one loan

6    number for each individual loan that's boarded.

7           So they'll get copies of the collateral

8    documents which are the note, mortgage, title policy,

9    closing documents, HUD-1 settlement statements.

10    They'll get servicing-related correspondence, incoming,

11    outgoing correspondence.  Sometimes we get copies

12    of -- if a matter has been in foreclosure, we'll get

13    the foreclosure pleadings and things like that.  Copies

14    of the breach letters.  Customer correspondence

15    regarding questions they may have or response letters.

16    We'll get monthly statements.  We'll just get all kinds

17    of servicing documents from the prior servicer.

18    **Q.**  And can you explain to the Court also how or

19    whether documents involving the trust's acquisition of

20    the loan are transferred over from a prior servicer;

21    for example, when Homeward merged with Ocwen, how the

22    investor acquisition documents are transferred.

23           MR. ENNIS:  Objection, your Honor.  There's no

24    demonstration for a foundation that they can

25    demonstrate the original creation of the documents of

1  this purported trust which ultimately seeks to get into

2  evidence.  He's talking generalities of documents

3  coming in through Ocwen from Homeward Residential, but

4  that's ten years after the creation of any documents.

5      THE COURT:  Well, I'm going to overrule the

6  objection and let you continue with laying the

7  foundation.

8      MR. BODURTHA:  Thank you, your Honor.

9  **Q.**  Mr. Handville, can you answer the question or do

10  you need me to rephrase that?

11  **A.**  No, I can answer the question.

12  **Q.**  Okay.

13  **A.**  Normally, you're going to get them either from the

14  prior servicer on a disk or sometimes you get a CD that

15  was generated by the law firm.  In this case, I

16  confirmed that we did receive a CD.  I believe the

17  company's name was McKee Nelson; I may have that wrong.

18  And that is where the pooling and servicing agreement

19  and the trust agreements that we've been able to

20  produce were received.

21  **Q.**  And Mr. Handville, how were you able to confirm

22  that Ocwen received a CD with the loan acquisition

23  documents?

24  **A.**  I spoke with a person at PHH named Jolene

25  Stratton.  I had some questions for her.  We were

1  searching for some other documents.  And after looking

2  through the SharePoint drive where these documents are

3  made available to staff, I reached out to her and she

4  confirmed that she had received the CD.

5       MR. ENNIS:  Objection, your Honor; motion to

6  strike.  He was asked how he did it, not what another

7  person told him.  That would be hearsay.

8       THE COURT:  Well, it is hearsay.

9       MR. BODURTHA:  I'm happy to rephrase the

10  question and have Mr. Handville answer to his

11  understanding of how the documents were received.

12       THE COURT:  Okay.  That will be fine.

13  **Q.**  Mr. Handville, do you have a present understanding

14  of how the documents particular to this loan were

15  received by Ocwen?

16       MR. ENNIS:  Your Honor, at this point I think

17  there has to be a point made that in Mr. Handville's

18  deposition on April 7th --

19       THE COURT:  You'll be able to cross-examine him

20  and if you want to use his deposition for a prior

21  inconsistent statement, you'll be able to do that.  But

22  this is not the time for that.

23       All right.  So proceed.

24       MR. BODURTHA:  Thank you, your Honor.

25  **Q.**  Do you need me to rephrase or restate the

1  question, Mr. Handville?

2  **A.**   Please.

3  **Q.**   Do you have an understanding of how the loan

4  acquisition documents were transferred to Ocwen when

5  Ocwen acquired Homeward?

6          MR. ENNIS:  Objection; lack of foundation.

7          THE COURT:  All right.  Overruled.  Just go

8  ahead.

9          THE WITNESS:  It's my understanding that Ocwen

10  received a CD with the information on it.

11  **Q.**   Okay.  And once Ocwen received that CD, are you

12  aware of how the documents were treated or what

13  happened to them in the course of moving them into

14  Ocwen's systems?

15  **A.**   The image of the documents were imported into a

16  SharePoint database which is published on the Ocwen

17  internet portal so that staff can go in and view them.

