NO. 23-1475

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

U.S. BANK N.A., as Trustee for the Registered Holders of the Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11,

Plaintiff - Appellee,

v.

MASOUD SHAKOORI-NAMINY,

Defendant - Appellant,

BRENDA SHAKOORI-NAMINY; SAND CANYON CORPORATION; WILMINGTON TRUST, NA, as Successor Trustee to Citibank, N.A., as Trustee for Bear Stearns Second Lien Trust 2007-SV1, Mortgage-Backed Certificates, Series 2007-SV1; HERITAGE CONCRETE CORP.; FIREPLACE LLC; STEPHEN E. MOTTAU; HALLINAN CAPITAL CORPORATION; SAND CANYON CORPORATION,

Defendants

On Appeal from a Final Judgment Entered After an Opinion and Order Granting A Declaratory Judgment and denying a Motion in Limine and for Sanctions and a Motion to Alter and Amend Judgment
Entered in the United States District Court for the District of Rhode Island

### REPLY BRIEF OF APPELLANT
### MASSOUD SHAKOORI NAMINY

John B. Ennis                              September 11, 2024
Rhode Island Bar # 2135
Court of Appeals Bar # 47641
John B. Ennis, Esq.
1200 Reservoir Avenue
Cranston, RI 02920
Tel: (401)943-9230
Fax: (401)679-0035
Email: Jbelaw75@gmail.com

1

## **TABLE OF CONTENTS**

Table of Contents                                                    p. 2

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    p. 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    p. 3

Certification of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..    p.26

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..    p.27

## **TABLES OF AUTHORITIES**

## **CASES**

*Navarro Savings Asssn v. Lee,*  446 U.S. 458 (1980**)**          p. 5

*Americold Realty Trust v. Conagra Foods*, 136 S. Ct. 1012 (2016)     p. 4

*Lee v Navarro*,  597 F.2d 421, 425 (1979)                     p. 7

*Bullard* v. *Cisco,* 290 U. S. 179, 189 (1933)               p. 6

 *BRT Management, LLC v. Malden Storage, LLC,* 68 F.4th 691 (First Cir., 2023),
                                                              *p. 5, 6. 7*

*Pribus v Bush*, 118 Cal.App.3d 1003 (1981)                   p. 16

*Brook Village North Associates v. General Electric Company*, 686 F. 2d 66 (First Cir., 1982)                                          p.  10

*U.S. Bank Trust v. Jones*, 925 F. 3d 534 (1st Circuit, 2019).      P. 21

2

*United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992)          p. 21

*United States v. Vigneau*, 187 F.3d 70, 77 & n.6 (1st Cir. 1999)      p. 22

*FTC v. Direct Marketing Concepts, Inc.,* 624 F.3d 1, 16 n.15 (1st Cir. 2010) p. 21


<u>*Note Cap. Grp., Inc. v. Perretta*</u>, 207 A.3d 998, 1000 n.4 (R.I. 2019)      p. 13

*Pimentel v. Deutsche Bank National Trust Company*, 174 A.3d 740      p. 13
(R.I., 2017)

*Adams v. Madison Realty & Development, Inc.*, 853 F.2d 163, 166 (3d Cir. 1988)
                                                                        p. 15

*Duxbury v Roberts* 388 Mass 385, 446 NE2d 401(1983)          p. 15

*US Bank Trust National Assn v Phann,* 220 NE 3rd 1001
( Ohio App, 2023)                                          p. 16

STATUTES

R.I.G.L§ 6A-3-204                          p. 3, 13,16,17, 24, 24,25

New York's Uniform Commercial Code section U.C.C. § 3-202    p. 15, 16

ARGUMENT

THE APPELLEE NEVER ESTABLISHED THE EXISTENCE OF
DIVERSITY JURISDICTION

This Reply Brief of the Appellant Masoud Shakoori ("Shakoori") initially

addresses the crucial issue that the District Court lacked Jurisdiction to hear this

case. Appellant has filed a Motion to Remand on this basis. The Appellee hever complied with the original version of Fed. R. Civ. Pro. 7.1 or the amended version It has also never complied with the amended version of Fed. R. Civ. Proc. 7.1.