18  **Q.**   That was going to be my next question.  Who has

19  access to the SharePoint system?

20  **A.**   To my knowledge, customer service would have

21  access to it, loan analysts have access to it, the

22  legal department has access to it.  The investor

23  reporting group would have access to it.  Most of the

24  people that service loans would have access to it

25  because in that same SharePoint directory they publish

1   a document, it's called a beneficiary matrix, and that

2   spells out the investor loan numbers and has the

3   information regarding how the trust is named.  It's

4   sort of like a "foreclosed in the name of" template so

5   you can look up the loan in the servicing platform, you

6   can get the investor number.  Then you go to this

7   database, and you can look up the investor information

8   that way.

9   **Q.**  Okay.  Just to put a fine point on my question,

10  what I was trying to understand is -- and here's the

11  question.

12          Is it fair to say that the SharePoint website is

13  an intranet site held by the company within which

14  company employees can access these trust acquisition

15  documents?

16  **A.**  That is correct.

17  **Q.**  Okay.  To the best of your knowledge, the loan

18  acquisition documents that you've reviewed for this

19  trial were taken from a CD and placed into the

20  SharePoint website; is that accurate?

21          MR. ENNIS:  Objection.

22          THE COURT:  All right.  If there's an objection,

23  it's overruled.  Go ahead and answer that.

24          THE WITNESS:  That's my understanding.

25  **Q.**  And have you had the opportunity to review

1     Homeward Residential's servicing records for other

2     loans that Ocwen ended up servicing?

3     **A.**   Yes.

4     **Q.**   And for how many years have you reviewed Homeward

5     servicing records?

6     **A.**   Well, since the merger.  I'd have to go back and

7     look and see.  I don't remember the exact date of the

8     merger.

9     **Q.**   And have you had the opportunity to review

10     Homeward servicing records for mortgage loans that were

11     originated with Option One Mortgage Corporation?

12     **A.**   Yes.

13     **Q.**   So is it fair to say that this lawsuit is not the

14     first time you've reviewed Homeward servicing records?

15     **A.**   Correct.

16     **Q.**   And is it fair to say that this is not the first

17     time you've reviewed mortgage servicing records for a

18     loan that was originated with Option One?

19     **A.**   I have seen other loans that way, yes.

20     **Q.**   What is the relationship between Ocwen Financial

21     Corporation and PHH Mortgage?

22     **A.**   PHH Mortgage is a subsidiary of Ocwen Financial

23     Corporation.

24     **Q.**   Has Ocwen's business remained the same since

25     merging with PHH?

1  **A.**    As far as servicing, yes.

2  **Q.**    Okay.  And when Ocwen Loan Servicing and PHH

3  merged, was there a transfer of records between Ocwen

4  and PHH?

5  **A.**    Yes.

6  **Q.**    And can you describe what records were

7  transferred.

8  **A.**    The servicing records that Ocwen maintained and

9  all the data were transferred over to the -- from the

10  REAL Servicing mortgage platform to the MSP -- it's

11  called Black Knight LoanSphere MSP -- servicing

12  platform using the same type of boarding process I

13  described earlier.  However, it was a little bit easier

14  in this case because at the time Ocwen and PHH merged,

15  Ocwen and PHH maintained two servicing systems so they

16  could easily compare the data that was boarded under

17  the new one directly from the data that was in the

18  prior system.

19  **Q.**    And how about the documents?  Can you explain to

20  the Court how the loan documents were transferred from

21  Ocwen to PHH.

22  **A.**    Ocwen used to maintain the loan documents in an

23  image database called CIS which stands for customizable

24  imaging solutions.  Subsequent to the servicing

25  transfer to PHH, those documents were imported into the

1   new document repository database which is called iDesk.

2   The record imaging people would sort them out and index

3   them with an identification such as collateral or HUD-1

4   or closing or acquisition or, you know, very broad

5   terminology for the type of document.

6           You just go in, pull the loan number up, brings

7   up all the images.  And then you can scroll through the

8   images and click one and it will bring it up.  And you

9   can print it or save it.