This Court in *BRT Management, LLC v. Malden Storage, LLC,* 68 F.4th 691 (First Cir., 2023),required a remand where there was no compliance with Amended Rule 7.1, Appellee has not provided the identity of any parties, including the Registered Certificate Holders on whose behalf this action was brought. In *BRT Management*, this Court cited *Americold Realty Trust v. Conagra Foods*, 136 S. Ct. 1012 (2016), in which the Supreme Court held that the citizenship of unincorporated associations are to be determined by their members:

Despite our oft-repetition of the rule linking unincorporated entities with their "members," we have never expressly defined the term. But we have equated an association's members with its owners or "`the several persons composing such association.'"

As the amended Rule 7.1 reflects, diversity jurisdiction turns on the citizenship of not just each party, but all individuals and entities attributable to each party. The Registered Holders of the Certificates must disclose the citizenship of their identity and state of domicile. No such disclosure has occurred in this case in the District Court. This Court in *BRT* noted the following diversity issues regarding trusts:

As the Supreme Court has explained, sometimes a trust is treated like an

unincorporated association, taking as its citizenship the citizenship of its members. Americold Realty Tr., 577 U.S. at 382, 136 S.Ct. 1012. In Americold, the Court attributed "confusion" regarding trust citizenship to "tradition," because "[t]raditionally, a trust was not considered a distinct legal entity, but a `fiduciary relationship' between multiple people," so "proceedings involving a trust were brought by or against the trustees in their own name[s]," and accordingly the trustees' citizenships were the ones that mattered. Id. at 383, 136 S.Ct. 1012. But because states "have applied the `trust' label to a variety of unincorporated entities" that can sue or be sued, those entities "possess[] the citizenship of all [their] members." Id. Many circuit courts have interpreted this language to mean that a "traditional" trust — one that "exists as a fiduciary relationship and not as a distinct legal entity" — takes the citizenship of its trustee, while a trust which does exist as a separate legal entity takes the citizenship of all its members. . . . To determine whether a trust is traditional, courts have looked to whether it can sue and be sued, and the extent to which it is otherwise treated as a juridical person under state law. . . . Defendants have not provided this information, thus precluding us from even trying to determine how to treat their trusts. Nor have defendants provided information about the trusts' beneficiaries or members (however defined) that might moot any need to determine whether it is necessary to look beyond the citizenship of 698*698 the trust or its trustees. *BRT Management* at pp.607-698.

The Appellee in its response to the Motion to Remand cited *Navarro Savings Asssn v. Lee,* 446 U.S. 458 (1980**)** for its contention that *Conagra* and *BRT* should be disregarded and that the only inquiry for diversity jurisdiction is the residence of U.S Bank National Association. It essentially contends that diversity based on the Trustee's residence can be established by a Trustee filing an action in a Federal Court. This assertion is contrary to *Navarro,* in which the Supreme Court affirmed the 5th Circuit which reversed the District Court for dismissing a case for lack of jurisdiction contending that the actual parties in interest were the

shareholders of the unincorporated association and not the trustees. The Supreme Court analyzed the diversity question in view of the powers of the trustees:

As early as 1808, this Court stated that trustees of an express trust are entitled to bring diversity actions in their own names and upon the basis of their own citizenship . . . In *Bullard* v. *Cisco,* 290 U. S. 179, 189 (1933), the trust beneficiaries were "numerous and widely scattered" investors who had conveyed certain bonds to a committee formed by a protective agreement. The agreement did not use trust terminology. Nevertheless, the Court held that the "rights, powers and duties expressly assigned" to committee members 464*464 "necessarily" made them trustees. *Ibid.* The agreement gave the committeemen "full title to the deposited bonds," and it defined "the control and power of disposal which the trustees were to have over them." *Ibid.* Refusing to analogize the committee to a collection agency, the Court concluded that "[t]he beneficiaries were not necessary parties and their citizenship was immaterial." *Id.,* at 190.[12]

*Bullard* reaffirms that a trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others.[13] The trustees in this case have such powers. At all relevant times, Fidelity operated under a declaration of trust that authorized the trustees to take legal title to trust assets, to invest those assets for the benefit of the shareholders, and to sue and be sued in their capacity as trustees. Respondents filed this lawsuit in that capacity. They seek damages for breach of an obligation running to the holder of a promissory note held in their own names. Fidelity's 9,500 beneficial shareholders had no voice in the initial investment decision. They can neither 465*465 control the disposition of this action nor intervene in the affairs of the trust except in the most extraordinary situations.[14]

We conclude that these respondents are active trustees whose control over the assets held in their names is real and substantial. That the trust may depart from conventional forms in other respects has no bearing upon this determination. Nor does Fidelity's resemblance to a business enterprise alter the distinctive rights and duties of the trustees.[15] There is no allegation of sham or collusion. See 28 U. S. C. § 1359; *Bullard* v. *Cisco, supra,* at 187-188, and n. 5. The respondents are not "naked trustees" who act as "mere conduits" for a remedy flowing to others.  . . . . They have legal title; they manage the assets; they control the litigation. In short,

6

they are real parties to the controversy. For more than 150 years, the law has permitted trustees who meet this standard to sue in their own right, 466*466 without regard to the citizenship of the trust beneficiaries. We find no reason to forsake that principle today.