10  **Q.**   Can you describe what steps you have taken to

11  review and familiarize yourself with the loan file at

12  issue in this litigation.

13  **A.**   Yes.  I looked at the business records, the

14  origination documents, the HUD-1, the closing

15  settlement statements, collateral file documents such

16  as the note, mortgage.  I reviewed correspondence.  I

17  reviewed escrow statements.  Monthly statements.

18  Payment history records.  I reviewed the foreclosure

19  complaint.  I reviewed some bankruptcy documents.  Of

20  course, counsel's petitions and pleadings as well as

21  responses to interrogatories.  And the trust documents

22  that we have as part of the exhibits.

23  **Q.**   Are all of the actions that you undertook that you

24  just explained, are those consistent with your job

25  duties as a loan analyst for PHH?

**Q.** And generally speaking, not talking about this particular loan, but were you able to review the same information about borrowers' loans that you now review on MSP?

**A.** Yes.

**Q.** In other words, when Ocwen used REAL Servicing, you had access to the borrower's account information, loan number and other data; is that true?

**A.** Correct.

**Q.** And is it your understanding that the Homeward Mortgage accounts and information was transferred over to Ocwen's REAL Servicing system?

**A.** Correct.

MR. ENNIS: Objection; foundation.

THE COURT: All right. You can ask him how he knows.

**Q.** Mr. Handville, do you know if Homeward's loan information was boarded on to REAL Servicing?

**A.** Yes, it was.

**Q.** Can you describe the process through which loans were boarded into REAL Servicing?

**A.** Yes. It's the same process I've described before. The electronic information is transmitted ahead of time. Once the loan information is received, we get an update prior to the loan going live. Information is

1   boarded live.  They run a test to make sure the

2   information populates properly with the new loan

3   numbers.

4        Then once the loan is boarded, the

5   reconciliation specialist from the investor reporting

6   group verifies the information regarding having the

7   loan set up properly with the proper due dates,

8   principal balances.  They verify that by looking at the

9   original collateral documents, the note and mortgage,

10   to make sure the term has been set up properly, as well

11   as any other documents that would have affected that

12   such as a modification.  And that way they verify the

13   information that's come in from the prior servicer.

14        And then they go through the regular audit

15   process for taxes and insurance and if the loan is in

16   bankruptcy or foreclosure, verifying that information

17   as well.

18   **Q.**   And so Mr. Handville, in your experience, beyond

19   this loan, did you have experience in reviewing

20   Homeward loan files and loan account information once

21   the loans had been transferred to Ocwen?

22   **A.**   Yes.

23   **Q.**   And was that review that you undertook on the REAL

24   Servicing platform?

25   **A.**   Yes.

**Q.**   But now that Ocwen has merged with PHH, those
servicing information and records have been transferred
to MSP; is that accurate?

**A.**   Yes.

**Q.**   And while you were using REAL Servicing, is it
fair to say that you could locate the investor
information that you previously discussed in relation
to MSP?

**A.**   Yes.

**Q.**   And were you also able to crosscheck that investor
information with other servicing systems that Ocwen
maintained?

**A.**   Yes.

**Q.**   Did Ocwen maintain a SharePoint site before
merging with PHH?

**A.**   Yes.

**Q.**   And before merging with PHH, did you utilize that
same SharePoint site in order to locate investor loan
acquisition documents?

**A.**   Yes.

**Q.**   And did you review REAL Servicing on a regular
basis as part of your job duties at Ocwen?

**A.**   Yes.

**Q.**   And did you review Homeward Residential service
loans that had been transferred to Ocwen on the REAL

1    Servicing database as part of your job?

2    **A.**    Yes.

3    **Q.**    Okay.  Now, Mr. Handville, does Ocwen presently

4    utilize a software system where you can access a

5    borrower's payment history and comments or notes

6    related to the borrower's loan?

7    **A.**    Yes.

8    **Q.**    Do you know the name of that system?

9    **A.**    Outside of the servicing system itself, which has

10   screens that have that information, I can pull -- I can

11   run a report and print out a system that will

12   maintain -- it will play back all the comments and the

13   payment history.  Whatever date specifications I put in

14   the software is called Web Direct.