The Fifth Circuit in *Lee v Navarro*, 597 F.2d 421, 425 (1979) had reviewed

the complaint and exhibits from the District Court complaint and found that the

trustees alone had extraordinary power with no power to the shareholders:

The allegations in the suit of plaintiffs, trustees of FMI, disclose that under Article III of the Declaration of Trust, "Trustees' Power," the trustees have the following general power (3.1):
The Trustees shall have, without other or further authorization, *full, absolute and exclusive power, control and authority over the Trust Estate* and of the business and affairs of the Trust, *Free from any power and control of the Shareholders,* to the same extent as if the Trustees were the sole owners of the Trust Estate in their own right, subject only to the limitations contained in this Declaration. The Trustees may do and perform such acts and things as in their sole judgment and discretion are necessary and proper for carrying out the purposes of the Trust or conducting its business and affairs. The enumeration of specific powers shall not be construed as limiting the exercise of general powers or any other specific power. Such powers of the Trustees may be exercised without order of or resort to any court.
(emphasis supplied)
Article III, "Specific Powers," (3.2r) of the Declaration provides that the powers of the trustees shall include the power "[t]o collect, sue for and receive all sums of money coming due to the Trust, and to prosecute, join, defend, compromise, abandon, or adjust, and actions, suits, claims, demands or other litigation relating to the Trust, the Trust Estate or the Trust's affairs."
Article I of the Declaration of Trust (1.1) states in part that "the Trustees shall conduct and transact the activities of the Trust, make and execute all documents and instruments and sue and be sued in the name of the Trust or in their names as Trustees of the Trust."
A careful review of the Declaration of Trust, as indicated above, amply supports plaintiffs' contention that as trustees of FMI they are the real parties at interest,

exclusively entitled to enforce the rights at issue in this case. In addition to the powers already enumerated, plaintiffs as trustees have absolute power to invest the capital and funds of the trust, to lend money, and to possess and exercise the rights incident to the ownership of mortgage loans. *See* Declaration of Trust, Article 3.2(a), (b), (c), (g) and (k). Article IV states that the trustees are "responsible for the general policies of the Trust and for such general supervision of the business of the Trust conducted by officers, agents, employees, investment advisers or independent contractors of the Trust as may be necessary to insure that such business conforms to the provisions of this Declaration."

On the other hand, the shareholders' rights are extremely limited, since they are entitled only to the rights of equitable interest owners or beneficiary shareholders, without any powers of control or management whatsoever. For example, Article 6.2, "Rights of Shareholders," in the Declaration reads in pertinent part as follows: The Shareholders shall have no legal right, title or interest in or to the Trust Estate and shall have no right to a partition thereof during the continuance of the Trust. Shareholders shall, however, be the equitable beneficiaries of the Trust, but shall have only the rights provided for in this Declaration and in the Trustees' Regulations. Except with respect to matters in which the Shareholders are specifically given the right to vote by this Declaration, no action taken by 425*425 the Shareholders at any meeting shall in any way bind the Trustees.

This was a factual finding from the pleadings in the District Court, in which the District Court had dismissed for lack of diversity. The 5th Circuit analyzed the relative powers of the Trustee and the shareholders. No such analysis was made by the District Court in this case and no evidence was presented in the District Court which established any powers of U.S. Bank, which would indicate that U.S. Bank possesses the same powers as the trustees in *Navarro*.

On the contrary the Trust Agreement, not a Pooling and Servicing Agreement, establishes extraordinary power in the Master Servicer, who was appointed by the Certificateholders in Section 9.01:

Duties of the Master Servicer.
The Certificateholders, by their purchase and acceptance of the Certificates, appoint Aurora Loan Services Inc., as Master Servicer. For and on behalf of the Depositor, the Trustee and the Certificateholders, the Master Servicer shall master service the Mortgage Loans in accordance with the provisions of this Agreement and the provisions of each Servicing Agreement. Notwithstanding anything in this Agreement, any Servicing Agreement or any Credit Risk Management Agreement to the contrary, the Master Servicer shall have no duty or obligation to enforce any Credit Risk Management Agreement or to supervise, monitor or oversee the activities of any Servicer under its Credit Risk Management Agreement with respect to any action taken or not taken by a Servicer at the direction of the Seller or pursuant to a recommendation of the Credit Risk Manager.