15   **Q.**    And Mr. Handville, do you know when Ocwen started

16   to utilize Web Direct?

17   **A.**    It was when they merged with PHH.  That's when

18   they began using it.

19   **Q.**    Do you utilize Web Direct in the regular course of

20   your job functions as a loan analyst?

21   **A.**    Yes.

22   **Q.**    Did you access Web Direct in order to review

23   payment history and comments or notes related to this

24   borrower's loan?

25   **A.**    I utilized the prior servicer history mainly,

1  although I did look at the comments and the notes after
2  the acquisition.
3  **Q.**   Okay.  Let's break this up into two questions.
4          What did you review in terms of prior servicing
5  history when you accessed Web Direct for the borrower's
6  loan?
7  **A.**   No, no, no.  I think you misunderstood.
8  **Q.**   Sorry.
9  **A.**   I looked at the payment history, the information
10  that we had imaged in CIS, and I did look at the
11  comments and notes from the time of the merger forward.
12  But most of the information I was looking at was in the
13  past, so I didn't really focus on the newer comments
14  and payment history information.
15  **Q.**   Okay.  Can you explain to the Court what
16  information you were able to maintain regarding the
17  borrower from Web Direct?
18  **A.**   It verified the principal balance and the due
19  date, escrow balance, and the fees and charges that
20  have been assessed to the loan since it boarded.
21  **Q.**   Okay.  And has Ocwen always used the Web Direct
22  system?
23  **A.**   No.  We didn't start using that until the merger
24  with PHH.
25  **Q.**   What system did Ocwen use prior to Web Direct?

1   **A.**   It's called MicroStrategy.

2   **Q.**   Okay.  Now, in terms of Web Direct, how do you

3   perform a search for a loan?

4   **A.**   You click on the link, opens it up.  You put in

5   the loan number.  And then you -- in Web Direct you

6   specify the date period.  So you could select one year,

7   the last year, or you could go back further or you

8   could go back to infinity and it will just pick up

9   wherever the information that it has into it.  And you

10   just ask it to print and it prints it out.

11   **Q.**   Okay.  And can you explain for the Court what

12   those printouts -- what information you're getting on

13   those printouts.

14   **A.**   Well, for payment history information you're going

15   to get the principal balance.  You're going to get a

16   heading at the top with the borrower's name and loan

17   information.  And the payment history; just shows what

18   the balances are any given time, fees and costs

19   assessed to the loan, things like that.

20       The comments will show the date of the entry and

21   the substance of the entry.  Say, if a borrower called

22   in and had a question about something, it would note

23   that in the comments.  And so on and so forth.

24   **Q.**   And Mr. Handville, were you able to pull a payment

25   history for the borrower's loan from Web Direct?

1     **A.** I did look at a payment history from Web Direct,

2     but there weren't any payments made on it so I didn't

3     really focus on it.

4     **Q.** Okay. Is the Web Direct software system one that

5     you use on a regular basis as part of your job at PHH?

6     **A.** Yes.

7     **Q.** Do you, Mr. Handville, have a recollection of how

8     you searched for loans on MicroStrategy?

9     **A.** MicroStrategy, you put the loan number in. As

10     long as you have the loan number, you can just enter

11     it.

12     **Q.** Is it fair to say, Mr. Handville, that the

13     MicroStrategy software system is similar to the Web

14     Direct system in terms of how you research loans?

15     **A.** In terms of how you research it and functionality,

16     it's very similar.

17     **Q.** That was going to be my follow-up. So is it fair

18     to say that the information you obtained from

19     MicroStrategy is similar to what you now obtain on Web

20     Direct?

21     MR. ENNIS: Objection. There's no suggestion

22     that he has searched this loan under MicroStrategy.

23     THE COURT: Overruled.

24     THE WITNESS: The functionality and the

25     information is largely the same.

1    **Q.**   Okay.  Were you able to review the borrower's

2    payment history on MicroStrategy?

3    **A.**   I don't think I looked at MicroStrategy on that

4    because we had the payment history from the prior

5    servicer in printed form already.