The trustee in this case, unlike *Navarro* received limited powers as indicated in

Section 6.01 of the Trust Agreement:

Duties of Trustee and Securities Administrator .

The Trustee, except during the continuance of an Event of Default, and the Securities Administrator, undertake to perform such duties and only such duties as are specifically set forth in this Agreement. Any permissive right of the Trustee or the Securities Administrator provided for in this Agreement shall not be construed as a duty of the Trustee or the Securities Administrator. If an Event of Default has occurred and has not otherwise been cured or waived, the Trustee or the Securities Administrator shall exercise such of the rights and powers vested in it by this Agreement and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs, unless the Securities Administrator is acting as Master Servicer, in which case it shall use the same degree of care and skill as the Master Servicer hereunder. . .

Neither the Trustee nor the Securities Administrator shall have any liability arising out of or in connection with this Agreement, except for its negligence or willful misconduct. Notwithstanding anything in this Agreement to the contrary, neither the Trustee nor the Securities Administrator shall be liable for special, indirect or consequential losses or damages of any kind whatsoever (including, but not limited

to, lost profits).  No provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; *provided, however,* that:

(i)

Neither the Trustee nor the Securities Administrator shall be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates as provided in Section 6.18 hereof;

. . .

(d)

**The Trustee shall have no duty hereunder with respect to any complaint, claim, demand, notice or other document it may receive or which may be alleged to have been delivered to or served upon it by the parties as a consequence of the assignment of any Mortgage Loan hereunder; *provided, however,* that the Trustee shall promptly remit to the Master Servicer upon receipt any such complaint, claim, demand, notice or other document (i) which is delivered to the Corporate Trust Office of the Trustee and makes reference to this series of Certificate or this Agreement, (ii) of which a Responsible Officer has actual knowledge, and (iii) which contains information sufficient to permit the Trustee to make a determination that the real property to which such document relates is a Mortgaged Property.**

(emphasis added)

(e)

Neither the Trustee nor the Securities Administrator shall be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of any NIMS Insurer or the Certificateholders of any Class holding Certificates which evidence, as to such Class, Percentage Interests aggregating not less than 25% as to the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Securities Administrator or exercising any trust or power conferred upon the Trustee or the Securities Administrator, as applicable, under this Agreement.

(f)

Neither the Trustee nor the Securities Administrator shall be required to perform services under this Agreement, or to expend or risk its own funds or otherwise incur financial liability for the performance of any of its duties hereunder or the exercise of any of its rights or powers if there is reasonable ground for believing that the timely payment of its fees and expenses or the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it, and

none of the provisions contained in this Agreement shall in any event require the Trustee or the Securities Administrator, as applicable, to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer or any Servicer under this Agreement or any Servicing Agreement except during such time, if any, as the Securities Administrator shall be the successor to, and be vested with the rights, duties, powers and privileges of, the Master Servicer in accordance with the terms of this Agreement.

(g)

The Trustee shall not be held liable by reason of any insufficiency in the Collection Account resulting from any investment loss on any Eligible Investment included therein (except to the extent that the Trustee is the obligor and has defaulted thereon).

Contrary to the limited power of the Trustee, which must present any claims

and litigation to the Master Servicer, 50% of the Certificateholders possess the

power to remove the Trustee as indicated in Section 6.06 (c):

The Holders of more than 50% of the Class Principal Amount (or Percentage Interest) of each Class of Certificates (or any NIMS Insurer in the event of failure of the Trustee or Securities Administrator, as applicable, to perform its obligations hereunder) may at any time upon 30 days' written notice to the Trustee or the Securities Administrator, as applicable, and to the Depositor remove the Trustee or the Securities Administrator, as applicable, by such written instrument, signed by such Holders or their attorney in fact duly authorized (or by any NIMS Insurer), one copy of which instrument shall be delivered to the Depositor, one copy to the Trustee, one copy each to the Master Servicer and any NIMS Insurer; the Depositor shall thereupon appoint a successor trustee or successor securities administrator, as applicable, in accordance with this Section mutually acceptable to the Depositor, the Master Servicer and any NIMS Insurer.