6    **Q.**   Okay.  Do you know if payment histories from the

7    prior system were transferred over to the Web Direct

8    system?

9    **A.**   I don't know.  I don't recall.

10   **Q.**   Okay.  Are you able to search on Web Direct for

11   payment and comment histories before Ocwen merged with

12   PHH?

13   **A.**   No.  That system wasn't available to us before

14   then.

15   **Q.**   Okay.  So can you explain to the Court then how

16   you were able to review payment histories and comment

17   histories for events that occurred before the merger

18   between Ocwen and PHH?

19   **A.**   Because that information was transferred from one

20   servicing platform to the other.

21   **Q.**   Okay.

22   **A.**   So the data is resident inside the servicing

23   platform.

24   **Q.**   Okay.  And were you able to review the borrower's

25   loan on -- sorry.  Strike that.

1    THE COURT:  I'm not sure I understand the last

2    two answers because you asked him if he could search

3    Web Direct for payment and comment history before the

4    merger and he said no.

5    MR. BODURTHA:  Okay.

6    THE COURT:  But then he said the information was

7    transferred from one platform to the next which would

8    imply that it's there, so could you get that clarified.

9    MR. BODURTHA:  Yes.  Let me see if I can clarify

10   that.

11   **Q.**   Mr. Handville, can you clarify how the prior

12   payment history and prior comments from MicroStrategy

13   are accessible.

14   **A.**   The payment information in MicroStrategy

15   incorporates the information resident in the prior

16   servicing platform REAL Servicing.  The information in

17   Web Direct incorporates the data of the time of the

18   transfer from Ocwen Loan Servicing to PHH.  So if I run

19   a payment history in MicroStrategy, it's going to start

20   around the time the loan boarded onto MSP.  If I want

21   to look at the payment history before then, then I

22   would go to the MicroStrategy system to look at what

23   REAL Servicing had incorporated.

24   To clarify for the Court, I was answering that I

25   wouldn't be able to look at documents in Web Direct

1  before the merger, meaning, we did not have access to

2  that system before the merger.

3      THE COURT:  I see.  Okay.

4  **Q.**  Do you still have access to MicroStrategy?

5  **A.**  Yes.

6  **Q.**  Okay.  So if you wanted to review the payment

7  history for this loan prior to the merger, could

8  access that payment history on MicroStrategy?

9  **A.**  Yes.

10  **Q.**  And did you access MicroStrategy to look at the

11  payment history for this borrower's loan before the

12  merger?

13  **A.**  I don't recall if I did or not.

14      MR. BODURTHA:  Okay.  Did I clarify the point,

15  your Honor?  I just want to make sure --

16      THE COURT:  Yes, I think you did.

17      MR. BODURTHA:  Okay.  Thank you.

18  **Q.**  Now, I want to go beyond the loan level and

19  borrower information with you, Mr. Handville.  Does

20  Ocwen presently have a software system where you can

21  search for documents that show the investor's

22  acquisition of the loans that Ocwen services?

23      MR. ENNIS:  Objection, your Honor.  There's no

24  servicing by Ocwen.

25      MR. BODURTHA:  Do you want me to rephrase and

1    that was paid.  Things like that.

2    **Q.**   What was the last tax amount paid?

3    **A.**   The 2021 taxes were paid in the amount of

4    $5,661.22.

5    **Q.**   Okay.  So Mr. Handville, is it your testimony

6    today, based upon a review of MSP, that the borrower's

7    loan is presently in default?

8    **A.**   Yes.

9    **Q.**   And it is in default based upon the borrower's

10   failure to make monthly mortgage loan payments; is that

11   accurate?

12   **A.**   Yes.

13   **Q.**   And based upon your review of the MSP records, the

14   last payment credited to the account is from 2010; is

15   that accurate?

16   **A.**   2011.

17   **Q.**   I'm sorry.  From 2011; is that accurate?

18   **A.**   Correct, yes.

19   **Q.**   Okay.  Now, turning away from the account history,

20   are you aware of documents a borrower will execute in

21   order to originate a mortgage loan?