Similar power to the Certificateholders is provided in Section 6.09(b)(iv):

the Trustee or the Certificateholders evidencing more than 50% of the Aggregate Voting Interests of the Certificates may at any time accept the resignation of or

remove any separate trustee, co trustee or custodian, so appointed by it or them, if such resignation or removal does not violate the other terms of this Agreement. Section 6.18 provides significant power to the Certificateholders:

Directions by Certificateholders and Duties of Trustee During Event of Default. Subject to the provisions of Section 8.01 hereof, during the continuance of any Event of Default, Holders of Certificates evidencing not less than 25% of the Class Principal Amount (or Percentage Interest) of each Class of Certificates affected thereby may, with the consent of any NIMS Insurer, direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement; *provided, however,* that the Trustee shall be under no obligation to pursue any such remedy, or to exercise any of the trusts or powers vested in it by this Agreement (including, without limitation, (i) the conducting or defending of any administrative action or litigation hereunder or in relation hereto and (ii) the terminating of the Master Servicer or any successor master servicer from its rights and duties as master servicer hereunder) at the request, order or direction of any of the Certificateholders or any NIMS Insurer, unless such Certificateholders or any NIMS Insurer shall have offered to the Trustee reasonable security or indemnity against the cost, expenses and liabilities which may be incurred therein or thereby; and, provided further, that, subject to the provisions of Section 8.01, the Trustee shall have the right to decline to follow any such direction if the Trustee, in accordance with an Opinion of Counsel acceptable to any NIMS Insurer, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith determines that the action or proceeding so directed would involve it in personal liability for which it is not indemnified to its satisfaction or be unjustly prejudicial to the non assenting Certificateholders.

Thus unlike *Navarro*, the certificateholders of this Trust possess significant power over the Trustee and Master Servicer and the Securities Administrator. Upon litigation, the Trustee must contact the Master Servicer to take action and cannot take legal action on its on behalf. Thus a Remand to the District Court to determine the identity and state of residence is necessary to determine whether the

District Court ever possessed jurisdiction and to compel  compliance with Fed R

Civ Pro. 7.1.

THE DISTRICT COURT'S ANALYSIS OF R.I.G.L. 6A-3-204  DID NOT
COMPLY WITH RHODE ISLAND LAW

The Appellant  never conceded that the "allonge" was affixed to the note and

that as a result there was compliance with R.I.G.L. 6A-3-204, which along with

Rhode Island Supreme Court interpretation make it clear that the signature to

endorse a note must be made on the instrument or on a paper affixed to the

instrument, which is commonly called an allonge, which had  to be affixed to the

instrument before  the endorsement signature was made to transfer the note by

negotiation.. This statute cannot be more clear in specifying this requirement that

an indorsement must be on the instrument or on a paper affixed to the instrument:

The District Court and the Appellee ignore *Note Capital Group. Inc.  v*

*Perretta,*  207 A. 3d 998, 1000 n.4 (R.I., 2019). In this case and two other Rhode

Island cases, the Supreme Court referenced an allonge by its definition in Black's

Law Dictionary:


An allonge is "[a] slip of paper sometimes attached to a negotiable
instrument **for the purpose of receiving further indorsements** when the original
paper is filled with indorsements." Note Cap. Grp., Inc. v. Perretta, 207 A.3d 998,
1000 n.4 (R.I. 2019) (quoting Black's Law Dictionary 92 (10th ed. 2014)).

The Supreme Court had made the same analysis in *Pimentel v. Deutsche Bank National Trust Company,* 174 A.3d 740 (R.I., 2017), stating:

[4] "An `allonge' is `[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements.'" *Moura,* 90 A.3d at 853 n. 1 (quoting *NV One, LLC v. Potomac Realty Capital, LLC,* 84 A.3d 800, 803 n. 4 (R.I. 2014) and Black's Law Dictionary 88 (9th ed. 2009)).

In all of these cases the Rhode Island Supreme Court clearly defined allonge as a paper attached to a negotiable instrument for the purpose of receiving further endorsements when the original paper is filled with indorsements. The term :"for the purpose of receiving further endorsements" speaks of an indorsement to be made after a paper had been affixed to the note in a previous time. *Shakoori* made this argument at trial which was rejected by the Trial Court. The crucial analysis of this Court should be that an indorsement must be on the instrument, whether the instrument itself or on a paper which is affixed to the instrument for the purpose of receiving further indorsements.

Appellants cited New York law, which according to the Trust Agreement governs this Trust as indicated by Section 11.06, Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND

THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES
HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH
LAWS.