22   **A.**   Yes.

23   **Q.**   And do the originating documents include a

24   promissory note?

25   **A.**   If the loan is granted, yes.

1    **Q.**   Okay.  Have you had the opportunity to review a

2    copy of the promissory note in this case?

3    **A.**   Yes, I have.

4    **Q.**   Okay.  And does that promissory note, a copy of

5    it, include the unredacted loan numbers at the top of

6    the agreement?

7    **A.**   Yes.

8    **Q.**   Okay.  Do you have an understanding of how

9    promissory notes are kept for loans once they're

10   deposited into trust?

11   **A.**   My understanding is that after the loans

12   originate, the originator holds on to the mortgage and

13   note until they have to be separated which is when they

14   send the mortgage off to be recorded, which is usually

15   right after the loan closes.  Once it comes back from

16   the county where it's recorded, they are joined

17   together and they are maintained until such time as the

18   loans are placed or sold.

19   **Q.**   Okay.  And what happens to the promissory note

20   while it is being maintained and then when it is sold?

21   **A.**   Well, shortly after closing, if not at closing,

22   the document is indorsed so that it can be placed into

23   a trust.

24   **Q.**   Okay.  And in your review of Exhibit C, does the

25   promissory note include an indorsement?

1    **A.**    The copy of the promissory note that I'm looking

2    at does include an allonge referencing the same loan

3    number and servicing ID.  It also contains the same

4    date on it.  And it makes reference to the note

5    referencing the loan number, the property address, the

6    loan amount.  And it's a blank indorsement by a Mary

7    Conway at Option One Mortgage Corporation.

8    **Q.**    So Mr. Handville, based upon your review of that

9    copy, you would agree with me that the promissory note

10    includes an indorsement by an allonge?

11          MR. ENNIS:  Objection; that's a legal question,

12    your Honor.  He can reference what he sees.  He can't

13    give an opinion as to whether or not that document

14    constitutes an indorsement.

15          MR. BODURTHA:  I'll rephrase.

16          THE COURT:  All right.  Rephrase.

17    **Q.**    Mr. Handville, in your experience, how would you

18    know that a promissory note includes an indorsement?

19    **A.**    In my experience, it could be indorsed by way of a

20    stamp, which is fairly common, usually on the signature

21    page, executed by the party that is doing the

22    assigning.  In some cases, it's to a particular entity.

23    In some cases, it's just blank.

24          In this case, this document bears a fourth page

25    which is captioned "Allonge to Note Investor," and it

1  makes reference to the subject loan.  And it says "Paid

2  to the Order of," which is blank without recourse.  And

3  it says "by" -- it says at the bottom "Option One

4  Mortgage Corporation," and it's signed by an assistant

5  secretary, a Mary Conway.

6  **Q.**  Is it your testimony, Mr. Handville, that the page

7  that you have just reviewed is the indorsement of the

8  promissory note?

9  MR. ENNIS:  Once again, your Honor, that's a

10  question for the Court to determine, not for a witness

11  to determine.

12  THE COURT:  All right.  He can testify what his

13  understanding is.  It's overruled.

14  THE WITNESS:  Yes.

15  **Q.**  Okay.  And I think you testified earlier that you

16  believe the indorsement is in blank; is that accurate?

17  **A.**  Yes.

18  **Q.**  Do you have an understanding of what it means if

19  an indorsement is made in blank?

20  **A.**  It's my understanding that it becomes a bearer

21  document made enforceable by the holder.

22  **Q.**  Do you have an understanding of the effect of a

23  bearer document?

24  **A.**  It doesn't identify a specific party, so if

25  somebody were to come into possession of the original,

1  they might be able to seek enforcement of it.

2  **Q.**   In other words, Mr. Handville, is it your

3  understanding that the entity that holds a note that's

4  been indorsed in blank has the right to enforce that

5  note?

6  **A.**   Yes.

7  **Q.**   Okay.  And let me ask you this.  In your

8  experience, have you had the opportunity to review the

9  contents of files that are kept and maintained with

10  promissory notes?

11  **A.**   Yes.