Thus analysis of New York's Uniform Commercial Code section U.C.C. §
3-202 should be considered.     The operative section of New York's UCC (cited
as CLS UCC § 3-202(2)) requires indorsement on the instrument itself "or on a
paper so firmly affixed thereto as to become a part thereof" in order to effectuate a
valid assignment of the entire instrument."[1]

In *Duxbury v Roberts* 388 Mass 385, 446 NE2d 401(1983), , the Court held:

To have a negotiation of an instrument payable to order, the instrument must be
delivered with any necessary indorsement. G.L.c. 106, § 3-202 (1). "An
indorsement must be written by or on behalf of the holder and on the instrument or
on a paper so firmly affixed thereto as to become a part thereof." G.L.c. 106, § 3-
202 (2), as appearing in St. 1957, c. 765, § 1. In this case Baines did not sign the
note when he transferred it to Duxbury. Rather, he signed only the document
entitled, "Partial Assignment of Note and Mortgage." His signing of this document
does not constitute an indorsement of the note because it was not "so firmly affixed
thereto as to become a part thereof." Therefore, Duxbury did not become a holder
or a holder in due course.

This indicates that the paper/allonge must be affixed to the note when the
endorsement is made.

Appellee also disregarded *Adams v. Madison Realty & Dev., Inc.,* 853 F.2d
163, 168 (3d Cir. N.J. 1988) the Third Circuit held:

"the unanimity of the courts in cases where the signature is separate from the instrument can be explained by a judicial perception that it is sound policy to require the indorsement to be on the instrument.

In *Madison,* The Court noted:

The district court acknowledged that the use of a separate, unattached sheet of paper to carry the indorsements failed to comply with Uniform Commercial Code section 3-202(2), which reads: "An indorsement **must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof.**" Conn.Gen.Stat.Ann. § 42a-3-202(2) (West 1987); N.H.Rev.Stat.Ann. § 382-A:3-202(2) (1961); N.J.Stat.Ann. § 12A:3-202(2) (West 1962). (Emphasis added)

This was and remains the uniform analysis of either UCC 3-204 or the previous 3-202 in New York and other states and the Third Circuit  properly interpreted the UCC requirement that the endorsement must be written on a paper affixed to the note to thereby become a part of the note. New York has the firmly affixed provision of the former section of the UCC, which Rhode Island at one time had. There is no distinction in Rhode Island commercial law between firmly affixed or affixed as the requirement of the paper having to be affixed to the insrument when the signature on the paper/allonge is made.

The Appellee disregarded *US Bank Trust National Assn v Phann,* 220 NE 3rd 1001( Ohio App, 2023), in which the  Court made   a similar analysis of an allonge as affixed to a negotiable instrument for the purpose of receiving futher indorsements. It and the District Court ignored the sound analysis which was made

16

by these Courts and the California Court of Appeals in *Pribus v Bush*, 118

Cal.App.3d 1003 at note 7 (1981):

We believe that inherent in the rationale underlying the majority rule is the concern for preventing fraud. An allonge, even though "so firmly affixed ... as to become a part" of the instrument, may be detached more easily than an indorsement on the instrument itself may be removed. Additionally**, a person's signature, innocently made upon an innocuous piece of paper, could be fraudulently attached to a negotiable instrument as a purported indorsement.** The majority rule, while not eliminating these methods of fraud, certainly reduces the opportunities for their use. (emphasis added).

These cases and all the UCC versions in the country refer to the necessity of

indorsements to be made on promissory notes or on papers(referred to as allonges)

affixed (or in some states firmly affixed) to the note.   The simple language of the

Rhode Island, New York (and other) statutes indicates that the endorsement is an

action taken to transfer the note by negotiation pursuant to UCC 3-204.   The

signature which reflects this action must be on the note, which is easy to prove.

This case however involved the second part of the statute, namely that the

endorsement can only be made on a paper affixed to the note/instrument.  The

statute in no way contemplates that negotiation can be effective if a signed allonge

is later affixed to the note.   There is no language in the UCC which permits

negotiation and transfer in this manner. Thus the Trial Court seriously erred in

finding that the Appellee was the holder of the note.