12  **Q.**   What is that file routinely called, in your

13  experience?

14  **A.**   In the industry, we refer to it as a "collateral

15  file," and it contains collateral-related documents.

16  **Q.**   Do you know why it's called a collateral file?

17  **A.**   It's just an industry standard.  It's been around

18  longer than I have in the business.  It is the file

19  that the original note, the original mortgage, and

20  other original origination or collateral-related

21  documents are maintained by the document custodian for

22  the trust.  Sometimes they have original title

23  policies.  They would have allonges or indorsements.

24  In some cases, there are Bailee Letters in there.

25  Various sorts of things like that.

1    **Q.**   In your experience, Mr. Handville, what is the

2    practice that PHH, and before at Ocwen, uses if a

3    collateral file containing the original promissory note

4    is transferred from one entity or person to another?

5    **A.**   Ocwen and/or PHH would, if it's requested by our

6    counsel for some reason, we would reach out to the

7    custodian and request it.  They would ship it to the

8    servicer.  And then the servicer would inventory it

9    into their system.  And then if they needed to ship it

10   out to counsel, they would do so via a Bailee Letter.

11   **Q.**   And Mr. Handville, in your review of -- sorry,

12   strike that.

13       Mr. Handville, have you reviewed a series of

14   Bailee Letters that are associated with this mortgage

15   loan?

16   **A.**   Yes.

17   **Q.**   And can you explain to the Court what your

18   understanding is of the transfer of the collateral file

19   through these Bailee Letters?

20   **A.**   The Bailee Letters are just -- it's a cover letter

21   that indicates it's a Bailee.  They are sending these

22   collateral documents.  And they usually outline what

23   they're sending.  And they specifically state that

24   we're sending this to you for, you know, the purposes

25   of you acknowledge acceptance and receipt.  And in many

1  cases the recipient will sign or initial at the bottom

2  the date received and send it back.

3  **Q.**  In your review of these Bailee Letters, Mr.

4  Handville, are you able to determine the last entity or

5  individual that received the original collateral file?

6      MR. ENNIS:  Objection, your Honor.  There's been

7  no showing that this is the original collateral file on

8  a loan that closed in 2003.

9      THE COURT:  All right.  You can inquire further

10  on that.  I'll overrule the objection.

11      You may answer that question.

12      THE WITNESS:  Could you repeat the question.

13  I'm sorry.

14  **Q.**  Are you able to determine from a review of the

15  Bailee Letters the last entity or individual that

16  received the original collateral file?

17      MR. ENNIS:  Once again, your Honor, same

18  objection.

19      THE COURT:  Okay.  I understand.  The objection

20  is overruled.  You may answer.

21      THE WITNESS:  Yes, the last party to receive it

22  according to the Bailee Letters that I looked at was

23  your firm.  You signed for it.

24  **Q.**  Okay.  And when?  Not that I want to make myself a

25  witness to this case, but when did I sign for that

1  Bailee Letter in the collateral file?

2  **A.**    Bear with me.  Let me pull it up.  It's Exhibit

3  KK.  May 10 of 2021.  Hang on.

4           This is a letter addressed from Korde &

5  Associates, who is the local foreclosure counsel, to

6  your attention at your firm.  And it says, "This is to

7  serve as a new Bailee Letter.  Confirm you received the

8  original collateral file."  And it says it contains the

9  following documents:  Recorded mortgage and original

10  note.

11  **Q.**    Okay.  So according to the records that you have

12  reviewed, the last person or entity that holds the

13  original collateral file with the original promissory

14  note is Hinshaw & Culbertson, counsel for U.S. Bank, as

15  Trustee.  Is that a fair statement?

16  **A.**    Yes.

17           MR. BODURTHA:  Your Honor, at this time I would

18  like to admit as an exhibit Exhibit C, which is the

19  redacted version of the promissory note.

20           MR. ENNIS:  Your Honor, I would object.  There

21  has been no showing -- they're trying to bring in a

22  series of Bailee Letters from 2013.  There's no

23  demonstration that this was the original closed

24  promissory note that was signed in July of 2003.