17

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING US BANK TO PRESENT EVIDENCE CONTRARY TO FACTS ESTABLISHED BY US BANK'S FAILURE TO RESPOND TO REQUEST FOR ADMISSIONS

The Admissions deemed admitted do not relate solely to the assignment of the mortgage, as suggested by the District Court. The following admissions were not considered by the District Court:

7. No entity with the name of Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11has ever existed.

8. La Salle Bank, National Association was never the trustee for Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

29. La Salle Bank as Trustee never purchased Defendant's note from Sand Canyon at any time.

30. La Salle Bank as Trustee did not provide any consideration for Defendant's mortgage to Sand Canyon on July 15, 2011.

35. La Salle Bank National Association did not exist as an entity on February 22, 2013.

36. La Salle Bank National Association merged with Bank of America, N.A. on October 17, 2008.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

relief be granted:

(2) Declaratory Judgment equitably assigning the Mortgage to U.S. Bank  nunc pro

tunc as of October 1, 2003, or alternatively as of December 15, 2008 or

alternatively as of February 22, 2013.


The case law is clear that Plaintiff cannot undo these admissions, which

relate to the note and the existence of the purported trust. This Court held that these

admissions bind the Plaintiff in  *Brook Village North Associates v. General*

*Electric Company*, 686 F. 2d 66 (First Cir., 1982)  cited previosulsy when a party

sought to withdraw an admission prior to trial. No such Motion to Withdraw the

Admission was made in this case. The Appellant  raised this issue on the first day

of trial as indicated by the Transcript:

And I would specifically present to the Court Request for Admission Number Seven which states that no entity within the name of Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 has ever existed. That is an established fact which is the name of the plaintiff in this case which is seeking relief.

Request for Admission Eight, which is a fact accepted as true, deemed true, pursuant to Federal Rule of Civil Procedure 36, is that LaSalle Bank National Association was never the trustee for Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

Request for Admission Forty, which is deemed admitted, which is very crucial: U.S. BankNational Association was never a trustee for any entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

And Request for Admission Number Four, there is no such entity named Structured Asset Investment Loan Trust,Mortgage Pass-Through Certificates, Series 2003-BC11.

These admissions were conclusive facts which could not be rebutted at trial by its attorney simply asking the Court to not consider these facts because he claimed they were not true.

## THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING EVIDENCE PROPOUNDED BY APPELLEE THROUGH ITS WITNESS HOWARD HANDVILLE

The District Court did not apply the standard for hearsay and the business records exception set forth in U.*S. Bank Trust v. Jones*, 925 F. 3d 534 (1st Circuit, 2019). *Jones* mandates that the testimony of Howard Handville did not verify anything about the boarding or the verification of the records of Homeward Residential (formerly American Home Mortgage Servicing, Inc., ) This witness could not explain how the records of Homeward/AHMSI regarding this loan were

confirmed and verified by Ocwen when servicing was transferred. He could not

explain how the records of American Home Mortgage were confirmed and verified

by AHMSI when servicing was transferred. He could not explain how the records

of Ocwen and its RealServicing electronic system of record, were confirmed and

verified when PHH took over servicing of Ocwen and transferred the records from

Ocwen's servicing platform to its own servicing platform. This testimony did not

satisfy the requirements of *Jones*, in which the records were admissible because the

servicer employee relied on the accuracy of the mortgage history and took

measures to verify the same and the servicer incorporated the previous servicer's

records into its own database and place its own financial interests at stake by

relying on those records and that is took steps to review the previous servicer's

records in a way that assured itself of the accuracy of those records. *Jones* at p.538.

No such testimony was presented in this case and no reference was made to

the verification or the procedures followed to verify accuracy when the records

were purportedly integrated. In *Jones* , this Court held:

Thus, we have affirmed the admission of business records containing third-party
entries without third-party testimony where the entries were **"intimately
integrated"** into the business records, FTC v. Direct Marketing Concepts, Inc., 624
F.3d 1, 16 n.15 (1st Cir. 2010), or where the party that produced the business
records **"relied on the [third-party] document and documents such as those[]**

**in his business**," United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992) (internal quotation marks omitted). Conversely, in the absence of third-party evidence, **we have rejected the admission of business records containing or relying on the accuracy of third-party information integrated into the later record where, for example, the later business did not "use[] a procedure for verifying" such information, lacked a "self-interest in assuring the accuracy of the outside information,**" United States v. Vigneau, 187 F.3d 70, 77 & n.6 (1st Cir. 1999) (emphasis omitted), or sought admission of third-party statements made "by a stranger to it," Bradley, 891 F.3d at 35 (quoting Vigneau, 187 F.3d at 75 (alterations omitted)). The key question is whether the records in question are "reliable enough to be admissible." Direct Marketing Concepts, 624 F.3d at 16 n.15..