25  There's no chain whatsoever from 2003 until 2013.

1    There's a ten-year gap.  And they cannot demonstrate

2    through any of these whatsoever that Option One

3    transferred this to anybody, the custodian, whomever

4    the custodian was at the time, there's no indication

5    whatsoever that this is an original note.

6          THE COURT:  Well, hang on, hang on.

7          Didn't Mr. Shakoori testify that this is his

8    note?

9          MR. BODURTHA:  He did, your Honor.

10          MR. ENNIS:  He said it was his signature.  He

11    didn't state it was an original.

12          THE COURT:  I know.  I didn't ask if he stated

13    it was an original.  I think he testified that this

14    appeared to be a copy of the note that he signed,

15    right?

16          MR. ENNIS:  Yes.

17          MR. BODURTHA:  I also presented Mr. Shakoori the

18    original promissory note, and I have it available for

19    the Court to review and compare against Exhibit C if

20    your Honor would like to.

21          THE COURT:  All right.  So the only issue is

22    whether the Exhibit C is a true and accurate copy of

23    the original mortgage note in this case.

24          MR. ENNIS:  As well as the allonge, your Honor,

25    which they tried to attach with Exhibit C.

1      MR. BODURTHA:  Your Honor, I can present the

2   Court with the original note that has the allonge

3   attached to it.  My only request is that I can have it

4   back before the end of the day.

5      THE COURT:  Well, look, I haven't heard anything

6   that suggests to me that -- Mr. Ennis, if the allonge

7   is attached to the original and Mr. Bodurtha has

8   provided you with the original as well as this copy and

9   your client has indicated that this is, in fact, his

10   signature or a copy of his signature appears to be

11   accurate and he did indeed sign it, I don't have any

12   indication of anything you've said to me that suggests

13   to me that this is not a legitimate business record or

14   lacks in trustworthiness.

15      So unless you're telling me that there's

16   some -- you're making all sorts of illusions to things,

17   but if the allonge is attached to the original note, I

18   can't see what the issue is.

19      MR. ENNIS:  Your Honor, it had to have been

20   affixed to the note after my client signed the note.

21      THE COURT:  All right.  I think we talked about

22   this on the first day of trial.  Your argument really

23   had to do with whether it was stapled or no.

24      MR. ENNIS:  Whether it was stapled -- when was

25   it signed and when was it affixed to the note?

1    THE COURT:  All right.  You can make arguments

2    about that, but that doesn't go to the admissibility of

3    the document.  So Exhibit C will be admitted in full.

4         (Plaintiff's Exhibit C was admitted in full)

5         MR. BODURTHA:  Your Honor, I don't have any

6    further questions at this time subject to redirect.

7         THE COURT:  Okay.  Very good.  All right.

8         Go off the record for a minute.

9         (Off-the-record discussion)

10                   CROSS-EXAMINATION

11   BY MR. ENNIS:

12   **Q.**   Mr. Handville, can you hear me?

13   **A.**   Yes, sir.

14   **Q.**   Now, do you recall signing supplemental answers to

15   interrogatories in this case?

16   **A.**   I do remember that I did execute some.

17   **Q.**   And they were, in fact, executed on January 31st

18   of 2022; is that not correct?

19   **A.**   I believe that's correct.

20   **Q.**   I would ask you to look at -- do you have a copy

21   of those supplemental answers to interrogatories which

22   were attached to your deposition which was taken on

23   April 7th?

24   **A.**   Bear with me.  Hang on.  I'm opening up a zip file

25   to see if I can find it.  No, it's not there.

1            I, Lisa Schwam, CRR-RPR-RMR, do hereby

2   certify that the foregoing transcript is a correct

3   transcript prepared to the best of my skill, knowledge

4   and ability of the proceedings in the above-entitled

5   matter.

6

7   /S/ Lisa Schwam

8   <u>Lisa Schwam, CRR-RPR-RMR</u>        Date:
     Federal Official Reporter       May 2, 2022

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that the documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 3, 2024.

*/s/ Marissa I. Delinks*
Marissa I. Delinks