The Court reviewed the testimony of the trial witness and noted:

In answering that question, we are mindful that the "**reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation**." Fed. R. Evid. 803 advisory committee's note to 1972 proposed rules. The rule seeks "to capture these factors and to extend their impact" by applying them to a "regularly conducted activity." Id (emphasis added).

Handville's base formulaic recitation of the  business exception to the hearsay rule had no factual basis.  He could not verify the accuracy of any records as per this testimony. He could not authenticate the note and allonge. He testified he indicated that his answer to interrogatory 14 was accurate indicating that the allonge was dated July 16, 2003 (App. p 371). He also stated:

And do you have any information which indicates that the signed promissory note was in the possession of Option One on July 16, 2003.

A. I don't   (App p. 372)

Thus there is testimony that the allonge was dated July 16, 2003, the date that the note was signed, even though the allonge was not affixed to the note on that date. He had no idea when the note was placed in the collateral file:

1      **Q.**     So you have no idea what was in the collateral
2             file when you signed that answer; isn't that correct?
3      **A.**     I had an idea.
4      **Q.**     Well, you had not seen it; isn't that correct?
5      **A.**     Yes.
6      **Q.**     And you didn't know if the original note was in
7             that file; isn't that correct?
8      **A.**     I had not seen any indication that it was missing and my
              counsel had talked to  confirm its

1      whereabouts, so I'm comfortable with that answer. . . **Q.**
              Okay.  Now, when did this note leave the

2      possession of Option One?
3      **A.**     I don't know. (App p. 375-376)

Evidence was presented that the closing attorney possessed the note and the allonge was not signed or affixed to the note on July 16, 2003, contrary to

23

R.I.G.L. 6A-3-20 and the allonge was not a paper affixed to the instrument when it was signed. US Bank demonstrated failure to conform with the UCC. The Trial Court erred by admitting the note and allonge without testimony that the allonge was affixed to the instrument when it was signed.

## THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING COPIES OF DOCUMENTS CONTRARY TO THE BEST EVIDENCE RULE, FRE 1002

The Appellant's brief and transcript established that because Howard Handville could not identify any original documents admitted into evidence, that the Trial Court erred and FRE 1002 was not satisfied, nor the standard set forth by this Court in *Jones.* The Trial Court erred by admitting these documents and Handville's testimony should have been disregarded. The Trial Court's admission of all these exhibits without foundational testimony constituted reversible error.

## THE DENIAL OF THE MOTION TO ALTER/AMEND JUDGMENT CONSTITUTED REVERSIBLE ERROR

The Appellant moved pursuant to Fed R Civ Pro 59 to alter or amend the Judgment. In this Motion Appellant presented facts from an analogous case, *Haggerty v PHH Mortgage* in which Option One had

similarly provided the attorney for the closing an allonge prior to the borrowers signing the note, corroborating with Appellant's argument in this case regarding the UCC 3-204's requirement that indorsements had to be on the instrument or on a paper affixed to the instrument. This evidence of pattern and practice of Option One was disregarded by the District Court.

## CONCLUSION

For these reasons, the Judgment of the Trial Court should be reversed and the complaint dismissed. The Appellant did not comply with either the original of or the amended version Fed R Civ Pro 7.1 and did not establish any basis for diversity jurisdiction, which must be addressed before any this Court even considers this appeal. Without Jurisdiction, Appellee's demand for relief could not have been considered by the District Court. The Appellant has cited the other bases for this Appeal and respectfully requests that this Court remand the case for noncompliance with Rule 7.1 and alternatively to reverse for the reasons stated in this Reply Brief and the initial Brief.

September 11, 2024

<div style="margin-left: 50%;">
Respectfully Submitted,
APPELLANT-DEFENDANT
MASOUD SHAKOORI-NAMINY
By his Attorney
/s/ John B. Ennis
JOHN B. ENNIS, ESQ. #2135
1200 Reservoir Avenue
Cranston, Rhode Island 02920
(401) 943-9230
jbelaw75@gmail.com
</div>

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contain 6453 words, excluding the parts of the brief exempted by Fed. App. P. 321(a)(7)(B)(iii).

2.      This brief complies the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionality spaced typeface- using 14 pt Times New Roman.

/s/ John B. Ennis. Esq.

## CERTIFICATION OF SERVICE

I hereby certify that a copy of this brief was served by electronic filing and by email on September 11, 2024

/s/ John B. Ennis, Esq.